MATTHEW J. LOMBARD (SBN 239910)
Law Offices of Matthew J. Lombard
11400 W. Olympic Blvd., Suite 1500
Los Angeles, California 90064
Telephone (424) 371-5930
Facsimile (310) 392-9029
Email: mlombard@lombardlaw.net

BRUCE A. ZUCKER (SBN 170331)
Kravis, Graham & Zucker, LLP
26565 Agoura Road, Suite 200
Calabasas, California 91302
Telephone (310) 975-7040
Email: bruce@kgzlaw.net

Attorneys for Defendant
MICHAEL R. HARRIS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL R. HARRIS,<br><br>Defendant.<br>_____ ) | Case No. CR 88-972-TJH-6<br><br>DEFENDANT'S MOTION TO REDUCE SENTENCE PER 18 U.S.C. §3582(c)(1)(A) |

Defendant MICHAEL R. HARRIS, by and through his undersigned counsel, respectfully submits this memorandum of law (and the attached exhibits) in support of his motion, pursuant to 18 U.S.C. §3582(c)(1)(A), for entry of an Order reducing his 235-month sentence (of which he already has served 30 years) to time served.

///
///

1

Date:  April 27, 2020                          Respectfully submitted:

                                   By      */s/Matthew J. Lombard*
                                           MATTHEW J. LOMBARD
                                           Law Offices of Matthew J. Lombard


                                   By      */s/Bruce Zucker*
                                           BRUCE ZUCKER
                                           Ahrony, Graham & Zucker, LLP

                                           Attorneys for Defendant
                                           MICHAEL HARRIS

# TABLE OF CONTENTS

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.  OVERVIEW: COMPELLING GROUNDS EXIST TO
     IMMEDIATELY GRANT INMATE MICHAEL HARRIS'
     MOTION FOR RELEASE UNDER 18 U.S.C. §3582(c)(1)(A) . . . . . . . . . . 2

III.  PERSONAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.  *Formative Years -- Seeds Planted.* . . . . . . . . . . . . . . . . . . . . . . . 6

     B.  *Seeds Sprouting.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.  *The Businessman* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

     D.  *Blind Ambition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

     E.  *Transformation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     F.  *Fatherhood.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

     G.  *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.  FACTUAL AND PROCEDURAL BACKGROUND AND
      HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

     A.  *Distinguishing the Two Undischarged California State*
         *Sentences at the Time the Instant Federal Sentence*
         *was Imposed.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

         1.  State Underlying Offense Conduct. . . . . . . . . . . . . . . . . . . . 30

     B.  *Federal Case.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

         1.  Federal Underlying Offense Conduct . . . . . . . . . . . . . . . . . .34

         2.  Mr. Harris' Removal from California State Prison
             Into Federal Custody to Face His Federal Indictment . . . . . . . . 38

         3.  Mr. Harris' Plea Negotiations and Trial . . . . . . . . . . . . . . . 39

         4.  The United States Probation Officer's Calculation
             of Mr. Harris' Guidelines Offense Level For His
             Narcotics-Related Convictions . . . . . . . . . . . . . . . . . . . . .39

i

5.   The U.S. Probation Office's Calculation of Mr. Harris' Guidelines Offense Level Adjustment for Role in the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

6.   The Probation Office's Computation of Mr. Harris' Criminal History Category . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

7.   Mr. Harris' Sentencing Hearing on November 26, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

8.   Mr. Harris' Federal Direct Appeal . . . . . . . . . . . . . . . . . . . . . 42

9.   Mr. Harris' Other Post-Conviction Litigation. . . . . . . . . . . . . 42

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

V.   THIS COURT HAS THE AUTHORITY TO REDUCE MR. HARRIS SENTENCE TO TIME SERVED PURSUANT TO 3582(c)(1)(A)(i) FOR EXTRAORDINARY AND COMPELLING REASONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A.   Congress Intended to Empower District Courts to Reduce Sentence Based on "Extraordinary and Compelling Reasons" Other Than Medial Condition, Age and Family Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B.   The U.S. Sentencing Commission has Indicated that the "Extraordinary and Compelling Reasons" Upon Which a Sentence Reduction Pursuant to 18 U.S.C. §3582(c)(1)(A) May Be Based are Not Limited to Medical Condition, Age and Family Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

C.   The First Step Act Authorizes Federal Courts to Reduce Sentences Based on Virtually Any "Extraordinary and Compelling Reasons". . . . . . . . . . . . . . . . . . . . . 52

VI.   MR. HARRIS HAS EXHAUSTED HIS ADMINISTRATIVE
      REMEDIES FOR THE FILING OF AN 18 U.S.C.
      §3582(c)(1)(A) SENTENCE REDUCTION MOTION
      DIRECTLY WITH THIS COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

VII.  EXTRAORDINARY AND COMPELLING REASONS
      SUPPORT THE REDUCTION OF MR. HARRIS' 235-
      MONTH SENTENCE TO TIME SERVED . . . . . . . . . . . . . . . . . . . . . . . .57

      A.   *Mr. Harris is Remorseful, Contrite, and Accepts*
           *Full Responsibility for His Criminal Conduct* . . . . . . . . . . . . . . . . . . 59

      B.   *Mr. Harris is Fully and Unconditionally Rehabilitated* . . . . . . . . . . .63

      C.   *Mr. Harris has Been a Recognized Leader and*
           *Innovator During His Three Decades of Incarceration*. . . . . . . . . . . 69

      D.   *Peace, Reconciliation, Transformation, and Redemption*. . . . . . . . . .95

      E.   *Prison Officials' Assessment of Mr. Harris' Extraordinary*
           *Rehabilitation*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

      F.   *California State Board Granted Mr. Harris Parole*
           *in 2011 after Finding Him Suitable for Early Release.*
           *Mr. Harris was Discharged from Parole in 2012* . . . . . . . . . . . . . . .102

      G.   *Mr. Harris Continued His Engagement with Programming*
           *after He was Transferred to Federal Custody* . . . . . . . . . . . . . . . . . . 104

      H.   *Facts Discovered Post-Sentencing Provide Credible*
           *Evidence Mr. Harris was Actually Innocent in His*
           *Now Discharged California State Case No. A954503* . . . . . . . . . . . 106

      I.   *Concurrent vs. Consecutive* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

1.    <u>If the Sentencing Judge Had Known of Mr.</u>
<u>Lester's Perjured Testimony that was Used to</u>
<u>Convict Mr. Harris in His State Cases, It is</u>
<u>Reasonable to Conclude He Would Have</u>
<u>Imposed a Concurrent Sentence Instead of</u>
<u>a Consecutive Sentence</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

2.    <u>The Sentencing Court's Intent in Running Mr.</u>
<u>Harris' Federal Sentence Consecutive to the</u>
<u>Determinate Three-Year State Term Rather</u>
<u>Than the 25-To-Life Indeterminate Term</u> . . . . . . . . . . . . . . . .116

3.    <u>The Federal Judge's Sentencing Order was</u>
<u>Improperly Executed to Run Consecutive</u>
<u>to the Wrong State Sentence</u> . . . . . . . . . . . . . . . . . . . . . . . . .118

J.    *The Drug Quantity Determination that Drove Mr.*
*Harris' Lengthy Federal Sentence is Subject to*
*Re-Assessment Due to Appeals Court Determinations*
*Subsequent to the Original PSR and Other Factors* . . . . . . . . . . . . .137

K.    *The Government's Improper Plea Bargain Negotiations*
*Tactics Violated DOJ Policy and Precipitated Mr.*
*Harris Going to Trial for which He is Serving a*
*235-Month Sentence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

L.    *Mr. Harris' Jury was Provided with Improper Jury*
*Instructions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

M.    *The Sentencing Court Erred by Not Addressing Mr.*
*Harris' Objection to the Factual Inaccuracies*
*Concerning the Offense Level Role Adjustment*
*at Sentencing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .141

N.   *Continuation of Mr. Harris' Sentence Would Precipitate a Circumstance of Unwarranted Sentencing Disparity* . . . . . . . . . . . 144

O.   *The COVID-19 Coronavirus Could Prove Deadly for Mr. Harris Due to His Guillain-Barré Syndrome* . . . . . . . . . . . . . . . .145

    1.   Why Mr. Harris' Documented Health Condition of Guillain-Barré Syndrome Magnifies His Risk of Contracting and Dying From the COVID-19 Coronavirus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .145

    2.   Mr. Harris' Ability to Avoid Contracting and Dying From the COVID-19 Coronavirus is Made Impossible By the Overcrowding in His Housing Unit at Lompoc FCI Prison, His Inability to Maintain Social Distancing in That Prison Setting, and the Continual Coming And Going of 15 to 30 Prison Staff In and Out of His Housing Unit Each Day Without Masks Or Any Other Protective Gear, Place Mr. Harris Squarely in the Path of the Contagion . . . . . . . . . . . . . . . . . . . . . . . . . . . . .148

    3.   Specific Conditions in Mr. Harris' Dormitory are Exactly What the COVID-19 Coronavirus Needs to Spread Rapidly and Infect All Inmates in the Dormitory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

    4.   The Response of the Bureau of Prisons . . . . . . . . . . . . . . . . . 151

    5.   Conditions at the Lompoc Prison Complex Create a "Perfect Circle Of Contamination and Infection" Between the Prison and the Outside Community, Exacerbating the Infection Rate for Both . . . . . . . . . . . . . . . .153

6. Attorney General Barr has Recognized the Need for the BOP to Release Vulnerable Prisoners Immediately . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

7. Eighth Amendment Protects Inmates Against Future Harm to Health Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

VIII. EMERGENCY COMPASSIONATE RELEASE: INCREASINGLY DISTRICT COURT JUDGES ARE EXERCISING THEIR ENHANCED DISCRETIONARY AUTHORITY THROUGH "COMPASSIONATE RELEASE" (AS AMENDED BY THE FIRST STEP ACT OF 2018) AND §3582(c)(1)(A) TO PROVIDE  RELIEF FOR FEDERAL DEFENDANTS BY REDUCING THEIR SENTENCES FOR EXTRAORDINARY AND COMPELLING REASONS . . . . . . . . . . . . . 155

IX. CONCLUSION: A REVIEW OF THE UNIQUE, EXTRAORDINARY AND COMPELLING FACTUAL AND LEGAL GROUNDS MILITATES FOR A REDUCTION OF MR. HARRIS' SENTENCE AND RELEASE FROM CUSTODY UNDER THE AUTHORITY OF 18 U.S.C. §3582(c)(1)(A) . . . . . . . . . . . 164

# TABLE OF AUTHORITIES

*Caselaw*

Albori v. United States

    67 F.2d 4, 7 (9th cir. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Alleyne v. United States

    570 U.S. 99, 108 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Collector v. Hubbard

    79 U.S. 1, 10, 20 L. Ed.2d 272 (1870) . . . . . . . . . . . . . . . . . . . . . . . 128

Cozine

    15 F.Supp.2d 1010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Crawford v. Jackson

    589 F.2d 693, 695, 191 U.S. App. D.C. 170 (D.C. Cir. 1978) . . . . . . 125

Dillon vs. United States

    560 U.S. 817, 827 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Dunne v. Keohane

    14 F.3d 335, 336-37 (7th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Elwell v. Fisher

    716 F.3d 477, 481 (8th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . .125

Federal Express Corp. v. Holowecki

    552, U.S. 389, 400, 128 S.Ct. 1147, 170 L. Ed.2d 10 (2008) . . . . . . .129

Green v. Christiansen

    732 F.2d 1397, 1399-1400 (9th Cir., 1978) . . . . . . . . . . . . . . . . . . . 124

Heath v. Alabama

    474 U.S. 82, 88-93, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) . . . . . . . . 129

Helling

    509 U.S. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

In Re Jennings

    118 F. 479, 482 (C.C.E.D. Mo. 1902) . . . . . . . . . . . . . . . . . . . . . . .135

In Re Kelly

      841 F.2d 908, 912 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .128

In Re Liberatore

      574 F.2d 78 (2nd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Jackson v. Brennan

      924 F.2d 725, 729 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . .129

Kiendra v. Hadden

      763 F.2d  72, 73 (2nd Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Lanier v. Williams

      361 F.Supp. 944, 947-48 (E.D.N.C. 1973) . . . . . . . . . . . . . . . . . . . . .133

McIntosh v. Looney

      249 F.2d 62, 64 (10th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

McPike v. Zerbst

      21 F.Supp 961. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Michael Ray Harris v. Jack Fox

      U.S. Dist. Court, Northern Dist. Cal. Case No.

      C-11-80261-WHA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Mistretta v. United States

      488 U.S. 361, 394 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

People v. Felix

      22 Cal 4th 657 [94 Cal. Rptr. 2d 54, 995 F.2d 186] (2000) . . . . . . . . 127

People v. Grimble

      116 Cal. App. 3d 678, 684-85, [172 Cal. Rptr. 362] (1981) . . . . . . . .127

People v. Michael (Sean) Harris

      Los Angeles County Case No. A954053 . . . . . . . . . . . . . . . . . . . . . . . 30

People v. Rodriguez

      207 Cal. App. 4th 204, 217, 143, Cal. Rptr. 3d 178 (2012) . . . . . . . . 127

Ponzi v. Fessenden

    258 U.S. 254, 259, 42 S.Ct. 309, 66 L. Ed. 607 (1922) . . . . . . . . . . 124

Schleining v. Thomas

    642 F.3d 1242, 1243 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . .132

Serrano

    615 Fed. Appx. at 468 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

Shelton v. Ciccone

    578 F.2d 1241 (8th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .124

Smith v. Swope

    91 F.2d 260. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .134

Smith v. Wash.

    781 F. Appx. 595, 597-598 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . 154

Strand v. Schmittroth

    251 F.2d 590, 599 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . .126

Taylor

    164 F.3d 445. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Thomas v. Brewer

    923 F.2d 1361, 1367 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . .125

United States v. Ameline

    376 F.3d 967 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .139

United States v. Apocada

    843 F.2d 421, 426 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . .138

United States v. Barona

    56 F.3d 1087. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

United States v. Beck

    Case No. 13-CR-186-6, 2019 WL 2716505 . . . . . . . . . . . . . . . . . . .52

U.S. v. Brian Bennett and Michael Harris

    Nos. 90-50686 and 90-50694 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Cantu

    Case No.05-CR-458, 2019 WL 2498923

    (S.D. Tex. June 17, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

United States v. Cantu-Rivera

    Case No. 89-CR-204, 2019 WL 2578272

    (S.D. Tex. June 24, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

United States v. Cole

    416 F.3d 894 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

United States v. Croft

    450 F.2d 1094, 1098 (6th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Delgado

    4 F.3d 780, 785086 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 137

United States v. Dimasi

    220 F. Supp. 3d 173, 175 (D. Mass 2016) . . . . . . . . . . . . . . . . . . . . . 51

United States v. Edwards

    800 F.2d 878, 808-81 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . .144

United States v. Evans

    159 F.3d 908, 912 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 125

United States v. Garcia-Sanchez

    187 F.2d 1143, 1149 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . .138

United States v. Gonzales

    520 U.S. 1, 5, 117 S.Ct. 1032, 137 L. Ed.2d 132 (1997) . . . . . . . . . 128

United States v. Harris

    1996 U.S. App. LEXIS 17765 (9th Cir., Mem. Disp.

    Dated: July 15, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

United States v. Harris

    1996 U.S. App. LEXIS 26690 (9th Cir., Mem. Disp.

    Dated: October 10, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Howard

    996 F.2d 1362, 1354 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . .139

United States v. Labeill-Soto

    163 F.3d 93, 99 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

United States v. Martinez

    837 F.2d 861, 865 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . .133

United States v. Maumau

    No.208-cr-00758-TC-11 (D. Utah, Feb 18 2020) . . . . . . . . . . . . . . .157

United States v. Mauro

    426 U.S. 340, 357-58, 98 S.Ct. 1834, 56 L. Ed. 2d 329 (1978) . . . . . 124

United States v. Mazzoni

    677 F.Supp. 339, 341-42 (E.D. Pa. 1987) . . . . . . . . . . . . . . . . . . . . . .133

United States v. McGraw

    Case No. 02-CR-00018, 2019 WL 2059488

    (S.D. Ind. May 9, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. McPherson

    Case No. 3:94-cr-5708, Dkt. No. 209 (W.D. Wash.

    Apr. 14, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .162

United States v. Michael Harris

    C.A. No. 18-50114 (9th Cir. July 9, 2018) . . . . . . . . . . . . . . . . . . . . . .46

United States v. Moe

    781 F.3d 1120, 1125-96 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . .139

United States v. Newland

    116 F.3d 400, 405 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . .168

United States v. Petty

    992 F.2d 8867, 890 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . .168

United States v. Rodriguez

    C.A. No. 17-10233 (9th Cir. April 24, 2019) . . . . . . . . . . . . . . . . . . . .46

xi

United States v. Tran

  8:08-cr-197-DOC, Dkt. No. 405 (C.D. Cal. Apr. 10, 2020) . . . . . . . .160

U.S. v. Villabona-Alvarado

  No. 88-CR-972-WJR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Warren

  610 F.2d 680, 684-94 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . .126

White v. Pearlman

  42 F.2d 788, 789 (10th Cir. 1930) . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Younger v. Harris

  401 U.S. 37, 44, 27 L.Ed.2d 669, 91 S.Ct. 746 (1971) . . . . . . . . . . . .130

*Statutes*

  U.S.S.G. §1B1.13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

  U.S.S.G. §1B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

  U.S.S.G. §3B1.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

  U.S.S.G. §2D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

  U.S.S.G. §2D1.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  U.S.S.G. §5G1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

  15 C.C.R. §2281 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

  15 C.C.R. §2281(b), (c), (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

  18 U.S.C. §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

  18 U.S.C. §922(o)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .160

  18 U.S.C. §924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

  18 U.S.C. §924(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

  18 U.S.C. §1951(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

  18 U.S.C. §3142(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

  18 U.S.C. §3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

  18 U.S.C. §3553(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .144

18 U.S.C. §3582. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

18 U.S.C. §3582(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

18 U.S.C. §3582(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

18 U.S.C. §4205(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

21 U.S.C. §841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

21 U.S.C. §841(a) (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

21 U.S.C. §846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

21 U.S.C. §848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

21 U.S.C. §848(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

28 U.S.C. §994(t) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

28 U.S.C. §1738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

28 U.S.C. §2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

28 U.S.C. §2241(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .124

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

PC §182(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

PC §187(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

PC §669. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

PC §669(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .119

PC §12022.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# DEFENDANT'S MOTION TO REDUCE
# SENTENCE PER 18 U.S.C. §3582(c)(1)(A)

## I.

## INTRODUCTION

Movant, Michael R. Harris, through undersigned counsel, respectfully asks this Court to grant his motion for reduction in sentence and compassionate release under 18 U.S.C. §3582(c)(1)(A), and to order his forthwith release to be followed by the 5-year term of Supervised Release that was imposed at sentencing. This motion should be granted due to the "extraordinary and compelling reasons" confronting the Federal prison system with the pandemic of COVID-19 as well as the fact that Mr. Harris is not a danger to the community. He has served more than 30 years in prison which have been distinguished by extraordinary self-rehabilitative efforts and participation in programs to assist his fellow inmates. Mr. Harris is now scheduled for release from the BOP in June of 2028. His offense conduct terminated in 1987, and he has been in continuous custody since then.

The urgency of this request is heightened by the serious medical condition known as Guillain-Barré Syndrome with which Michael Harris has been diagnosed. Guillain-Barré Syndrome is characterized by serious respiratory disorder caused by weakening of the breathing muscles and damage to the immune system. These pre-existing health problems leave Michael Harris, who is 58 years old, highly susceptible to contracting the coronavirus and at elevated risk for death or serious lasting injury if infected.

As this Court is aware, the Bureau of Prisons generally, and the Federal Corrections Complex (FCC) at Lompoc, California, in particular, have been overrun by the COVID-19 epidemic in recent weeks. As of April 26, 2020, FCC Lompoc had 89 confirmed cases of COVID-19 among inmates (approximately 11.5% of total BOP cases, and third highest in the BOP) along with 27 infected staff. One inmate

has recently died, along with another who died just days after being released from prison on April 1, 2020[1] following 27 years imprisonment in the BOP.

The overarching principles of respect for the law and general deterrence, along with the other 18 U.S.C. §3553(a) factors, would in no way be undermined by granting Mr. Harris' motion for compassionate release or converting the remainder of his sentence to Home Confinement in light of the cataclysmic toll of the current pandemic, especially in view of his personal transformation that has been evident for many years and his proven commitment to rehabilitation.

We respectfully ask the Court to consider this motion on an expedited basis since each day in custody brings renewed risk to Michael Harris' health.  If Mr. Harris were to become critically ill or die while in custody, it would be not only devastating from a human standpoint for Mr. Harris and his family, but would eliminate a person who, following his release, would in all probability serve as a great source of healing and mentoring in the disadvantaged community of South Central Los Angeles in which he was raised.

II.

OVERVIEW: COMPELLING GROUNDS EXIST TO IMMEDIATELY GRANT INMATE MICHAEL HARRIS' MOTION FOR RELEASE UNDER 18 U.S.C. §3582(c)(1)(A)

While the Coronavirus outbreak vastly increases the exigency of this motion, it is by no means the extraordinary or compelling grounds on which it should be granted.  Mr. Harris and undersigned counsel had been well on the way to submitting this motion under §3582(c)(1)(A) before the advent of the current pandemic made it potentially a life or death matter.

When Congress abolished federal parole with the passage of the Sentencing Reform Act of 1984, it invested in the U.S. Bureau of Prisons ("BOP") the discretion

---

[1] See *Los Angeles Times* article entitled, "Coronavirus Outbreak at Lompoc Prison is the Worst in the Nation:  69 Inmates, 25 Staff Infected" dated April 16, 2020.

1  to revisit the sentences imposed on a few narrow categories of defendants.  But the

2  BOP seldom exercised that authority.  Rather than building a bridge out of prison for

3  those prisoners whose conduct warranted a second chance and for whom

4  "extraordinary and compelling reasons" existed to grant release, the BOP, in almost

5  every instance, chose to stand with the status quo and keep such deserving prisoners

6  locked up.  Historically, this has been true even for those prisoners who were

7  sentenced decades ago, even for those prisoners serving exceedingly long prison

8  terms that were the functional equivalent of life, and even prisoners for whom

9  continued incarceration could no longer be justified on moral or utilitarian grounds

10  nor for the safety of the community.

11  Responding to the reality that the BOP was not making use of its legal

12  authority to seek sentence reductions for qualified defendants, Congress recently

13  vested federal judges with the power to do what previously they were prohibited

14  from doing absent a motion from the Director of the BOP.  Specifically, changes to

15  18 U.S.C. §3582(c)(1)(A) contained in the First Step Act ("FSA"), signed into law

16  on December 21, 2018, authorizes a District Court judge to reduce a term of

17  imprisonment -- even to time served -- of any defendant, after that defendant has

18  exhausted his/her administrative remedies.  The Court is authorized to do this if it

19  finds that "extraordinary and compelling reasons" warrant such a reduction.  In other

20  words, Federal judges now are empowered to take a "second look" at the sentence

21  imposed on a worthy and deserving defendant, and if, in their discretion,

22  "extraordinary and compelling reasons" exist, provide that defendant with a second

23  chance.

24  Michael Ray Harris is such a defendant.  In 1990, Mr. Harris was sentenced to

25  nineteen years and seven months for a non-violent federal drug offense.  Yet thirty

26  years later, for reasons that are "extraordinary and compelling" and militate for a

27  second evaluation, Mr. Harris is still imprisoned with eight years of his federal

28  sentence left to serve.  Of the thirty-two continuous years he has spent in prison, Mr.

3

Harris served twenty-three years for a state crime of which he actually is innocent, and the last nine years in federal prison due to a series of errors made by the U.S Marshals Service in calculating and executing his federal sentence.

Mr. Harris realizes that the above circumstances are all ultimately consequences of mistaken decisions that he himself made in his younger years. He has taken responsibility and has strived to make the most of opportunities that existed in the prisons where he has been housed -- first inside the California Department of Corrections and Rehabilitation (CDCR) and now within the BOP, to educate, improve and better himself. Rather than become embittered and resentful, Mr. Harris founded, led, advised, or participated in more than a dozen successful, forward-looking programs in California's prisons that benefitted fellow inmates, some of which have been emulated in prison systems across the country.

There is little question that Mr. Harris long ago matured out of the irresponsible and self-destructive attitudes of his youth. His character has evolved inexorably during the last 32 years that he has been incarcerated. He has aligned himself with the most positive elements within the inmate population and has never lost hope of someday reestablishing himself in his family and community, incorporating the lessons and insight acquired during his sojourn through the state and federal prison systems.

Accordingly, and for all the reasons detailed below -- including but not limited to: his actual innocence with respect to his state conviction; the improper plea tactics of the U.S. Attorney's Office; the improper jury instructions in his federal trial; his minor role in the federal offense; the erroneous drug amount attributed to him which improperly elevated his guidelines base offense level under U.S.S.G. §2D1.1(c); the improper computation and execution of his federal sentence by the United States Marshals Service; and the disparity between the length of his sentence and those of his co-defendants -- Mr. Harris respectfully asks this Court take a "second look" at his record of exceptional post-conviction rehabilitation and consider it as one among

4

multiple "compelling and extraordinary" reasons, together with the current health crisis, to enter an order, pursuant to 18 U.S.C. §3582(c)(1)(A) reducing Mr. Harris' sentence to time served.

It is important to note that when Mr. Harris originally submitted his Request to the Warden at FCI Lompoc for Compassionate Release, pursuant to §3582(c)(1)(A) as amended by the First Step Act of 2018 ("FSA"), he submitted it for reasons that were extraordinary and compelling, but were not primarily related to medical condition, age, or family circumstances.

Mr. Harris' original such request was submitted on August 16, 2019, and was denied on August 21, 2019. It was resubmitted on November 17, 2019, received by the BOP on November 25, 2019, and also denied, on January 22, 2020. (See Exhibit C.) At that time, the global COVID-19 coronavirus pandemic had not yet really hit the United States. However, events that have transpired in the interim heighten the urgency of Mr. Harris' Compassionate Release request due to his diagnosis of Guillain-Barré Syndrome, an auto-immune disorder often marked by the body's immune system attacking itself.

Because of the COVID-19 virus, administrative offices at FCI Lompoc have been shut down until further notice as part of the nationwide mandatory BOP lockdown. Administrative staff, such as case managers and counselors, have been reassigned by the BOP to correctional officer status. Currently all FCI Lompoc inmates, including Mr. Harris, are on a 24 hour a day quarantine lockdown with no access to telephones or e-mail nor ability to communicate with their attorneys. Any further pursuit of administrative remedies would be futile and ineffective under the present circumstances. Mr. Harris' incurable medical condition should, either in combination with other factors or standing alone, be considered an extraordinary and compelling reason for the Court to reduce his sentence to time served and to order his immediate release.

Due to the recent, aggressive, and explosive expansion of COVID-19 corona virus cases throughout the United States and in the BOP, including more than one hundred combined cases between inmates and staff at the Lompoc prison complex, Mr. Harris is now in acute danger of contracting COVID-19 in his prison setting where his impaired auto immune system would leave him essentially defenseless. COVID-19 is especially deadly for older individuals with immune-compromised conditions such as Mr. Harris. This imminent threat to his health and safety is in its own right an "extraordinary and compelling" reason to reduce Mr. Harris' sentence to time served and to effectuate his immediate release.

III.

PERSONAL BACKGROUND

A.    *Formative Years -- Seeds Planted*

Michael Ray Harris was born in Los Angeles, California on September 20, 1961. His mother and father were part of the "Great Migration" of the Twentieth Century from the mostly rural deep South to the cities of the North and West of the United States.

Michael Harris' father, Henry Harris, was born in 1915 in Dumas, Arkansas, one of eleven children. Henry Harris' father was a farmer, and his mother ran a laundry. His maternal grandmother, Mattie Hardin, had been a slave. Henry Harris came to Bakersfield, California, at age thirteen to live with his sisters and attend high school. Subsequently, he moved to Los Angeles in search of work.

Michael Harris' mother, Fannie Mae Jordan, was born in 1935 in Arkadelphia, Arkansas, and grew up in Oak Grove, Louisiana, a small town 87 miles east of Monroe, Louisiana, 20 miles south of the Arkansas border and 20 miles west of the Mississippi River. She was one of ten children. Her parents were sharecroppers who farmed cotton, corn, peas, sorghum and livestock, as her grandparents had done previously. Her father, Minous Jordan, was eventually able to purchase the land on which he had sharecropped.

Michael's parents separated when he was four years old.  He was raised by his mother, although he saw his father sporadically.  Michael's family was a loving family.  He was very close to his siblings.  His younger brother, David Louis Harris, was one year younger, and his sister, Starlisa Young, is four years younger than Michael.  Michael's father separately had three sons with another woman prior to Michael's birth, and Starlisa's father, James Young, brought to the household two sons and a daughter he had fathered, Calvin, Donald and Loretta.  Besides Michael's siblings and step-siblings, there were numerous uncles, aunts, and countless cousins in his very large extended family.  The family regularly attended New Hope Baptist Church at 52nd Street and Central Avenue in Los Angeles.

The greatest influence on Michael in his formative years was his mother.  From his mother Michael learned how to observe and navigate with people from all walks of life.  At her funeral in 2017, she was remembered as a mother who "was set on teaching her children, grandkids and great-grandkids how to be independent self-sufficient go-getters.  Her children remember her as a kind, gentle, patient, driven mother who encouraged them to pursue their goals...[she] was a jack of all trades, but best known for her cooking.  Often an example of talent, she could cook any kind of breakfast and soul food, that would make your mouth water and leave you wanting more.  She was a generous, witty, dedicated woman who was passionate about helping and feeding people in the community."

Both of Michael's parents had an entrepreneurial spirit.  Prior to moving to Los Angeles, his mother had worked at Pippin's Restaurant in Oak Grove, a popular spot for members of the community to meet and talk while enjoying wholesome Southern cuisine.  Pippins' sweet potato pie, banana pudding, peach cobbler and tea cakes were the best, west of the Mississippi.  The restaurant was popular among both whites and Blacks, although as strange as it may seem now, the restaurant was sectioned off with a wall between the section for white customers and the section for

Black customers.  This segregation of customers at Pippin's lasted well into the 1980s.

Michael was raised in the Los Angeles neighborhood of South Park, in a home on 53rd and Avalon Blvd. and later, in a house on 46th Street near Central Avenue. His youth was centered around the heart of urban life in L.A., bordered by Central Ave, Hooper Ave., Vernon Ave. and Slauson Blvd., an area that in the 1930s, 40s and 50s had been known informally as "Harlem West," and that today is called "South Central L.A."

Michael's mother worked two, and sometimes three jobs, often 16 to 20 hours a day, six to seven days a week, including at a near-by restaurant, Chapman's Grill, located also at 52nd Street and Central Avenue, across the street from the family's church.  Her strong work ethic and thrift was reflected in the way she saved tips and wages from overtime, eventually enabling her to purchase the house on 46th near Central Avenue in which she lived with Michael and her other children, as well as hosting numerous relatives who would visit from near and far.

Michael's mother eventually purchased Chapman's Grill with the money she had saved and renamed it Fannie's Grill (later changing the name to Fannie Mae's). It became a neighborhood culinary landmark, a gathering place before and after work, during lunches, and following church on Sundays.  It was locally-famous for its breakfasts and soul food dinners.  In a short time, she made enough to purchase Pippin's Restaurant in the community of her youth, Oak Grove, Louisiana, renaming it Jordan's Cafe.  The Louisiana restaurant was managed by Fannie Jordan's sister, Michael's Aunt Matilda.  The two restaurants provided employment for Michael, his siblings, aunts, uncles, and cousins -- those in Louisiana as well as those in Los Angeles.

Michael's mother taught her children the importance of honesty and hard work.  As a young boy watching his mother work so hard, it pained Michael that he was not able to relieve the financial difficulties she faced.  In the sixth grade he

8

began working on weekends and after school to contribute to the household.  He helped with whatever he could do at his mother's restaurant, from sweeping the floor to washing dishes and making deliveries.  It was the first chance he had in his life to help relieve the strain on his mother.

Until age 15, Michael, while growing up, would spend his summers with his maternal grandmother, Caroline (Callie) Jordan, in Louisiana.  There, in Oak Grove, in the warm embrace of his extended clan, Michael came to appreciate the importance of family.  His mother's family owned 187 acres which had been acquired by his deceased grandfather, Minous Jordan.  Under the direction of Grandmother Callie, they raised cattle, sheep, chickens, and grew potatoes, okra, corn, sweet potatoes, watermelon, cantaloupe and squash, some for their own consumption and the rest to sell.

Those 187 acres were surrounded by thousands of acres owned by a prominent white land owner of the area, Mr. Slim Milton.  The headquarters for the Milton operation was next door to Grandmother Callie's 187 acres.  Young Michael and his brother and sister helped both at his Grandmother Callie's farm and at the nearby headquarters of the much larger surrounding Milton ranch.  There, on both of those rural properties, Michael learned to ride horses, round-up cattle, feed animals, plant, grow and harvest crops, pick cotton, and the dozens of other jobs a farm demands.

Slim Milton for years had wanted to purchase the 187 acres Michael's family owned, and add it to his other holdings, which included the local bank and large tracts of real estate both in Oak Grove and in other towns.  The Milton land was prime grazing land on which cattle could be raised.  The segregationist practices included keeping Blacks from owning such grazing land.  Instead, they were allowed to raise crops to feed themselves on small farms, usually on white-owned land on which they farmed as sharecroppers.

It was unusual for a Black family to own grazing land, and it went against the white controlled "Southern way."  At age 13, Michael became aware that Slim

9

Milton was putting pressure on his family to sell their farm. A majority of Grandmother Callie's children wanted to sell, at whatever price they could get. They needed the money, and Mr. Milton could wield his local power to make life difficult for the family if they did not sell. Michael's mother wanted to keep the land in the family, but she was outvoted by other family members, and the farm was sold to Mr. Milton for pennies on the dollar.

Michael was deeply affected by what he considered an unfair transaction and was bothered that at his young age he couldn't do anything about it. He felt helpless. He was a kid, watching and silently protesting. The 187 acres of the family farm was the only thing connecting young Michael to his grandfather. Along with recognizing that the sale for far less than it was worth was tantamount to stealing a legacy from his grandfather, the incident made clear to Michael that real estate had value.

Michael's work ethic was learned not only from his mother and grandmother, however. His father, Henry Harris, had acquired and owned a block-long lumber mill in Los Angeles, "Harris Custom Mill," that provided finished wood for furniture manufacturers. His father also owned a fleet of dump trucks. His mill had its own railroad siding along the "Alameda Corridor," between Gage and Florence Avenues, a little more than three miles from Michael's home near Central Avenue. Like his mother, Michael's father acquired and built his businesses with sweat and long hours.

Unknown to Michael's mother at the time of their meeting, Michael's father was married to another woman and had three other older sons, Kurt, Kenny, and Gene, from a previous relationship. Michael's father acknowledged Michael and his younger brother, David, as his sons, but Michael felt the sting of not being fully included in his father's life. Not once, for instance, did his father ever invite him over to his home.

Although a successful businessman, his father was not a warm, engaging individual. He did not smile or give praise easily. This father/son wound was one

10

which Michael carried into adulthood and it caused both positive and negative reactions.  Positively, Michael vowed to love and never to abandon or neglect any children he fathered.  Negatively, the fact his father never took Michael under his wing in the lumber mill business, in spite of Michael repeatedly asking for the opportunity to work there, fueled the drive to succeed at any cost that Michael later displayed.

The role models for Michael and his siblings while growing up were their hardworking, industrious family members.  From them, Michael developed his own tenacious work ethic.

B.    *Seeds Sprouting*

Starting in the seventh grade, Michael began working weekends and after school at Scotty's Shoe Shine Parlor on Central Avenue in the Black center of Los Angeles.  Scotty's was on the same block as Johnson's Shoe Shine Parlor.  There was furious competition between the two parlors.  Both parlors hired youth from the community, who made it almost a sport in competing for customers.  Michael and the other kids would do the shoe refinishing, replacing soles, shining shoes and so forth.  Sometimes, a customer would drop off fifteen or twenty pairs of shoes, forcing Michael to make partners out of his fellow shoeshine youths whom he normally tried to out-hustle.  That competitive atmosphere taught Michael how to be a salesman.  On a good weekend, Michael would make seven hundred to a thousand dollars from his service and tips, giving the majority to his mother to help ease her burden.

Michael, a keen listener and learner, would keep his eyes and ears open while working at Scotty's, observing people, learning how to manage people and situations. Later, as a dealer of cocaine, his mind would go back to his days at Scotty's, not thinking at that time of the harm he was helping create with drug dealing, but applying to the drug trade the business lessons he had learned from keeping his eyes and ears open in those early years.

11

As a youth, Michael had plenty of positive hobbies.  He had a passion for photography, sports, music and films, especially those which chronicled and highlighted Black culture.  He became a disciplined practitioner of Tae Kwon Do.  In the early 1970s, local youth gangs were beginning to form into the Bloods and Crips, but Michael and his younger brother learned to navigate without becoming members of, or pledging allegiance to, any gang.

At a young age, Michael was classically trained on the piano by his next-door neighbor, Mrs. Payne.  In elementary school, he was active in various school productions.  While in junior high, he acted in plays, performed with the school band, and learned to play various instruments, including trombone and drums.  Later, in college, he enrolled in numerous acting classes from comedy to drama to improv.  One of his first business ventures was a music studio called "Jingle Factory," a company that specialized in creating radio commercials for local businesses.

Some years later, as a young adult, Michael Harris was mentored by Eric Monte on script writing.  Monte was the creator and writer of the urban cult classic hit, "Cooley High," and the hit TV series, "Good Times."  He had taken time out to help Michael Harris write an urban film entitled, "Crenshaw Boulevard," a story highlighting growing up in the urban core of Los Angeles in the 1980s.  Michael Harris also met with Mr. and Mrs. Michael Schultz, the directing team of the urban film, "Car Wash," about directing his proposed film.

Along with his interest in film, Michael Harris' early interest in entertainment found expression with his enthusiasm for live theater.  His attraction to theater was sparked at the Inner City Cultural Center where he first encountered the play, "Checkmates."  It created in him a desire to produce Black-themed live theater.

In his early attempts to set up his company to produce plays, Michael he continually ran into negativity.  Many excellent Black actors and actresses were unemployed.   Yet, because a Black producer in theater never had made it to Broadway, the response to his efforts was "Black productions are not profitable.

Why try?"  Invariably, Michael's response was, "Why not?"  What followed was his creation of Y-Not Production Company.  His objective was to produce shows which entertained, provoked thought, and depicted positive images, especially for people of color.

Under that company, Michael Harris went on to produce two plays: "Checkmates" and "Stepping Into Tomorrow."  The first play he produced, "Checkmates," opened at the Westwood Playhouse to critical acclaim and then toured the country with cast members Denzel Washington, Ruby Dee, Paul Winfield, and Vanessa Williams.  "Checkmates" went on to premiere on Broadway and enjoyed a run of six months.  It was the first Broadway play ever financed and produced by an African-American.

"Stepping Into Tomorrow," the second play produced by his production company, was memorable because it was co-written by daughters of the two historic giants of the civil rights movement of the mid-Twentieth Century:  Yolanda King, daughter of Dr. Martin Luther King, Jr., and Attallah Shabazz, daughter of Malcolm X.  The play featured performances by the daughters of Harry Belafonte, Dr. King, Malcolm X, and Sidney Poitier.

Although Michael Harris's first play, "Checkmates" was a critically acclaimed success during its tour to Broadway, when it reached Broadway, he already had been arrested in Los Angeles and he was not present to use his marketing skills to continue to promote it.

C.    *The Businessman*

The successes Michael Harris had with his production company, Y-Not, during its relatively brief existence, were not his only achievements in the business world.  In his early 20s, he began to create and partner with others in legitimate businesses, several of which related directly or indirectly to entertainment.  Into these businesses he put to use the skills and disciplines developed in his youth: his classical piano lessons, high school acting and band practice, and college courses in

13

drama and script writing.  Some businesses he started from scratch, and some he helped rescue after partnering with owners who were struggling to maintain and make their business profitable.  With every business, he invested himself, as he had seen his mother invest herself in her restaurants.

The common theme of all his businesses is that they were designed to provide Black and other minority employment.  He learned everything he could about each business.  Ultimately, he provided employment for hundreds of minority men and women, and each business was successful

His first business was a limousine service, Kartier Service ("Cars of the Stars").  That business rapidly grew to fifteen limousines.  For special events at which large numbers of limousines were required, he'd arrange with competitors to split their hourly fee, thus making pure profit while turning a competitor into a partner.  Also, through his limousine business, one of only a few Black-owned limo services in Los Angeles at that time, he developed contacts in the music and entertainment world in Hollywood and Beverly Hills, contacts which later would serve him well.

In addition to the limousine service, Michael Harris started Jingle Factory, to create commercials for local Black-owned businesses to use on radio.  For that venture, he built a studio and hired talent, again efforts which later would serve him well.

Another two businesses he began were hair salons and beauty supply shops, one in Beverly Hills and one in the L.A.'s Crenshaw District.

From his time learning the electric contractor supply business while working a few years earlier at the Darnella Company, he opened his own electric contractor business, serving the greater Los Angeles area, successfully bidding on and completing dozens of large contracts, both private and public.

14

Michael Harris also developed a maintenance company, Universal Service Center, obtaining and fulfilling contracts to maintain many significant commercial buildings in the Brentwood, Westwood and Beverly Hills areas of Los Angeles.

In addition, he ran a printing company, "Between The Trees Publishing," to produce urban entertainment and business materials.

Included in his businesses was 54th Street Deli, a delicatessen in the Crenshaw area of Los Angeles.

Continuing with his entertainment ventures, and drawing both on his musical education and knowledge of the streets, Michael Harris co-founded his first record label, Rap-A-Lot Records, in Houston, Texas.

But what followed Rap-A-Lot is what Michael Harris is most famous for in music history:  he founded and financed Death Row Records.  He conceived the idea of the label while in San Quentin Prison.  He had been returned there after his federal prosecution in 1990.  When he returned, San Quentin had changed from a high security institution to low security, and he was considered out of custody.  The only space available to house him was on Condemned Row, aka Death Row.  Hence, the name for his new music business venture, created while temporarily housed on Death Row.

But being housed on Death Row not only provided the source of the name of his new record label.  It was on Death Row, while talking with condemned men awaiting execution, that Michael began to look inward and search for the how and why he had gotten off track, how he had lost his moral compass.

D.    *Blind Ambition*

With such evident talent, work habits, and so much promise, how did Michael Harris get off track, lose his moral compass, and get into the drug trade?  There is no simple answer.  Mr. Harris has written that as a young adult, he put into practice both the positive and negative lessons of his formative years.  He always had the burning desire to ease the burden on his mother, with her non-stop work schedule to provide

15

for and protect her family.  As a child, that sense that he needed to be the protector of his family was deepened as the result of an accident in which his younger brother was hit by an automobile in front of young Michael's eyes.  Fortunately, his brother survived, but the image and helplessness Michael felt stayed implanted in his psyche.  Never again did he want that feeling of helplessness regarding the security of any member of his family.

The strong work ethic young Michael learned while helping in his mother's restaurants and during summers at the family's Louisiana farm, became evident after his graduation from high school, when he began working at the Century Plaza Hotel at the same time he began college courses at West Los Angeles City College.  At college, however, he avoided general education courses while focusing on classes in business, music, and entertainment.  He wanted to learn everything he could about starting and running a business.

Eventually, he lost his job at the Century Plaza Hotel for falling asleep before his shift ended.  Right away he was hired at Darnella Electric, an electric equipment wholesaling company near LAX where the owners took an interest in him and became mentors, making him feel there could be a good future with the company.  The owners taught him all the different jobs in the shop.

However, one day, a year and a half later, the owner came to Michael and said he had to let Michael go, because people in the company felt he was learning too much.  He told Michael other employees felt intimidated and were afraid Michael was going to take their jobs.

Driving home, Michael Harris pondered the eighteen months he had spent on that job, and sensed he had been used.  He felt frustrated, deflated, angry and humiliated.  The owners had utilized his intelligence, ambition, drive, and organizational skills in an attempt to squeeze more productivity from their employees by scaring them into thinking he would replace one or another of them.  It

16

was clear to Michael that the owners never had the intention of allowing him to continue as an employee, let alone move up in the company.

When he got home, Michael sat on his porch and found himself looking around.  He saw his former classmates and neighborhood friends driving nice new cars.  They didn't have jobs.  Michael knew where their money was coming from, a lifestyle and path he previously had rejected.  He remembers suddenly waking up to what was going on around him:  his community was being flooded with a tidal wave of cocaine.  Among the seed planted in his youth, at that vulnerable point, a poisonous weed had sprouted in his psyche.  At that moment he thought, "Why not me?"  He wanted more for himself and his family, and there it was, waiting for the taking.

That day, Michael cashed his last paycheck from Darnella, bought some drugs, sold them, and began the chain of decisions which, within a short time, would land him in prison for the following 32 years...and counting.  In the few years following his initial drug purchase -- a purchase born of anger, humiliation, ambition, and the lure of "easy" money -- he was able to achieve a certain level of monetary success.  Looking back years later, after psychologically crawling up and out of the ruins of what had been his life, he realized that when he had been financially richest was when he had been most morally bankrupt.

Michael Harris has acknowledged his participation in the drug trade, and that he was more than just a peddler.  He combined and applied all those business lessons he had learned with the street hustling skills he had developed, and took advantage of the gigantic amount of cocaine flooding Los Angeles at that time.  In hindsight, he comprehends that he became an agent of destruction of his own Black community, of his family, his adulthood, his freedom.  He became oblivious to the harm and was guided by blind ambition and greed.  He came to realize the end result was exactly opposite of what originally he intended.

*E.      Transformation*

But being a drug dealer is what Michael Harris did, not who he is.  He has not tried to hide what he did.  He has apologized to his community in interviews and elsewhere for the appalling damage he helped inflict on the community in which he was raised.  He lost everything he had loved and everything which had real value to him.  During his time as a drug dealer, he has said, he had grown physically as a male, but he acted in immature boyish ways, to the detriment of himself, his family, and countless others.  After more than three decades in prison, when he leaves, he will be a senior citizen, but also he will leave as a morally mature man.  It took losing everything and spending years in prison before Michael Harris started to take the deep dive into the ashes of his life, a dive which led to unexpected and positive results for him, for many other prisoners, and for society.

The process of transformation for Michael Harris began when he was temporarily on San Quentin's Death Row.  One might think the conditions of Death Row -- as well as at "Super Max" Pelican Bay State Prison (where he spent two years), and other high security prisons in which he spent time -- would have produced a monster.  Instead, in prison, one's mind can be impacted in unexpected ways.  In prison, a person is stripped of normal human interactions and has plenty of time to think, to dissect one's existence, and reflect on his life.  In the case of Michael Harris, he was able to start to fully understand the wisdom and lessons from his mother and grandmother, especially the "mother wit" of tempering wisdom with sound, compassionate judgment.

Thus, in those stark prison settings, among the most restrictive in the world, listening to men who, like Michael Harris, had life sentences, and especially talking with condemned men on Death Row, relating to their stories, he was profoundly affected.  It awakened him to the reality of why he was there, how he got there, and what harm he had helped produce.

With this initial awakening, as he struggled to develop a path forward, Mr. Harris began to read books directly related to the social, psychological, and spiritual causes and effects of his prior actions.  He recognized in himself, and in other prisoners whose stories he heard, some common themes.

He began to recognize that the very factors which had motivated the harm he had produced also were present in many other prisoners, including "the lifers" as well as in many condemned men on Death Row.  Like him, they had chosen a criminal lifestyle due to environmental conditioning, producing destructive habits such as acting and reacting before thinking.  Like him, he realized, they seemed stuck in a place that is horrendous, moving through their lives thoughtlessly, unconsciously, defiantly and often violently, their actions born of a state of continual inflamed fury.  Worst of all, he realized, they had no consideration for the effects of their actions on other people or even on themselves.

Eventually, Mr. Harris was transferred from his temporary Death Row housing to Pelican Bay State Prison, which had just opened as arguably the highest security and most restrictive prison in the country.  There, his internal transformation continued.  He continued to read, and to engage other prisoners and to share some of the ideas he had run across in his reading which had resonated with him.  He discussed with other prisoners some of the social and psychological ideas he had encountered in his reading which he felt were related to the themes he recognized he had in common with them, especially with those like-minded prisoners who wanted to discover the essence of their lives and more fully understand why they had ended up in prison.  He was combining psychology with his own experiences and communicating it through street vernacular.

In the early 2000s, Michael Harris had been relocated to Soledad State Prison, where 95% of the prisoners were "lifers" like him.  However, it was apparent that the institution lacked therapeutic groups that the men so desperately needed to effectuate change within themselves.  The lack of self-help groups was so great that the waiting

19

list extended to 18 to 24 months for the few groups available.  But there he continued his informal discussions with prisoners.  The warden gave Mr. Harris and his co-founders permission for the organization of a group within prison, to be led by Mr. Harris.  In 2001, an organization of prisoners was formed which the participants named, "Partnership Building Community Groups," or PBCG.

The participants in PBCG were gang members from the rival Bloods and Crips gangs, as well as non-affiliated "gangsters." They had all come from the street life and were now looking for meaning in their lives.  They wanted to contribute by keeping young people from getting deeper into the criminal lifestyle.  Michael Harris shared what he had learned through his reading, knowledge of the street, and prior informal discussions in prison, such as how to engage verbally and empathetically instead of defiantly.

Thus, with increasing self-awareness, Michael Harris began the process of re-engineering himself and, by sharing his awareness with other prisoners, he was able to get at the roots of the defiance and rebelliousness within those who wished to re-engineer themselves.

In 2005, Michael Harris was returned to San Quentin.  This time, he was put in the general population.  In the years since he had been transferred from Death Row to Pelican Bay, San Quentin had been designated a Level Two facility -- lower security than before.  In San Quentin he found a progressive, forward-looking prison administration which encouraged exactly the style Michael Harris had been steadily developing on his own for the prior fifteen years:  introspection, sharing of experiences, integration of psychological and spiritual therapeutic techniques with a prisoner's own experiences, helping prisoners to understand rehabilitation processes to avoid prison in the future, and how to impart to others such hard-earned wisdom.  To aid these processes, the prison administration had encouraged the organization of over thirty prisoner-participation groups, many of which prisoners themselves organized, to promote such positive processes and goals.

Just as impressive, there were three thousand volunteers who came into the prison to share knowledge and skills of all kinds, from vocational subjects to poetry and literature, to advanced scientific academic disciplines.  There was something for everyone.  Also, there were high school and college courses available for all prisoners.  Obtaining a degree was encouraged.  Ironically, as a direct result of coming to prison and landing in San Quentin, quite a few prisoners became the first in their family to graduate from college, thus demonstrating the power of restorative justice as well as the law of unintended consequences.

There were financial literacy seminars, a Job Day, vocational courses and seminars, violence prevention groups, a Journalism Guild, presentations by top notch speakers, writers, sociologists, psychologists, retirees, professors & former professors, visits by graduate and undergraduate students who participated with prisoners in various groups, and other volunteers from every conceivable endeavor to share with the prisoners.  There were incubator groups which grew with prisoner participation, with those prisoners eventually going on to lead other groups.

Michael Harris thrived in this environment like a seed thrown into a newly plowed field.  He helped organize or lead seven new prisoner groups.  He was a powerhouse of ideas, becoming a conduit for sharing the knowledge he had learned.  Eventually, he organized or led well over a dozen groups, their common cause being, among other goals, to end the psychological and social isolation of prisoners.

Of the many projects Michael Harris was instrumental in beginning and/or which he led, two stand out.  The first was his involvement with the "San Quentin News."  After it had remained dormant for seventeen years, Mr. Harris revived and became editor-in-chief of "San Quentin News," an in-prison newspaper.  Under his editorship, the paper reported news of relevance not only to the prisoners but also to the staff, such as news related to the negotiations for a new contract between the state and the union representing correctional officers.  "The San Quentin News," produced by the prisoners themselves, helped transform the interior of the San

21

1 | Quentin walls into a thriving community.  The prison success stories also represented
2 | a beacon of hope for the outer community.

3 | As editor, Mr. Harris made sure the newspaper interviewed those prisoners
4 | about to leave, as well as Death Row inmates.  There were interviews with
5 | government officials who visited the prison, including governors, senators,
6 | congresspersons, assemblypersons, and United States District Court Judge Thelton
7 | Henderson, who had ruled that the State of California needed to build adequate
8 | health care facilities in state prisons.  News about rehabilitation programs, skills
9 | seminars, college courses, therapeutic programs, sports competitions in San Quentin,
10 | human interest stories of what particular prisoners had done occupationally prior to
11 | prison, unique skills prisoners had, what the various prisoner groups were doing -- all
12 | this and much more was covered in the "San Quentin News," stimulating further
13 | interest and participation in those prison-sanctioned activities among the prisoners.

14 | The newspaper treated the prisoners as residents rather than inmates.  With the
15 | "San Quentin News," many prisoners, for the first time, felt a sense of being part of a
16 | caring community, one in which they took an interest.  Relations between prisoners
17 | and between prisoners and staff, sometimes adversarial and tense, became more
18 | relaxed and respectful as each read and expressed an interest in stories about the
19 | other.

20 | The newspaper was distributed not only in San Quentin Prison but in 33 other
21 | California state prisons, as well as to officials in the capital, Sacramento.  The
22 | newspaper is now circulating on the world-wide web.  Producing each issue over
23 | many years trained hundreds of prisoners.  "Learning by doing" was not just a
24 | slogan.  Working on the "San Quentin News" prepared numerous prisoners in one or
25 | another skill later utilized into paying jobs on the outside once released.

26 | Another project led by Mr. Harris was The Richmond Project.  When the
27 | Project began, Richmond, California, had the highest per capita murder rate in the
28 | entire country.  Many of those involved in Richmond gang life were serving time in

1  San Quentin.  They had ties to the Richmond community, which lay just across the

2  Richmond-San Rafael Bridge from San Quentin.  The Richmond Project gathered

3  those prisoners, many of them rivals, into a group to meet weekly and discuss,

4  develop, and implement programs to decrease the rate of violence and murder in

5  Richmond.

6  Under the mentoring of Mr. Harris, rival members of gangs in Richmond sat

7  in a circle, discussed their differences -- but more often discovered how much they

8  had in common -- and reached conclusions on how to end what had seemed an

9  endless cycle of mayhem in the city.  City officials were brought in to speak with the

10 Richmond prisoners, and those prisoners, in turn, brought out messages of peace and

11 reconciliation when released back to Richmond.  Soon, the murder rate in Richmond

12 dropped dramatically as the rate of school attendance increased.  The program was

13 so successful, that, as will be seen later in this motion, the Police Chief or Richmond,

14 who never had written a letter of support for any prisoner, strongly advocated for

15 Harris to be released.  The Mayor of Richmond and other Richmond officials also

16 wrote letters urging the release of Mr. Harris.

17 Michael Harris continues his decades-long journey of re-engineering himself

18 and assisting those other inmates who also want to transform themselves.  To date,

19 Mr. Harris estimates he has read over 3,000 books in prison and mentored over

20 10,000 prisoners, one-on-one and in small groups.  He sums up what he has learned

21 and the message he continues to share with other prisoners in one sentence: "There is

22 no right way to do wrong."

23 F.   *Fatherhood*

24 Michael's younger sister, Starlisa, has written in support of Michael's release

25 from prison.  Her letter (appended) states in part:

26 Michael went above and beyond to take care of our mother.

27 He loved her so much and was very protective of her.

28 Having a strong mother in the household is what kept

23

1  Michael grounded for a short while.  Michael never spoke
2  too much about his biological father, nevertheless it is
3  natural to feel some sort of void and possibly build minor
4  animosity towards life itself when either parent is absent
5  from a child's life.  Our mother was hard working and, at
6  times, her jobs required her to be away from the house a lot.
7  Michael quickly took on the role of "man-of-the-house,"
8  because there were days that my siblings and I had to rely
9  on him.  (See Exhibit B.)

10  The fulfillment of responsibility as "man-of-the-house" described by Mr.
11  Harris' sister foreshadows the responsibility Mr. Harris has displayed toward his
12  children, albeit from behind prison walls.

13  In the midst of the success Mr. Harris was achieving in his legitimate
14  businesses while exiting the drug trade, his girlfriend became pregnant with his first
15  child.  A healthy baby girl was born.  She is Mr. Harris' eldest daughter, Mykel Ray'a
16  Harris.

17  When Mykel's mother suffered a mental breakdown, he took on sole parenting
18  responsibility for his then one-and-a-half year old child.  For two years, until his
19  arrest and incarceration, he was a single parent raising his young daughter with the
20  help of his mother and sister, Starlisa.  In hindsight, he's horrified at the thought of
21  the potential danger which could have befallen his daughter and extended family
22  members prior to his arrest, due to his criminal activity.  All the while he thought he
23  was a responsible father.

24  Inherent in that lifestyle was the threat of the loss of the child's father, which is
25  exactly what happened.  He was lost to prison.  Nevertheless, even from prison, he
26  strived to protect, support, educate, and loved his daughter.  He talked and
27  corresponded with Mykel as best as could be expected in his circumstances.

28

24

That child, now a 35-year old woman, graduated with a Bachelor's Degree in Business Management and has been a human resources specialist for the last ten years, now working at NASA Johnson Space Center in Houston, Texas, as a Senior Human Resources Generalist.  She writes:

> Since I can remember, my father has been the only consistent parent in my life, even while being incarcerated...for that I will always be grateful and appreciative of him...  It has been very difficult to grow up without both of my parents by my side, but I believe it is [a] contribution that has made me the strong woman I am today...  When I first expressed to my dad I was with child, his face flooded with emotion, he was so excited knowing that his first born was expecting his first grandchild... When he looked at her [for the first time], I could not hold back my tears as I saw tears of joy flow down his face as he held his granddaughter in his hands...  My dad shows her the same love if not more that he has showed me over the years and continues to do so.  Having him home with us, just the thought brings tears to my eyes, happy tears of course.
>
> I owe my ongoing success and determination to my father...   He was always there to listen to me, and be my shoulder to cry on (digitally).  He is very aware of his role as a father, an exceptional father at that...  My father has become a very wise man over the years, and this skill allows him to instill in others what was never instilled in him as a young man.

1   I believe in my father so strongly that I know that he can
2   come home and continue to live out his dreams of
3   becoming one of the most prominent and successful
4   entertainment gurus.  (See Exhibit B.)

5   In 1995, a second daughter, Lydasia Harris, was born.  She was the result of a
6   conjugal visit between Mr. Harris and his then-wife, Lydia Harris, in Lancaster State
7   Prison.  Lydasia Harris writes:

8   I am Lydasia Rayanna Harris, the second and youngest
9   child of Michael Ray Harris...  [My] father has been
10   incarcerated my entire life...  I reside in Houston, Texas...
11   [I] attended Xavier University, where I played collegiate
12   tennis as well as obtained my bachelor's degree in Business
13   Management.
14   With my father not physically being around through the
15   years of me growing up, it has definitely taken a toll on me
16   but in the same sense has made me stronger.  When I was
17   younger and could not comprehend what was going on, the
18   confusion and the feeling of neglect not only caused pain
19   but also caused anger.  I was an extremely angry child and
20   also very distant.  Consequently, I developed habits of
21   always wanting more and never being satisfied.  I knew
22   something was missing and it frustrated me that I could not
23   put the pieces together on my own.  The missing piece was
24   and still is the absence of my father.  Although my [mother
25   and grandmother] did the very best they could, there are
26   some things that only a father can teach his daughter.
27   Growing up and seeing my friends spend time with both
28   parents was something I truly envied.  As a child I never

26

understood why I always had to be excluded from father and daughter events, why he was never there to support me and why I could never see him outside of prison walls.  All of these unanswered questions at the time troubled me so deeply that I started to resent my family as a whole because I was craving for this "normal family" that I did not have.  Though I was angry, the desire for a relationship with my father was always there.

I always look forward to the weekends that I am able to go and visit with him.  My favorite day to visit and also the day where the reality of him being away from family becomes an even heavier burden is Father's Day.  Every Father's Day we were not fortunate enough to spend together, but there [have been] several times we were able to spend this day together at the prison.  Just to see his face brings a sense of comfort and a smile to mine.  While visiting with my father we have deep conversations and he always leaves me with positive and inspirational words.  Spending the few hours with him and possibly returning the next day is something I always look forward to but the goodbye is always the part that is hard for me to cope with.  To look back and see him standing there wishing he could walk out with us is an indescribable pain.  There is not a time I have left the prison without crying on the way out.  I love my Dad with everything in me and although he's been away we are as close as the prison walls will allow us to be.  There are many life lessons that I never learned because of his absence and as a result, I am having to learn

27

the hard way by teaching myself how to overcome adversity.  This is where the strength that I have developed has come from.  [That is the one thing] that completes me and having to find a way to go day-by-day builds strength and character.  As I am now a young woman in business I do have a very strong desire to have my father alongside to witness all of my accomplishments thus far.

No one is perfect, and I believe everyone deserves a second chance if they are making progress and taking the initiative to do better.  My father is an extremely intelligent man, and full of ideas.  While he has been incarcerated he has used his natural born talents to contribute to a mentoring program in the prison.  He has spoken to young men about good decision-making and his goal is to inspire them to steer away from street life and to focus more on pursuing their careers and making their passion into a profession.  He makes it a priority to inform and bring awareness to the bad decisions he made in his younger years, because he wants people to learn from his mistakes.  My father is truly my hero, because over the years I have seen him grow and I have seen how he wants others to grow.  Life is not just about one's self, but it is also about how you treat others and my father is one to give his last to those around him.  He is one of the strongest people I know, because in the midst of it all, he never folded, remains hopeful and refuses to let this current situation defeat him.  In March of 2017, our family lost someone that was special to us all.  This special woman was my

father's mother Fannie Jordan.  Because of his incarceration, my father was not able to spend any time with his mother before she took her last breath.  She loved him dearly and through her constant battle with cancer she reminded us all that all she wanted was to see her son walk out of the prison doors.  Although she is gone to be with the Lord, she still lives through her family.

If my father is released, he will reside in California again.  All of his family that is left lives in different parts of California and because my dad is a family man I know he will want to be close with the family.  God makes no mistakes and I do believe there is no better timing than His timing.  My father, his family and friends have all suffered long enough with him being away.  My whole life I have had to endure the pain of being apart and him never having the opportunity to see me accomplish anything.  The thought of him being home after so many years is indescribable.  I cannot even imagine how I would react, seeing him walk outside of the prison doors.  The dream I have been dreaming for years would finally become my reality.  (See Exhibit B.)

G.    *Conclusion*

Michael Harris is more than a survivor.  He is a father, grandfather, brother, uncle and granduncle.  He is his family's patriarch.  He's an historic figure in the annals of music, recognized as the one who -- from behind prison walls -- helped put hip hop in motion as a leading form of American music in the last decade of the Twentieth Century, and as a leading form of World Music in the first two decades of the Twenty-First Century.  On March 25, 2020, Librarian Carla Hayden of the

Library of Congress announced that an album from 1992, "Dr. Dre's The Chronic," owned and produced by Mr. Harris' GF Entertainment/Death Row Records, Co., was inducted into the National Recording Registry, to showcase the breadth and depth of American sounds.  It was one of only 25 "American sounds," spanning the period 1927 to the present, inducted in 2020, culled from an historical list of 800 possibilities.

The question becomes how did this man, who showed so much promise in his youth, become a drug dealer, helping spread the poison which decimated his community in the 1980s?   While in prison, he began the process of reclaiming his soul, his better self.  He has continually apologized to his community.  He came to fully understand the lessons from his mother and grandmother, from whom he had learned the value of hard work and staying on the straight narrow path.  In prison, he has taken that long path to redemption.  He became a mentor literally to thousands of men during his 32 years of incarceration.  He has reclaimed his other self which, in his youth, he had traded for the quick buck and fast life.  Now, as a senior citizen, and for the many unique "extraordinary and compelling reasons," detailed on the following pages, it is time for Michael Ray Harris to be released back into society.

III.

FACTUAL AND PROCEDURAL BACKGROUND AND HISTORY

A.   *Distinguishing the Two Undischarged California State Sentences at the Time the Instant Federal Sentence was Imposed*

1.   State Underlying Offense Conduct.

In July 1987, Mr. Harris was charged in Los Angeles County with Conspiracy to Commit Murder (PC §182(1)/PC §187(a)), including an enhancement for inflicting Great Bodily Injury (PC §12022.7).  See People v. Michael (Sean) Harris, Los Angeles County Case No. A954053.  After posting bond, Mr. Harris remained free through the date of his conviction in April 1988.

During the period Mr. Harris remained free on bail, the DEA task force conducted an investigation targeting the Villabona/Bennett organization, based in Los Angeles, which was responsible for distributing large amounts of cocaine.

In March of 1988, Mr. Harris proceeded to trial in LA County on the attempted murder charge. Petitioner was convicted on April 16, 1988 of the conspiracy to commit murder charges, with an enhancement for Great Bodily Injury. Thereafter, he was remanded to the custody of the Sheriff and held at the LA County Jail until the sentencing process concluded.

On September 16, 1988, Mr. Harris was sentenced. He received a 3-year determinate sentence for the Great Bodily Injury to run consecutive to, and be served prior to, a twenty-five (25) year-to-life indeterminate sentence for the attempted murder.

On September 27, 1988, Mr. Harris was transferred to the custody of the California Department of Corrections and Rehabilitation ("CDCR") to serve his term(s) of imprisonment.

On November 1988, Mario Villabona, Brian Bennett and other participants in their organization were arrested and charged in federal court in Los Angeles with drug trafficking. See U.S. v. Villabona, No. 88-CR-972-WJR.

On December 2, 1988, a federal grand jury in Los Angeles returned a four-count indictment against Mr. Harris, charging him with possession and distribution of cocaine, in violation of 21 U.S.C. §§841(a) (1) and 846. These charges were brought in a superseding indictment returned in the Villabona prosecution. See U.S. v. Villabona, No. 88-CR-972-WJR (Dkt. Ent. #2).

On December 29, 1988, Mr. Harris was removed from State custody, into the custody of the United States Marshals Service ("USMS"), on a writ of habeas corpus ad prosequendum to answer to the federal charges.

On January 3, 1989, a federal grand jury returned another superseding indictment charging Mr. Harris with possession and distribution of cocaine, in

violation of 21 U.S.C. §§841(a) (1) and 846.  Mr. Harris appeared in federal court on January 5, 1989.  See U.S. v. Villabona, No. 88-CR-972-WJR (Dkt. Ent. #59).

On August 3, 1989, a federal grand jury returned a second superseding indictment charging Mr. Harris and twelve others with conspiracy to possess and distribute nearly 2,776 kilograms of cocaine, in violation of 21 U.S.C. §§841(a)(1) and 846.  Petitioner was charged with three substantive counts of possessing cocaine with the intent to distribute (21 U.S.C. §841(a) (1)), for the three transactions set forth in paragraph three.  (Dkt. Ent. #291).

On May 18, 1990, following a 67-day jury trail, Mr. Harris was convicted on each of the four counts of the second superseding indictment in which he was charged.

On November 26, 1990, Mr. Harris was sentenced in the United States District Court for the Central District of California by Honorable William J. Rea to 235 months on each of the four counts of conviction, to run concurrent to each other.  Mr. Harris' federal sentence was also ordered to run consecutive to the State sentence "defendant is presently serving."  (Exhibit D.)  This sentencing order by the federal judge judicially aggregated Mr. Harris' 235-month determinate federal sentence to the 36 month (three year) determinate State sentence Mr. Harris was "presently serving" to be served prior to Mr. Harris' 25-year-to-life indeterminate State sentence.  Mr. Harris was then remanded into the custody of the United States Marshals Service ("USMS"), who entered the following sentencing information into their Prisoner Tracking System, "235 MONTHS CAG CONSECUTIVE TO STATE."

This sentencing information, used by the USMS to execute Mr. Harris' federal sentence, was erroneous as it was not the same sentencing instruction from the federal judge on Mr. Harris' Judgment and Commitment Order filed on December 5, 1990, which ordered: "The defendant is hereby committed to the custody of the

1  Bureau of Prisons for the terms of 235 months...  This shall run consecutive to the

2  state prison sentence the defendant is presently serving."  (Exhibit D.)

3       On January 15, 1991, the USMS returned Mr. Harris back to San Quentin, to

4  surrender the writ of habeas corpus ad prosequendum, effectively placing Mr. Harris

5  back into state custody.

6       On January 18, 1991, the USMS placed a detainer against Mr. Harris as a

7  "Sentenced Federal Prisoner" with the CDCR.

8       On January 27, 1991, Mr. Harris' three-year determinate state sentence expired

9  by law, thus, by the federal judge's sentencing order and by operation of California

10 law (Cal. PC §669), Mr. Harris should have been delivered back into federal custody

11 to begin serving his 235-month federal sentence.  Instead, Mr. Harris was improperly

12 left in CDCR custody to begin serving his 25-year-to-life indeterminate state

13 sentence.

14      On April 2, 1991, over 60 days after Mr. Harris' 3-year determinate sentence

15 had expired, and when Mr. Harris should have already been delivered into federal

16 custody, the USMS finally contacted the CDCR Records Department seeking status

17 on the state sentence Mr. Harris was "presently serving."  Since Mr. Harris's three-

18 year determinate state sentence which he was "presently serving" on November 26,

19 1990, when the consecutive federal sentence was imposed, had already expired, the

20 CDCR provided the USMS with the sentencing information regarding Mr. Harris'

21 25-year-to-life indeterminate state sentence he was "presently serving" on April 2,

22 1991, when the request for information was made:  "From United States Marshals

23 Service.  Attention: Records at San Quentin.  RE: U.S. Marshal Service Detainer

24 Status.  SUBJECT: Michael Harris D-97093.  On: Jan. 18, 1991 the United States

25 Marshal for the Northern District of California - Placed a Detainer on Michael Harris

26 for Sentenced Federal Prisoner.  Please answer one of the below questions regarding

27 defendant's status at your facility and return this form in the enclosed self-addressed

28

33

1   envelope.  Subject's tentative release date?  (Answer:) MEPD 8-21-2006."  (See

2   Exhibit F.)

3        From January, 1991 through 2011, Mr. Harris was transferred between State

4   and federal custody on several occasions, for a combined total of approximately two

5   years and eight months, which provided the USMS ample opportunities to correct

6   their error.  However, at no time during this period did the USMS properly execute

7   the 1990 federal sentencing order and deliver Mr. Harris into the custody of the

8   Federal Bureau of Prisons to commence serving his 235-month federal sentence.

9   (See Exhibit D.)

10        On October 11, 2011, the USMS picked up Mr. Harris, but, due to their

11   improper execution of Mr. Harris' federal sentence, they delivered him to the custody

12   of the federal Bureau of Prisons some three years *after* his federal sentence should

13   have legally expired in or about 2008.

14   B.   *Federal Case*

15        1.   <u>Federal Underlying Offense Conduct</u>

16        Information presented by the government alleged the following:  In the 1980's

17   co-conspirators Mario Villabona and Brian "Bo" Bennett were the leaders of a large

18   scale drug trafficking organization based in Los Angeles and operating in other states

19   as well.  The Villabona Organization was responsible for distributing thousands of

20   kilograms of cocaine.  Beginning in about 1983 and continuing until December

21   1988, Villabona, a Colombian national, and Bennett, a United States citizen,

22   obtained their cocaine from Villabona's suppliers in Colombia, principally an

23   individual named "Oscar" whom, it later became known, was Villabona's uncle and a

24   high ranking member of the Cali Cartel.

25        It was Villabona who "organized and supervised the obtaining of 1000-

26   kilogram quantities of cocaine" from his source of supply in Colombia and then

27   "organized and supervised the transportation of large quantities of cocaine" from

28   Colombia to the United States.  (See 1990 PSR at ¶56.)

34

The Organized Crime Drug Enforcement Task Force (the "Task Force") in Los Angeles brought together federal, state, and local agencies under the leadership of special Agent Comer of the Drug Enforcement Administration. From 1985 through the spring of 1987, the task Force conducted a major narcotics and money laundering investigation. In this investigation, code-named Operation Pisces, undercover agents posing as money launderers met and accepted large quantities of U.S. currency from narcotics traffickers and persons responsible for collecting and transporting cash derived from illicit cocaine sales. During the above time span, approximately $45 million in U.S. currency was delivered to Operation Pisces undercover agents in Los Angeles, New York, Miami and elsewhere. Surveillance made possible by these deliveries resulted in the seizures of large quantities of cocaine in Los Angeles.

It was in March 1987 during the course of the Operation Pisces investigation that undercover agents met with and received large amounts of U.S. currency from the Los Angeles-based drug trafficking organization led by Mario Villabona. After Villabona had been identified through Operation Pisces, the Task Force began an investigation targeting his network. This investigation continued until Villabona's arrest in November 1988.

With respect to Michael Harris' connection to these events, it should be noted that Mr. Harris first met Mario Villabona in the summer of 1987. The Government has a photograph of Harris and Villabona at the function where they were originally introduced to one another.

Defendant Harris' involvement in Villabona's drug activity is summarized in the 1990 PSR, which indicates that Mr. Harris participated in a December 1987 phone call to set up a transaction involving 11.5 kilograms of cocaine. (Exhibit G at Paragraph 70.) It should be noted that the PSR does not present or cite any specific evidence of Mr. Harris' involvement in additional drug activity. There is no allegation of Mr. Harris being involved in any Villabona-Bennett drug-related activity before or after December 1987.

35

1   In November of 1988, Villabona was arrested at his residence in Malibu on the

2   instant Federal drug trafficking charges.

3   On December 6, 1988, a Federal Grand Jury in Los Angeles indicted

4   Villabona, together with 12 other individuals on narcotics charges.  On January 3,

5   1989, the Grand Jury returned a first superseding indictment against the same

6   defendants.  Mr. Harris appeared in U.S. District court that month and entered a not

7   guilty plea.  On August 3, 1989, the Grand Jury returned a second superseding

8   indictment against the same defendants.  The second superseding indictment charged

9   all thirteen defendants with conspiracy to (1) possess cocaine with intent to

10  distribute, (2) distribute cocaine, and (3) aid and abet the possession and distribution

11  of cocaine, in violation of 21 U.S.C. §§846 and 841(a)(1).  The conspirators were

12  alleged to have distributed well over a thousand kilograms of cocaine (Count 1).  Mr.

13  Harris also was charged with one count of possessing cocaine with intent to

14  distribute, in violation of 21 U.S.C. §841(a)(1) (Count 3), and two counts of aiding

15  and abetting in similar activity (Counts 2 and 4).  Harris was arraigned on the second

16  superseding indictment on August 7, 1989, and entered a plea of not guilty to all

17  charges.

18  On May 18, 1990, all of the defendants that had proceeded to trial, including

19  Michael Harris, were convicted.

20  In July 1990, a Presentence Report was prepared.  In determining Mr. Harris'

21  Base Offense Level, the U.S. Probation Office calculated that Mr. Harris should be

22  held accountable for the entire amount of 2,776 kilograms of cocaine attributed to

23  the Villabona-Bennett organization throughout the full length of the conspiracy, by

24  virtue of him having been convicted of the conspiracy charged in Count One (see

25  1990 PSR at ¶113).

26  On November 26, 1990, the Honorable William J. Rea, District Court Judge,

27  sentenced Michael Harris to a 235-month term of imprisonment at the low end of the

28  guideline range for Level 36, Criminal History Category III.  Mr. Harris, having been

1   determined to be a participant in Villabona's drug conspiracy, was sentenced on the

2   basis of 2,776 kilograms of cocaine, even though that amount far exceeded the

3   amount of cocaine that he had been personally responsible for.  The court ordered the

4   terms of all four counts to be served concurrently with each other, for a total terms of

5   235 months, but to be served consecutively to the three year determinate state prison

6   sentence for Great Bodily Injury ("GBI") that Harris had been serving at the time his

7   Federal sentence had been imposed.  (Note that his 25 years to life indeterminate

8   state term had not commenced to run at the time of his federal sentence.)

9        In 1995, the Ninth Circuit vacated Villabona's and Bennett's 21 U.S.C. §848

10  Continuing Criminal Enterprise (CCE) convictions.  It did so on grounds that there

11  was insufficient evidence to support §848's requirement that Villabona and Bennett

12  must each have supervised five or more criminally culpable individuals.  Notably,

13  the Government conceded in their appeal brief that Harris, as a matter of law, was

14  not a supervisee.[2]

15       According to both the Government and the Ninth Circuit, Harris' relationship

16  with the Villabona/Bennett group was properly characterized as a buyer/seller

17  relationship.

18       In 1996, Villabona and Bennett were resentenced after the Ninth Circuit

19  vacated their §848 convictions, along with the life sentences that had been imposed

20  back in November 1990.  Villabona and Bennett were each resentenced to terms of

21  328 months (27 years, 4 months).  Both Villabona and Bennett were released from

22  the Bureau of Prisons seven to eight years ago.

23       The only defendant in this case still incarcerated is Mr. Harris,

24  notwithstanding the fact that his role in the overall drug activity was far less

25  significant than Villabona, Bennett, and several of the other principals.

26       On December 4, 1987, Danish authorities learned that Helle Nielson, Mario

27

28       [2] See Nos. 90-50686 and 90-50694, Appellee's Brief in U.S. v. Brian Bennett and Michael Harris, Page 48, Footnote 36.

Villabona and Brian Bennett had registered at the Savoy Hotel in Copenhagen. A court-authorized wire tap was initiated and numerous telephone calls between Villabona and his criminal associates were intercepted. These calls were made to various parts of the world, including conversations regarding money laundering and cocaine delivery. (See PSR, ¶67.) On December 9, 1987, Villabona and Bennett traveled to Milan, Italy.

On December 10, 1987, an Italian Magistrate issued an order authorizing wiretaps on Villabona and Bennett's room telephones at the Milan Hotel. More incriminating calls were intercepted. "Villabona called defendant Michael Harris, and they discussed and 11.5-kilogram deal." (See PSR, ¶70.) Villabona called Michael Harris with instructions regarding picking up cocaine from Martinez. Martinez called (sic) Villabona to report "mission accomplished." (See PSR, ¶72.) Mr. Harris "allegedly operated his own distribution ring in Los Angeles, which was separate and apart from the Villabona-Bennett Enterprise, for which he was a distributor." (See PSR, ¶109.) Mr. Harris' PSR contains no assertion or allegation that he (or anyone else associated with the Villabona-Bennett Organization) ever engaged in any acts of violence or trafficked in or used weapons.

2.     Mr. Harris' Removal from California State Prison Into Federal Custody to Face His Federal Indictment

On December 12, 1988, while Mr. Harris was serving his three year determinate state sentence in California for Great Bodily Injury, he was physically removed from the custody of the CDCR, transferred into the custody of USMS on a writ of habeas corpus ad prosequendum, and transported to Metropolitan Detention Center, Los Angeles, ("MDC-LA") to face federal drug charges. Mr. Harris was indicted along with twelve other individuals with a variety of narcotic-related offenses. In the twenty-eight count indictment, Mr. Harris was charged with the following four counts:

Count 1: Conspiracy to Possess With Intent to Distribute, and to Aid and Abet Possession and Distribution of Cocaine, in violation of 21 U.S.C. §§841; 841(a)(1); 18 U.S.C. §2.

Count 2: Aiding and Abetting With Intent to Distribute Cocaine in Violation of 21 U.S.C. §841(a)(1); 18 U.S.C. §2.

Count 3: Possession With Intent to Distribute Cocaine in Violation of 21 U.S.C. §841(a)(1).

Count 4: Aiding and Abetting Possession With Intent to Distribute Cocaine in violation of 21 U.S.C. §841(a)(1); 18 U.S.C. §2.

### 3.   Mr. Harris' Plea Negotiations and Trial

Upon retaining counsel, Mr. Harris attempted to enter plea negotiations with the government.  He made it clear that he was willing to accept responsibility for his own acts and limited involvement with Mr. Villabona.  Though the government accepted non-cooperation pleas from six of Mr. Harris' co-defendants, all who were supervisees of the criminal conspiracy, they denied Mr. Harris the same opportunity. Instead, they demanded Mr. Harris and co-defendants Villabona and Bennett cooperate with the government to receive a lesser sentence under a plea, or they would require he would go to trial and face a sentence that was significantly harsher.

Since Mr. Harris had only minor interaction with Mr. Villabona, no involvement in the larger conspiracy, and was unwilling to provide perjured testimony, he had no choice but to go to trial.  Mr. Harris was unsuccessful in his attempt to sever his trial from those of his co-defendants, so he was tried alongside the leaders of the criminal conspiracy.

### 4.   The United States Probation Officer's Calculation of Mr. Harris' Guidelines Offense Level for His Narcotics-Related Convictions

The United States Probation Office grouped Mr. Harris' convictions on Counts 1-4 together for the purposes of calculating his offense level under the United States Sentencing Guidelines (the "Guidelines") for his narcotics-related convictions.  (See

PSR, ¶¶112-114.)  It then used §2D1.1 of the Guidelines to calculate that offense level.  (Id.)  In particular, §2D1.1 of the Guidelines instructs that the base offense level for any narcotics-related offense is determined by the Drug Quantity Table.

### 5.   The U.S. Probation Office's Calculation of Mr. Harris' Guidelines Offense Level Adjustment for Role in the Offense

U.S.S.G. §3B1.2 provides that the offense level for a minor participant in a conspiracy shall be reduced by 2 points.  Even though Mr. Harris was described by the DEA as a "Los Angeles trafficker" who allegedly operated his own distributor ring which was "separate and apart from the Villabona-Bennett enterprise," (see PSR, ¶109) the Probation Office still recommended that no 2 point downward adjustment for mitigated role be applied.

### 6.   The Probation Office's Computation of Mr. Harris' Criminal History Category

The computation of a defendant's criminal history is used by the United States Probation Office to place a defendant in a category (I-VI), which when combined with the "Total Offense Level," determines an applicable Guidelines Sentencing Range.  The number, and severity, or prior terms of imprisonment, are assigned Criminal History Points and are added together to establish a defendant's Criminal History Category.  Mr. Harris had a prior state case in 1983 for carrying a concealed weapon, which resulted in a 2 point Guideline score.  In 1985, Mr. Harris plead guilty to Possession of a Weapon in a Vehicle, a misdemeanor, which resulted in 1 point of Criminal History.  In 1988, Mr. Harris had been convicted of a Conspiracy to Commit Murder and Great Bodily Injury, which resulted in his being sentenced to an indeterminate state sentence of 25 years to life to run *consecutive* to a 3 year determinate state sentence and an increase in his Criminal History Guideline Score of 3 points.

As previously mentioned, Mr. Harris has always maintained his innocence of committing the state crime.  The total Criminal History points of 6 placed Mr. Harris

in Category III, which set his then sentencing guidelines range between 188-235 months.  If the 3 points for the 1988 state crimes that Mr. Harris has proof he actually was innocent of, were removed then Mr. Harris would be reduced to Criminal History Category II, which would result in a Guidelines Sentencing range of 168-210 months.

7.   Mr. Harris' Sentencing Hearing on November 26, 1990

Mr. Harris appeared before Judge William J. Rea for sentencing on Nov. 26, 1990, and was represented by David M. Dudley.  Mr. Dudley argued principally that the court should not effectively sentence Mr. Harris to a life sentence by ordering his 235-month federal sentence to run consecutive to his two undischarged state sentences (see Sentencing Transcript, Exhibit H).  There was much discussion by Mr. Dudley as to why Judge Rea should order Mr. Harris' federal sentence to run concurrent to his state sentences.  It is explicitly clear based on the sentencing transcript that Judge Rea chose to run Mr. Harris' federal sentence consecutive to the state sentence that Mr. Harris was presently serving because the state offense was a crime of violence.  The information in front of Judge Rea at the time of sentencing was a Probation Report which showed Mr. Harris was sentenced by the state court to serve two undischarged state sentences:

1)   a 3-year determinate state sentence for Great Bodily Injury which was being served consecutive to;

2)   a 25-year-to-life indeterminate state sentence for Conspiracy to Commit Murder.

It is abundantly clear that Judge Rea chose to run Mr. Harris' federal sentence consecutive to the determinate state sentence for GBI Mr. Harris was presently serving because of the violent nature of the state crime.  Judge Rea even stated that "the thrust of this particular case" was that Mr. Harris should not receive any federal credit, or a "free bite out of the apple," for a state crime that included conspiracy to commit murder.  (Id.)  Nowhere does Judge Rea ever state, or imply, that it was the

41

nature of Mr. Harris' federal drug convictions on which he was basing his decision to impose a consecutive federal sentence.  Quite the opposite, Judge Rea chose to run each of Mr. Harris' four federal drug convictions concurrent with each other.

The second issue Mr. Dudley argued both at sentencing and in his sentencing memorandum (see Exhibit I; 1990 Sentencing Memorandum) is his objection to the Probation Officer's failure -- based on the irrefutable facts presented at trial -- to apply a 2 point minor participation reduction, per U.S.S.G. §1B1.2, to Mr. Harris' role in the overall Villabona-Bennett conspiracy which would have reduced his offense level from 36 to 34.  Although Mr. Dudley clearly brought his objection to the attention of Judge Rea, a review of the sentencing transcripts will show that Judge Rea failed to ever address the issue.  While Mr. Harris, the government, and the Court all agreed that Mr. Harris' base offense level for drug amount was 36, which at the time represented any amount of cocaine greater than 50 kilograms, at no time during the course of sentencing was there ever any discussion much less agreement concerning the specific amount of drugs involved in the greater conspiracy that was directly attributable to Mr. Harris's own or relevant conduct.

8.   Mr. Harris' Federal Direct Appeal

To United States Court of Appeals for the Ninth Circuit.  United States v. Barona, 56 F.3d 1087; 1995 U.S. App. LEXIS 13590; 95 Cal. Daily Op. Service 4161; 95 Daily Journal DAR 7174, October 5, 1994, Argued and Submitted, Pasadena, California, June 5, 1995, Filed.

Mr. Harris timely appealed his conviction and sentence to the U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit"), which was affirmed in part, reversed in part, and remanded to the District Court on June 6, 1995.  Writ of Certiorari was denied on January 22, 1996.

9.   Mr. Harris' Other Post-Conviction Litigation

Petitioner filed a motion under 28 U.S.C. §2255.  See Dkt. Ent. #1086.  The Court denied Petitioner's §2255 motion on August 31, 1995, which the Ninth Circuit

42

affirmed on July 15, 1996.  See <u>United States v. Harris</u>, 1996 U.S. App. LEXIS 17765 (9th Cir., Mem. Disp. Dated: July 15, 1996).

On October 30, 1995, Petitioner filed a motion for resentencing under Fed. R. Crim. P. 32.  See Dkt. Ent. #1118.  Following an evidentiary hearing conducted on November 6, 1995, the Court denied Petitioner's motion.  The Ninth Circuit affirmed on October 10, 1996.  See <u>United States v. Harris</u>, 1996 U.S. App. LEXIS 26690 (9th Cir., Mem. Disp. Dated: October 10, 1996).

On December 16, 2011, Petitioner filed his Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. §2241, <u>Michael Ray Harris v. Jack Fox</u> (U.S. Dist. Court, Northern Dist. Cal. Case No. C-11-80261-WHA).  (Dkt. Ent. #12.)  On December 30, 2011, the government filed a Motion to Dismiss.  (Dkt. Ent. #22.)  On September 4, 2014, the District Court entered an order denying the Petition under §2241.  (Dkt. Ent. #45.)

On October 2, 2014, Petitioner filed a timely Notice of Appeal as to the order denying his Petition for Writ of Habeas Corpus.  (Dkt. Ent. #49.)

On September 4, 2014, Petitioner filed a Motion to Alter or Amend the Order and Judgment under Fed. R. Civ. P. 59(e) and 60(b).  (Dkt. Ent. #48.)  On November 10, 2014, the District Court denied Petitioner's Motion.  (Dkt. Ent. #56.)

On December 9, 2014, Petitioner filed a timely Notice of Appeal as to the order denying his Motion to Alter or Amend the Order and Judgment.  (Dkt. Ent. #57.)

On May 17, 2017, Petitioner filed in the sentencing court to reduce his sentence by the equivalent of two guideline levels pursuant to U.S.S.G. Amendment No. 782 and 18 U.S.C. §3582(c)(2).

On May 17, 2017, the District Court ordered the Probation Office to submit an updated/complete supplemental presentence report for purposes of resolving defendant Harris' §3582(c)(2) motion.  On July 24, 2017, the supplemental PSR and recommendation letter were disclosed to the parties.  The revised PSR initially

supported the motion for a 2-level reduction in the Base offense Level for drug amount from 36 to 34.  The cover letter to the Presentence Report contained an insightful analysis of pertinent considerations in assessing the propriety of the Amendment 782 reduction with respect to Mr. Harris.  In recommending a reduction from 235 months to 188 months, the Probation Officer cited:

--The 18 U.S.C. §3553(a) criteria, with a particular emphasis on relative culpability among the defendants in this case and avoiding "unwarranted sentencing disparities among defendants with similar records who had been found guilty of similar conduct" (see Pages 3-4 of Cover Letter to Presentence Report, dated July 17, 2017);

-- Public Safety Considerations.  The Probation Officer noted that if the sentencing reduction were to be granted, Mr. Harris would be approximately 61 years old when released from prison and pointed out that "research clearly shows the risk of recidivism is substantially lower for an offender that age.  In short, reducing the defendant's sentence to 188 months is unlikely to compromise public safety" (see Pages 4-5 of Cover Letter to Presentence Report, dated July 17, 2017); and

--Post-Sentencing Conduct.  Here the Probation Officer observed:

Harris has distinguished himself by his exceptional pro-social, post-sentencing conduct while in state prison.  He worked to make society safer by mentoring fellow inmates to lead a crime-free life, and by promoting educational and vocational initiatives within the prison system.  It speaks volumes that so many distinguished  public servants in the Bay area, occupying high-profile positions, would endorse so strongly someone like Harris, who was then a San Quentin inmate serving a 25-year prison sentence for attempted murder.  A common theme runs through the

44

1    many letters submitted by both the mayor and chief of

2    police for the city of Richmond, California, as well [as]

3    those submitted by the state senator, assembly member,

4    county supervisor and others serving that area (PACER

5    Doc. No. 1373-1).  All believed the city of Richmond

6    would have benefitted immediately if Harris was paroled,

7    so that he might deploy his unique skill set to improve

8    neighborhood safety.

9    Since entering the Bureau of Prisons, Harris has continued

10   his exceptional post-sentencing rehabilitation.  He has

11   completed numerous educational programs, including

12   college-level courses.  As was the case in the California

13   Department of Corrections, Harris has maintained an

14   exemplary disciplinary record.  In light of the factors

15   considered above, the Probation Officer recommends the

16   Court exercise its discretion to reduce Harris's base offense

17   level by two levels.  (See Page 5 of Cover Letter to the

18   PSR.)

19        On October 3, 2017, the Government filed its Opposition.  On October 9, 2017

20   the Probation Office filed an amended PSR, reversing its earlier position.  On

21   October 13, 2017, Petitioner Harris, through counsel, replied to the Government's

22   Opposition.

23        On March 27, 2018, the Court considered Petitioner Michael Harris' motion

24   for a sentence reduction pursuant to 18 U.S.C. §3582(c)(2), together with the moving

25   and opposing papers.  This court stated that Petitioner "Harris raises various

26   arguments as to why the full 2,776 kilograms should not be attributable to him.

27   However, [Section] 3582(c)(2)'s limited scope allows for the Court to, now,

28   determine only what the amended guideline range would have been had the relevant

amendment been in effect at the time of the initial sentencing.  See <u>Dillon vs. United States</u>, 560 U.S. 817, 827 (2010).  Accordingly, Harris' arguments are outside the scope of a [Section] 3582(c)(2) motion.  See <u>Dillon</u>, 560 U.S. at 827.

"Because Harris is ineligible for a sentence reduction, the Court may not consider Harris's post-conviction achievements or any other 18 U.S.C. §3582(a) sentencing factors in evaluating this motion.  See <u>Serrano</u>, 615 Fed. Appx. at 468." The motion for sentence reduction based on Amendment 782 was denied.

Harris filed a timely appeal on July 9, 2018 to the Ninth Circuit, <u>United States v. Michael Harris</u>, C.A. No. 18-50114.  After briefing was completed by both parties, the government filed a supplemental letter dated April 25, 2019 pursuant to Federal Rule of Appellate Procedure 28(j) to address recently published authority, <u>United States v. Rodriguez</u>, C.A. No. 17-10233 (slip op.) (9th Cir. April 24, 2019), which address issues raised in Mr. Harris' appeal.  The government in its letter conceded that the recently decided Rodriguez opinion "undermines" its position.

In response to the government's April 25, 2019 letter, Petitioner Harris' attorney filed a letter dated April 27, 2019, in which Harris agreed that the Rodriguez opinion "undermines [the government's] previously argued position in its answering brief that 'the sentencing court's adoption of the PSR's uncontested drug-quantity findings precluded further fact-finding to determine defendant's eligibility for relief under 18 U.S.C. §3582(c)(2)."

The Ninth Circuit panel, in a Memorandum dated July 2, 2019, affirmed the lower court's opinion that "Harris' arguments are outside the scope of a Section 3582(c)(2) motion."

## IV.

## ARGUMENT

Mr. Harris recognizes the significant harm caused by the cocaine that flooded into Los Angeles during the late 1980s, and he accepts full responsibility for his role and active participation in its distribution.  However, Mr. Harris' case is

1   extraordinary and compelling because Harris served 23 years in the California state

2   prison system for a crime of which he is actually innocent, and consequently he now

3   is barely halfway through serving a 19-year consecutive federal sentence that was

4   improperly executed and should have expired years ago.  During this 32 period, Mr.

5   Harris' rehabilitation has been beyond exceptional, as he has not only transformed his

6   own life, he has helped to create numerous rehabilitative programs that have helped

7   countless other prisoners to transform their own.

8       Over these past three decades, Mr. Harris, by his actions, has consistently

9   proven himself to be deserving of a "second chance" and a reduction of his sentence.

10  And with the recent passage of the First Step Act of 2018, this Court has been

11  authorized by Congress to take a "second look" at Mr. Harris's case, and based on

12  any reason(s) this Court finds "extraordinary and compelling," this court is

13  empowered to reduce Mr. Harris' sentence and grant his release.

14                                 V.

15      THIS COURT HAS THE AUTHORITY TO REDUCE MR. HARRIS

16      SENTENCE TO TIME SERVED PURSUANT TO 3582(c)(1)(A)(i)

17      FOR EXTRAORDINARY AND COMPELLING REASONS

18      With the changes to 18 U.S.C. §3582(c)(1)(A) contained in the First Step Act,

19  District Courts no longer need await a motion from the Director of the BOP before

20  reducing a defendant's sentence (even to time served) based on the existence of

21  "extraordinary and compelling" circumstances. Rather, District Courts may now do

22  so directly upon the filing of a motion by a defendant after the earlier of the

23  following two events: (1) rejection by the warden of the facility in which a defendant

24  is being held of such a request; or (2) the lapse of 30 days from the receipt of the

25  request by the warden of such facility.

26      Moreover, the "extraordinary and compelling reasons" upon which District

27  Courts may reduce a sentence are no longer limited to medical condition, age and

28  family circumstances.  Rather, no limits any longer exist as to the "extraordinary and

compelling reasons" that might warrant a sentence reduction pursuant to 18 U.S.C. §3582(c)(1)(A). This Court therefore is free to determine on its own whether "extraordinary and compelling reasons" exist such that a reduction of Mr. Harris's federal sentence is warranted.

A. *Congress Intended to Empower District Courts to Reduce Sentence Based on "Extraordinary and Compelling Reasons" Other Than Medial Condition, Age and Family Circumstances*

Congress first enacted the modern form of "compassionate release" in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation included (among other things) the major sentencing reforms reflected in the Sentencing Reform Act of 1984, including the abolition of parole and implementation of the Sentencing Guidelines, which combined to ensure that most defendants would serve in full the terms of imprisonment imposed on them at sentencing (save for limited "good-time" credit). Recognizing that the abolition of parole would eliminate the criminal justice system's means for adjusting to changed circumstances, Congress created number of statutory sentence adjustment provisions which are collectively codified in 18 U.S.C. §3582(c).[3]

As relevant here, 18 U.S.C. §3582(c)(1)(A) provides that District Courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction." Three points bear noting with regard to the operation of 18 U.S.C. §3582(c)(1)(A):

First, Congress empowered district courts, not the U.S. Parole Commission, to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983). Put differently, Congress envisioned 18 U.S.C. §3582(c)(1)(A) acting as a "safety valve[] for [the] modification of sentences" and intended for district courts to be able to reduce

---

[3] See generally Shon Hopwood, Second Looks & Second Chances, Cardozo Law Review (available today at https://papers.ssrn.com/so13/papers.cfm?abstract_id=3404899).

48

1  sentences when justified by the various factors and reasons that the U.S. Parole

2  Commission previously had considered in making parole determinations.  Id. at 121.

3  Lawmakers further noted that the foregoing approach would keep "the sentencing

4  power in the judiciary where it belongs," rather than with the U.S. Parole

5  Commission, and that 18 U.S.C. §3582(c)(1)(A) would allow for the "later review of

6  sentences in particularly compelling situations."  Id.  This legislative history

7  demonstrates that Congress, in passing the Comprehensive Crime Control Act 1984,

8  intended to give district courts an equitable power to employ on an individualized

9  basis to correct sentences when "extraordinary and compelling reasons" indicate that

10  the sentence initially imposed on any individual defendant no longer served

11  legislative objectives.

12      Second, although the power to reduce sentence provided for by 18 U.S.C.

13  §3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or

14  terminally ill defendants, nothing in the statutory language or legislative history of

15  18 U.S.C. §3582(c) indicates that Congress intended to limit its application to elderly

16  defendants or defendants with compelling medical circumstances. Rather, if a judge

17  finds the existence of any "extraordinary and compelling reasons" warranting a

18  sentence reduction, those reasons could, pursuant to 18 U.S.C. §3582(c)(1)(A), form

19  the legal basis for the reduction "of an unusually long sentence." Id. at 55-56.

20  Indeed, the legislative history of 18 U.S.C. §3582(c)(1)(A) indicates that lawmakers

21  thought that "extraordinary and compelling reasons" for a sentence reduction should

22  not be limited to medical condition, age  and family circumstances.  In particular,

23  recognizing that parole had historically played a key role in the federal criminal

24  justice system, legislators explained how some defendants may warrant a sentence

25  reduction (after service of some period of incarceration) based on any number of

26  "circumstances":

27          The [Senate Judiciary] Committee believes that there may

28          be unusual cases in which an eventual reduction in the

49

1      length of a term of imprisonment is justified by changed

2      circumstances.  These would include cases of severe

3      illness, **cases in which other extraordinary and**

4      **compelling circumstances justify a reduction of an**

5      **unusually long sentence**, and some cases in which the

6      sentencing guidelines for the offense of which the

7      defendant was convicted have been later amended to

8      provide a shorter term of imprisonment."  Id. at 55-56

9      (1983).  (Emphasis added.)

10      Third, notwithstanding all of the foregoing, Congress conditioned the

11  reduction of any "final term of imprisonment pursuant to 18 U.S.C. §3582(c)(1)(A)

12  on the filing of a motion by the Director of the BOP requesting such a reduction.

13  Thus, District Courts -- until the recently enacted First Step Act -- were only

14  authorized to reduce a sentence based on "extraordinary and compelling reasons" if

15  asked to do so by the Director of the BOP.

16  *B.*  *The U.S. Sentencing Commission has Indicated that the "Extraordinary and*

17      *Compelling Reasons" Upon Which a Sentence Reduction Pursuant to 18*

18      *U.S.C. §3582(c)(1)(A) May Be Based are Not Limited to Medical Condition,*

19      *Age and Family Circumstances*

20      In enacting the Comprehensive Crime Control Act of 1984, Congress tasked

21  the U.S. Sentencing Commission (the "Sentencing Commission") with responsibility

22  for developing standards for identifying the existence of "extraordinary and

23  compelling reasons" for a sentence reduction.  See 28 U.S.C. §994(t) ("The

24  Commission...shall describe what should be considered extraordinary and

25  compelling reasons for sentence reduction, including the criteria to be applied and a

26  list of specific examples").  The Sentencing Commission, though, initially neglected

27  that legislatively mandated obligation.  But in 2007, the Sentencing Commission

28  finally acted, promulgating a policy statement advising that "extraordinary and

1  compelling reasons" warranting a sentence reduction could include medical

2  condition, age, family circumstances and "other reasons."  See U.S.S.G. §1B1.13,

3  Application Note 1(A) (Amendment 698).

4        Notwithstanding the foregoing, in April, 2013, the Office of the Inspector

5  General of the U.S. Department of Justice (the "OIG") issued a scathing report

6  finding that the Director of the BOP rarely filed 18 U.S.C. §3582(c)(1)(A) sentence

7  reduction motions (even for defendants who clearly met the Sentencing

8  Commission's objective criteria for a sentence reduction).[4]  In response, the

9  Sentencing Commission expanded its guidance to district courts on qualifying

10 circumstances and encouraged the BOP to file 18 U.S.C. §3582(c)(1)(A) motions

11 whenever a defendant meets the criteria set forth in §1B1.13 of the guidelines.  See

12 U.S.S.G. §1B1.13, Applications Note 4; United States v. Dimasi, 220 F. Supp. 3d

13 173, 175 (D. Mass 2016) (discussing the progression from the OIG report to new

14 "encouraging" guidelines).  In doing so, the Sentencing commission identified

15 several categories of qualifying "extraordinary and compelling reasons," including

16 medical condition, age, family circumstances and "[o]ther reasons, for circumstances

17 in which the Director of the BOP determines that there is an extraordinary and

18 compelling reason other than, or in combination with," medical condition, age and

19 family circumstances.  U.S.S.G. §1B1.13, Application Note 1(A) (internal quotation

20 marks omitted).  The Sentencing Commission also clarified that "extraordinary and

21 compelling reasons" need "not have been unforeseen at the time of sentencing in

22 order to warrant" a sentence reduction.  Id.  Application Note 2.  In other words, an

23 "extraordinary and compelling" reason for a sentence reduction that could have been

24 known or anticipated by a district court at the time of initial sentencing "does not

25 precludes [its] consideration" for a sentence reduction.  Id.

26

27 _____

28 [4] See U.S. Department of Justice Office of the Inspector General, "The Federal
Bureau of Prisons' Compassionate Release Program (Apr. 2013) (Footnote 11).  (See
also https://oig.justice.gov/reports/2013/e1306.pdf.).

Thus, simply put, the Sentencing Commission, consistent with the text and legislative history of 18 U.S.C. §3582(c)(1)(A), concluded that reasons beyond medical condition, age and family circumstances could constitute "extraordinary and compelling reasons" for a sentence reduction and that those "extraordinary and compelling reasons" need not necessarily relate to a defendant's circumstances after sentencing.

One other significant point bears noting:  Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop standards for identifying "extraordinary and compelling reasons" for a sentence reduction:  "Rehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason."  28 U.S.C. §994(t).  (Emphasis added.)  Lawmakers no doubt legislated that sole limitation so that District Courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984.  But legislators' use of the modifier "alone" evidences that they believed that rehabilitation *is relevant* to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

C.    *The First Step Act Authorizes Federal Courts to Reduce Sentences Based on Virtually Any "Extraordinary and Compelling Reasons"*

As detailed above, District Courts, before the First Step Act, could only reduce a defendant's sentence if the Director of the BOP filed a motion before the District Court requesting such relief.  See United States v. Beck, Case No. 13-CR-186-6, 2019 WL 2716505, at *4 (W.D.N.C. June 28, 2019) ("Before passage of the First Step Act of 2018, district courts could grant compassionate release sentence reductions only upon a motion by the BOP Director").  In other words, District Courts had no authority before the First Step Act (absent the filing of a motion by the

Director of the BOP) to reduce the sentence of any defendant, even if a defendant unambiguously presented "extraordinary and compelling reasons" for a sentence reduction (either as determined by a judge or as defined by the Sentencing Commission in §1B1.13 of the Guidelines).

Thus, practically speaking, the Director of the BOP was unilaterally empowered to determine which defendants presented "extraordinary and compelling reasons" for a sentence reduction and was the only individual authorized by law to initiate a sentence reduction proceeding.[5] Indeed, even the U.S. Department of Justice recognized that, before passage of the First Step Act, the BOP (not the Sentencing Commission, a defendant, a prosecutor or even a judge) functionally had final say on what constituted an "extraordinary and compelling reason" for a sentence reduction because only the Director of the BOP could file an 18 U.S.C. §3582(c)(1)(A) sentence reduction motion.  As the U.S. Department of Justice asserted in a letter to Gilberto Hinojosa, Chairman of the U.S. Sentencing Commission in 2007, since Congress authorized the BOP alone to determine which defendants to bring to a court's attention for a potential sentence reduction, "it would be senseless [for the Sentencing Commission] to issue policy statements allowing the court to grant such motions on a broader basis than the responsible agency will seek them").

The OIG found that leaving the Director of the BOP with such unilateral and unqualified authority created several problems.  Among other things, the OIG found that the BOP: (1) failed to provide adequate guidance to staff on the criteria for 18 U.S.C. §3582(c)(1)(A) motions; (2) failed to set time-lines for the review of requests for 18 U.S.C. §3582(c)(1)(A) motions; (3) failed to create formal procedures for informing defendants about 18 U.S.C. §3582(c)(1)(A); and (4) failed to generate a

---

[5] The BOP's policies and procedures concerning 18 U.S.C. §3582(c)(1)(A) sentence reduction motions in existence before passage of the First Step Act are found in "Program Statement 5050.49 -- "Compassionate Release/Reduction in Sentence: Procedures for implementation of 18 U.S.C. §3582(c)(1)(A) and 4205(g)" (March 25, 2015).  See https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

53

1  system for tracking requests for 18 U.S.C. §3582(c)(1)(A) motions.  Thus, the OIG

2  concluded that the "BOP does not properly manage the compassionate release

3  program, resulting in inmates who may be eligible candidates for release not being

4  considered."  Id.[6]

5      Congress heard and acted on those complaints.  In late 2018, it passed the First

6  Step Act, which fundamentally transformed the process by which 18 U.S.C.

7  §3582(c)(1)(A) sentence reduction motions are adjudicated.  In particular, instead of

8  relying on the Director of the BOP to determine whether "extraordinary and

9  compelling reasons" exist supportive of a sentence reduction and instead of relying

10 on the Director of the BOP to file an 18 U.S.C. §3582(c)(1)(A) sentence reduction

11 motion, District Courts today can resentence a defendant "upon motion of the

12 defendant" as long as a defendant first files a request for a sentence reduction motion

13 with the warden of the facility in which s/he is being held that is rejected or the lapse

14 of 30 days "from the receipt of such a request by the warden of the defendant's

15 facility," whichever happens first.  See 18 U.S.C. §3582(c)(1)(A); Beck, 2019 WL

16 2716505, at *5 ("Among other things, [the First Step Act] add[s] a provision

17 allowing courts to consider motions by defendants for compassionate release without

18 a motion by the BOP Director so long as the defendant has asked the Director to

19 bring such a motion and the Director fails or refuses").

20     Thus, simply put, once a defendant files an 18 U.S.C. §3582(c)(1)(A) sentence

21 reduction motion after the occurrence of either of the two foregoing events, a district

22 court may reduce that defendant's sentence to time served (or any other prison term

23 short of the initial sentence) if it finds that (1) "extraordinary and compelling

24 reasons" exist for a sentence reduction after considering the 18 U.S.C. §3553(a)

25 factors; and (2) a reduced prison term is consistent with the applicable policy

26 statements set forth in §1B1.13 of the Guidelines.

27

28

---

[6] See also Stephen R. Sady & Lynn Deffebach, "Second Look Resentencing
Under 18 U.S.C. §3582(c) as an Example of Bureau of Prisons Policies That Result
in Over Incarceration," 21 Fed. Sent. Rptr. 167 (Feb. 2009).

See <u>Beck</u>, 2019 WL 2716505 at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.[7]

Congress made the forgoing changes in an effort to expand the use of 18 U.S.C. §3582(c)(1)(A) in the reduction of sentence that no longer serve the penological objectives of the federal criminal justice system. Thus, today, federal judges have the power to order sentence reductions and, doing so, are authorized to reduce prison terms (even to time served) on the full array of grounds reasonably encompassed by the phrase "extraordinary and compelling reasons."  Put differently, relief under 18 U.S.C. §3582(c)(1)(A) is now available to any defendant whose conditions have changed such that a fair-minded person could conclude that "extraordinary and compelling" reason for a sentence reduction exist.

<u>United States v. Cantu-Rivera</u>, Case No. 89-CR-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019), is instructive with regard to this Court's newfound authority to reduce sentences based on "extraordinary and compelling reasons" (even if those reasons do not relate to medical condition, age or family circumstances). Initially, the court in Cantu-Rivera explained that"[t]he First Step Act of 2018 amended 18 U.S.C. §3582(c)(1)(A) to allow district courts to modify sentences of imprisonment upon motion by the defendant if the defendant has fully exhausted all [BOP] administrative remedies...or 30 days from the receipt of such a request by a warden

---

[7] Nothing in 18 U.S.C. §3582(c)(1)(A) precludes a district court from resentencing a defendant who presents "extraordinary and compelling reasons" for a sentence reduction to a prison terms that is shorter than any mandatory minimum (including, as applicable here, the mandatory life sentence provided for by 21 U.S.C. §848(b)).

Also, notably, 18 U.S.C. §3582(c)(1)(A) sentence reduction motions do not constitute an appeal or review of a BOP determination on a request for such a sentence reduction motion.  Rather, any such motion is filed and considered on a de novo basis.  See <u>Beck</u>, 2019 WL 2716505 at *13 ("the terms of the First Step Act give courts independent authority to grant motions for compassionate release and says nothing about deference to BOP, thus establishing that Congress wants courts to take a de novo look at compassionate release motion").

of the defendants facility, whichever is earlier."  Id. at *1 (internal quotation marks omitted).  It then reduced that defendant's life sentence (for conspiracy to possess with intent to distribute in excess of five kilograms of cocaine) to time served (after service of more than 30 years imprisonment) based  principally on "the extraordinary degree of rehabilitation Mr. Cantu-Rivera has accomplished during," the 30 years he has been incarcerated," including "extensive educational achievements," such as completion of over 4,000 hours of teaching while in federal prison to complete a Teaching Aide apprenticeship with the Department of Labor," his "service as a teaching assistant in several prison facilities for high-school equivalency and English-as-a Second-Language programs" and "his service in the BOP's suicide watch program , helping to care for inmates placed in solitary confinement due to suicide attempt."

Similarly, in United States v. Cantu, Case No.05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019), the court properly noted that "[a] court may now," Pursuant to 18 U.S.C. §3582(c)(1)((A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"  Id. at*1.  It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to §1B1.13 of the Guidelines. Id. at *3.

And, in United States v. McGraw, Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court stated that the First Step Act's modification of 18 U.S.C. §3582(c)(1)(A) "now provides an avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to

Sentencing Guidelines §1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction." Id. at *1. It then reduced that defendant's life sentence (after service of more than 17 years imprisonment ) based principally on "his serious medical conditions," even though he had a long criminal history and had occupied a "leadership" position in the Diablos motorcycle gang. Id. at 2-6.

VI.

MR. HARRIS HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES FOR THE FILING OF AN 18 U.S.C. §3582(c)(1)(A) SENTENCE REDUCTION MOTION DIRECTLY WITH THIS COURT

On November 25, 2019, Mr. Harris filed a request for a sentence reduction motion (Remedy Request No. 998407-F1) with the warden of the facility in which he is incarcerated (Federal Correctional Institution, Lompoc ("FCI Lompoc"), in Lompoc, California (Exhibit C). More than 30 days passed before Mr. Harris received a response (on January 22, 2020) from the warden at FCI Lompoc rejecting his request for a sentence reduction motion. (Exhibit C.) Thus, Mr. Harris now is statutorily authorized to directly present this Court with the instant 18 U.S.C. §3582(c)(1)(A) sentence reduction motion.

VII.

EXTRAORDINARY AND COMPELLING REASONS SUPPORT THE REDUCTION OF MR. HARRIS' 235-MONTH SENTENCE TO TIME SERVED

As noted before, Mr. Harris has served over 32 years in prison, 23 of those for a state crime for which he was innocent, and he has since served almost nine years on a 19-year federal sentence which was improperly executed -- a long time behind bars by any measure by anyone. (See McGraw, 219 WL 2059488 at *5 ("Mr. McGraw has been in custody since September, 2002 -- nearly 17 years. That is a significant sanction.")) Rather than blaming others for his incarceration, Mr. Harris

1  acknowledged and accepted complete responsibility for his incarceration as an
2  inevitable consequence of his youthful and misguided decision to sell drugs.

3  Having recognized the factors which led him to make the unfortunate choice
4  to engage in a criminal lifestyle, Mr. Harris took action to change the direction of his
5  life's journey and began to walk down a path of self-reflection, emotional growth,
6  and personal transformation.  Mr. Harris realized if he was to find meaning and self-
7  worth in life, he would have to find it while incarcerated, so he became an active
8  participant in the many self-help and educational programs offered within the prison
9  over the years.  Mr. Harris steadily progressed from one who sought help from
10 others, to one who provided help to others.  Mr. Harris has done everything in his
11 power to rehabilitate himself, as demonstrated by his many exceptional
12 accomplishments and his meritorious prison record.  Mr. Harris' numerous
13 contributions in bettering our communities have been recognized by prison officials,
14 elected and government officials, and business and community leaders, all of whom
15 have written letters of support and see no point in his continued confinement.  And
16 he has the wholehearted support of a large and loving family.

17 As a buyer, who was "separate and apart" from the Villabona Organization,
18 Mr. Harris played a minor role in the conspiracy, but he makes no excuses for the
19 harm his distribution of drugs into Los Angeles caused his community and his
20 family.  Mr. Harris fully understands the nature and the magnitude of his
21 wrongdoings, and does not seek to justify, diminish or detract from the seriousness
22 of his offenses.  He unequivocally accepts responsibility for his criminal conduct (as
23 he was prepared to do before trial but for the government's insistence that he provide
24 substantial cooperation and assistance against his co-defendants in order to be
25 offered any plea agreement).

26 The decades Mr. Harris has spent imprisoned has profoundly affected his view
27 of himself, of his decisions, and of his impact upon society.  He has put a great deal
28

58

1  of time and effort into transforming himself into a self-aware, responsible and pro-
2  social citizen, who will present no danger to the public if released from custody.

3  Thus, Mr. Harris respectfully submits that "extraordinary and compelling
4  reasons" exist for the reduction of his 235-month sentence to time served.

5  A.   *Mr. Harris is Remorseful, Contrite, and Accepts Full Responsibility for His*
6      *Criminal Conduct*

7  While Mr. Harris has made it clear that he was only a customer of the
8  Villabona-Bennett Organization, Mr. Harris does not deny that he operated his own
9  sizeable drug distribution network in Los Angeles.  Though Mr. Harris has always
10  maintained that he was a minor participant in the drug conspiracy for which he was
11  indicted, Mr. Harris has never sought to diminish his role in the devastation wrought
12  upon his community as a direct consequence of his drug distribution activities.  Mr.
13  Harris may have occupied a minor role in the particular criminal offense for which
14  he was convicted, but he recognizes that his past actions play a major part in the
15  damage caused by the cocaine epidemic of the 1980s.

16  When Mr. Harris was selling drugs, in the mid-1980s, he thought he knew
17  everything.  As a wholesaler of cocaine, he wasn't involved in the day-to-day street
18  level retail end of the drug trade.  Since he didn't witness firsthand how the drugs he
19  distributed were ruining the lives of the people who used them, he viewed his
20  criminal activity as a victimless enterprise.  While Mr. Harris tried to hide in plain-
21  sight as a legitimate entrepreneur of society, he funded his businesses from the
22  profits he obtained off the addictions of others.  At the time of his arrest, Mr. Harris
23  was too young and too self-centered to connect the dots between the drugs he
24  distributed, and the lives of those drugs destroyed.

25  During his lengthy period of incarceration, Mr. Harris has learned to recognize
26  the errors in his thinking.  Over the past more than three decades, Mr. Harris has
27  lived alongside countless addicts, from every race and background, and he has
28  listened to their personal horror stories of abusing the same kinds of drugs Mr. Harris

59

once distributed.  This reality has profoundly altered his understanding of the harm his criminal activity actually caused.  Mr. Harris recognizes that he earned his incarceration through his own choices.  He accepts full responsibility for his past actions and to this day carries a deep sense of regret.  It both pains and shames him to think about who he was, and what he did to his family and to his community.  Mr. Harris has learned valuable lessons over the past more than thirty years, and he fully recognizes that he must always be accountable as a member of society, regardless of whether that society is located within a prison, or in the world outside of the prison's walls.  Mr. Harris offers the following evidence of his remorse, contrition, and acceptance of responsibility, and respectfully submits that, combined with other factors detailed herein, these endorsements demonstrate "extraordinary and compelling reasons" supportive of a sentence reduction:

> Lt. S. Robinson, Public Information Officer, San Quentin State Prison wrote:
>
> > Harris kindles a spirit of altruism necessary for community harmony as he demonstrates the transformation that an individual can achieve through authentic commitment to personal responsibility.  Harris has unquestionably discarded his youthful, irresponsible direction in order to become a builder of character and hope.  He has developed into a productive person and exemplifies the TRUST concept of rebuilding himself and becoming a productive member of society.  (See Exhibit B.)

Aly Tamboura, who spent time as an inmate in prison with Mr. Harris at San Quentin and worked on the "San Quentin News" after Mr. Harris resurrected it and became its editor-in-chief in response to the warden's request, now works with Mark Zuckerberg and his wife, Priscilla Chang, at their foundation, CZI Initiative.  He writes:

1  I witnessed first-hand how remorseful Michael is for the

2  harm he has caused to others.  He held himself accountable

3  for his mistakes and frequently influenced others to do the

4  same.  I wholeheartedly believe Michael deserves a second

5  chance to be with his family and his community.  I base

6  my belief on my experience working with and learning

7  from Michael.  I am humbly asking the court to show

8  mercy to a man who while incarcerated has had such a

9  positive impact on many lives.  (See Exhibit B.)

10  John C. Eagan, retired after 30-plus years as a journalist, former reporter,

11  editor and executive with The Associated Press, and an advisor to "San Quentin

12  News," states:

13  I am a retired journalist who has known Michael since

14  April, 2008.  I came to realize Michael as one of the finest,

15  most extraordinary men I have known.  He is a completely

16  different man today than he was when he was involved in

17  illegal drug activities, which resulted in his incarceration in

18  California state prisons and subsequently the federal prison

19  system.  He has served more than enough time behind bars

20  to pay his debt to society.  (See Exhibit B.)

21  Mykel Harris, oldest daughter of Mr. Harris, who works for NASA Johnson

22  Space Center as a Senior HR Generalist, writes:

23  I ask that you take careful consideration into the decision

24  making of my father's freedom.  My father is aware of his

25  mistakes that I feel has been exceedingly paid off.  I ask

26  that you find it in your hearts to forgive this man; please

27  know he will be a wise man and will appreciate his

28  transition back into society.  (See Exhibit B.)

61

1   Christopher Petrella, T.R.U.S.T. Educator, Ph.D. Candidate, University of

2   California, Berkeley, asserts:

3   Mr. Harris is affable, gentle, and highly motivated to "do

4   the right thing."  He is a clear-thinker, a soulful being, and

5   undoubtedly remorseful over the crime that ultimately led

6   him to San Quentin.  Mr. Harris is magnanimous,

7   thoughtful, kind-hearted, and committed to making the

8   world a better place first by articulating a new value set

9   premised on compassion, communication and

10   understanding.  Further, as a scholar of African American

11   Studies I see with great clarity how dedicated Mr. Harris

12   is, in particular to improving the African-American

13   community, a community that he acknowledges destroying

14   through his actions.  (See Exhibit B.)

15   Van Jones, CNN Commentator, Social and Criminal Justice Advocate, who

16   co-founded and co-facilitated with Mr. Harris a self-help group in San Quentin called

17   "Green Life," observes in his support letter:

18   Please note: In my 20+ years of criminal justice advocacy,

19   I have never written a letter for any individual prisoner,

20   state or federal, in support of his or her clemency petition

21   or any petition for reduction in sentence.

22   Never.  Not once.

23   But with great pride and abiding hope, I write to express

24   my full complete and unconditional support for Michael

25   Ray Harris' application for reduction in sentence.

26   And I hope that God will give me the skill to convey to

27   you how worthy of release Mr. Harris is, in my eyes and in

28   the eyes of so many others.

62

1   It is not just that his transformation and conduct has earned

2   him his freedom.

3   It's that we need him to be free...

4   If there is one person behind federal bars whose release

5   could result in immediate and unambiguously positive

6   outcomes for whole communities, that person would be

7   Michael Ray Harris.

8   He is not proud of his past.  There are things on his record

9   that might give you pause.  But I pray that you will see an

10  opportunity here to show that redemption is possible, for

11  anyone...

12  Thirty years is long enough.  I can attest to this journey of

13  redemption; his commitment to the creation and

14  implementation of practical programs that provide the

15  metamorphosis required for America's rapidly-increasing

16  prison populations.

17  **B.    *Mr. Harris is Fully and Unconditionally Rehabilitated***

18      Some people in custody say you have to come to prison to find yourself.  Mr.

19  Harris doesn't believe that.  But he does believe that it's up to a person to find

20  himself, and to find some purpose in life, whenever and wherever one is able to do

21  so.  Mr. Harris realized there was no guarantee he would ever leave prison when he

22  was committed over thirty years ago to serve a 25-years-to-life sentence for a crime

23  of which he was actually innocent.  Mr. Harris could have chosen to become

24  embittered and resentful, but instead he chose to search within himself, and Mr.

25  Harris found his true self, purpose, and plans for how to live a meaningful life, even

26  while incarcerated.

27      In the thirty-plus years Mr. Harris has been imprisoned, he has devoted

28  himself to significant self-reflection and has gained a clear and articulate

understanding of the various factors that led to his living a life that involved criminal activity.  Mr. Harris is able to identify and acknowledge that his addiction to money, coupled with his anger and disconnection with his community, led him down a dark path that ultimately resulted in his incarceration.  Upon recognizing the factors that led to his regrettable decisions, Mr. Harris has worked to overcome his personal issues and he became deeply involved with self-help, therapeutic, educational, and community outreach programs.  Mr. Harris invested decades working steadily to prove to himself and to others that he could lead a meaningful, purpose-filled existence.  Mr. Harris has worked long and hard, in good faith, to make something of himself -- to earn his self-respect and to earn the respect of others:

Dr. Sang G. Lee, a Foreign Service Diplomat with the U.S. Agency for International Development, has written:

> Mr. Harris has the respect of many working in and
> incarcerated in San Quentin Prison.  He has a unique
> ability to motivate and have a positive influence on other
> people while identifying their talents.  I saw this first hand
> teaching MOMAS.  He worked as one of the lead
> facilitators while I worked as the lead teacher.  He is
> committed to bettering the lives of others and openly
> speaks about his past mistakes with honesty and humility.
> (See Exhibit B.)

Aly Tamboura wrote:

> I cannot attest to the man that Michael was when he was
> sentenced to prison because I never met that man.
> However, I can tell you that he is one of the humblest men
> I have had the privilege of meeting.  He knew the
> destructive realities of prison life, and while many of the
> men I met in prison were raging against the administration,

Michael was diligently working to make it a better place

for inmates and staff alike.  (See Exhibit B.)

Rebecca Carter, Ph.D., Founding Director of Bonafide, has written: "I have personally witnessed the respect young people hold for Michael and his ability to guide people from a path of self-destruction to one of community building and self-improvement.  (See Exhibit B.)

Mr. Harris has devoted thousands of hours during his incarceration participating in rehabilitation programs.  Some of the more notable are:

1)    <u>T.R.U.S.T. (Teaching Responsibility Utilizing Sociological Training) Fellowship Group</u>.  The Mission of the San Quentin T.R.U.S.T. is to assist men in becoming leaders within themselves, their families, their communities and to build a bridge of accountability between the community inside and outside the prison.  After identifying the undesirable value system, participants engage in a variety of methods to purge themselves of said values.  The workshops also offered mature strategies for participants to continue the purging process throughout their lives.

K. J. Williams, then Associate Warden, General Population at San Quentin State Prison, wrote:  "The goal of the T.R.U.S.T. is to educate, organize and assist incarcerated men to become vibrant and productive community members through an understanding and reawakening of their history, culture and values.  Mr. Harris repeatedly has demonstrated the goal of the T.R.U.S.T. through his creation of programs which benefit the community and his interaction with fellow inmates -- promoting their personal development and improvement."  (See Exhibit B.)

Lt. S. Robinson, Chief Sponsor, San Quentin T.R.U.S.T. at San Quentin State Prison, wrote:

May 14, 2007, Harris was inducted into the San Quentin

T.R.U.S.T. for the Development of Incarcerated Men as a

Probationary Member.  September 10, '07 became Full

Trust Member [and] a T.R.U.S.T. facilitator.  Harris was

65

1    elected to the Education and Marketing committee.  He has

2    contributed to workshop curriculum building, completed

3    T.R.U.S.T. training, and serves as a workshop facilitator.

4    He supportively assisted in T.R.U.S.T. functions such as

5    the annual Cinco de Mayo and Black History

6    Month/Cultural Inclusion yard shows that foster cultural

7    awareness and promotes traditional values.  He also

8    assisted in the annual Health Fair held in conjunction with

9    Alameda County Health Department to stimulate the

10   awareness of the correlation between a healthy body and a

11   healthy mind.

12        2)    Insight Prison Project.   Another program Mr. Harris participated in was

13   the Insight Prison Project (IPP).  IPP's programs focus on a socialization process, a

14   process of transformational re-education that is designed to bring about a shift in

15   ingrained patterns of harmful and destructive behavior.  IPP pushed cognitive

16   behavioral work beyond isolated mental process and challenged participants in the

17   program to integrate cognitive learning with an awareness of how thoughts, impulses

18   and actions manifest physically and emotionally.

19        3)    Victim Offender Education Group (VOEG).  One of the most powerful

20   programs Mr. Harris participated in was the Victim Offender Education Group

21   (VOEG).  A pioneer in the field of restorative justice, VOEG is a cornerstone

22   program which positively affects rates of institutional violence, successful reentry

23   into communities, and individual health and well-being.  This program is a rare

24   application supported by crime victims, incarcerated people, and community

25   volunteers.  VOEG was an 18-month intensive group program that allowed Mr.

26   Harris to understand himself better, how his life experiences and decisions led him to

27   prison and how his crimes impacted the many victims within his community.  The

28   process utilized a restorative justice philosophy that helped Mr. Harris to address

66

memories and feelings connected to traumatic and unresolved events in his life so that Mr. Harris could integrate his experiences into his life in order to experience a renewed sense of wholeness, authenticity, emotional well-being, and positive behavior.

It was in this intensive environment that Mr. Harris began to truly realize the damage that the drugs he sold afflicted on his community.  He began to connect the dots between what he had been doing and the lives that were ruined.  Mr. Harris finally came to clearly see his direct responsibility for the damage caused by the cocaine epidemic of the 1980s.  The experience of learning the personal stories of people of all ages, races, and backgrounds, who were abusing the same drugs he had been distributing, profoundly altered Mr. Harris's understanding of what he did and what brought him to prison.  He fully accepted that he alone, and the choices he made, were responsible for his incarceration.  This process of understanding and developing true insight into the underlying circumstances of his condition provided Mr. Harris the ability to self-identify patterns of negative behaviors and to replace them with healthier ways of thinking and behaving.

4)      No More Tears/The Healing Circle.  No More Tears is a violence and crime-prevention program founded by incarcerated men and concerned citizens (from the outside) to remedy the rise of violent crime in their communities and to reduce the recidivism rate of citizens returning from a period of incarceration.  The curriculum consists of workshops which focuses on some of the factors that contributed to a life of crime and imprisonment.  Here, men learn to reexamine their belief systems, learn de-escalation tactics, and develop alternatives to a life of violence or crime.

The Healing Circle.  Graduates of the No More Tears program, such as Mr. Harris, move on to attend The Healing Circle's transformative events where survivors of violent crime and former perpetrators unite in deep listening and

exploring sessions which sidestep the politics of difference in favor of self-exploration in an empathetic and supportive atmosphere.

5)   Arts in Corrections.  This is a creative writing class Mr. Harris participated in which allowed him to learn to express his feelings and experiences through the written word.  He learned the power of keeping a written journal to keep track of his journey and struggles, his hopes and dreams.  Mr. Harris debuted a short story version of his memoirs entitled "Nightmares and Daydreams" in a book series published by the class entitled "Brothers In Pen," which he hopes will allow readers to learn from his mistakes.

6)   Prison University Project/Patten University.  The Prison University Project, started at San Quentin State Prison, is a national leader in providing quality higher education opportunities to incarcerated people.  The mission of the Prison University Project is to provide an intellectually rigorous, inclusive Associated of Arts degree program, and to foster the values of equity, civic engagement, independence of thought, and freedom of expression.  Recognizing the value of knowledge and that education is a key to open the door of future legitimate opportunity, Mr. Harris enrolled in multiple programs with hopes to obtain degrees in both business and journalism.

In addition to his years of active participation in rehabilitation programming, Mr. Harris was also subject to extensive psychological evaluations, as part of parole suitability, to determine whether he would pose a threat or danger to society if he was released or his sentence was reduced.  The psychological analysis report rated Mr. Harris as a very low overall risk, with a GAF score of 19 and a very low range of psychopathy.  His risk of recidivism under the LS/CMI is in the low range, and his HCR-20 risk assessment is very low.  Additionally, numerous peer-reviewed research studies clearly have indicated that men who are older than 45 are 78% less likely to re-offend than men in their 20's.  Mr. Harris is not the immature person he was at 26, when he first arrived in prison.  He is now a 58-year old grandfather who

has dedicated the last 32 years transforming himself into a self-aware, conscientious, law-abiding, mature adult.  Mr. Harris bears little resemblance, save in the physical sense, to the individual who entered prison in 1988.  Over the last 32 years, Mr. Harris has experienced numerous life-changing lessons and has proven himself fully rehabilitated and able to lead a worthwhile, productive and crime-free life.

Although Congress provided that rehabilitation alone cannot serve as an "extraordinary and compelling reason" for a sentence reduction, Mr. Harris's exceptional educational and rehabilitation accomplishments are still "extraordinary and compelling," and combined with the other factors detailed herein, supports a reduction of Mr. Harris' sentence to time served.

C.    *Mr. Harris has Been a Recognized Leader and Innovator During His Three Decades of Incarceration*

Over the years, Mr. Harris undertook the difficult and important challenges of successfully transforming himself from a self-centered, criminally-minded individual who caused harm to his own community, into a respectable leader dedicated to healing the same communities he once harmed.  Having been born and raised in Los Angeles, Mr. Harris knew the language, mindset, lifestyle, and rules of the urban community ("the streets"), from where a sizeable percentage of the inmate population originates.

Having also been a successful entrepreneur and business owner, including co-founding one of the most influential rap record labels of the 1990s, Mr. Harris knew as well the language, mindset, and rules of the business world, "the suites."  Having the unique perspective of experiencing life from "the streets to the suites,"  Mr. Harris recognized the need for prison programs which not only taught participant-inmates emotional literacy, that is, how to take responsibility for their thoughts, feelings, actions, and how to abandon "criminal behavior," but also the need to embrace business and financial literacy, that is, practical knowledge of business communications, computer skills, financial management, and operational education.

By collaborating with other inmates, prison administrators, business leaders, community activists, government officials, and numerous volunteers, Mr. Harris helped to advise, create, develop, facilitate, and/or lead some of the most successful and forward-thinking rehabilitation programs in California's prison system, some of which have been duplicated by other prison systems across the country.  Not only did Mr. Harris develop programs that provided the emotional and financial tools needed to succeed upon release, Mr. Harris leveraged his urban superstar status as a platform to use his own life as a cautionary tale -- detailing the consequences of pursuing a drug dealing, street hustler lifestyle, in order to dissuade people from continuing on a dead-end life of crime upon leaving prison.

By developing educational, therapeutic, social, and vocational programs to prepare prisoners for their return back into society, Mr. Harris has helped reduce crime, violence, and recidivism in countless lives by providing participants with the emotional and financial tools they require to effectively meet their post-release needs, and the needs of their communities, as evidenced by the following testimonials:

David Cowan, a former San Quentin inmate and now, having been released, Operations Manager of the Prison University Project, relates:

> I write this letter in support of Michael Harris...  I noticed
> him learn about the special environment that was built at
> San Quentin -- 70 programs and over 3,000 volunteers
> from the outside community.  I watched him assess every
> program and begin to contribute.  This Michael cared
> about the psychological condition of the individuals
> around him and the programmatic and organizational well-
> being of the many programs.  I watched him get involved
> with everyone as a partner and very quickly became
> accepted as a leader.  He began to join with like minds and

create programs himself that addressed issues that other
programs didn't address.  His programs were very forward
looking.  His care for people was sincere.  As my own
maturity was important to me, I welcomed and appreciated
the level of maturity that I saw in him.  I valued how he
used his life experiences and assessment skills to teach and
to lift people up."  (See Exhibit B.)

Christopher Petrella, T.R.U.S.T. Educator, observed:

Despite having known Mr. Harris for only a year to date, I
very quickly developed an abiding respect for him.  Mr.
Harris knows the difference between change and growth.
That is, change is inevitable, but growth is optional.  He
has pursued the latter option with unabated intentionality
marked by vigor, honesty, introspection, kindness, and
open communication.  Not only has Mr. Harris participated
widely in the educational and vocational programming
offered to him at San Quentin, but he has taken on
leadership roles in many of his organizations.  Mr. Harris
is currently the Editor-In-Chief of the San Quentin
newspaper, co-founded the Journalism Guild, and co-
founded Partnership Building Community Groups
(PBCG).  His involvement in each of these initiatives
evinces both a density of purpose and willingness to
collaborate with other men at San Quentin.  I am
convinced, therefore, that Mr. Harris will be an asset to
any company or organization with which he chooses to
associate himself upon his release.  (See Exhibit B.)

Some of the programs Mr. Harris helped create, develop, implement, or lead, include:

1)   <u>Partnership Building Community Groups (PBCG)</u>.   While at the Correctional Training Facility in Soledad, CA, Mr. Harris created PBCG with Bishop Mady Thomas III.  It has evolved into a 501(c)(3) tax-exempt charitable organization.  The project focuses on curbing gang involvement, which often results in addiction, criminal activity, incarceration, violence and death.  The goal of the project is to establish an accredited service with educational vocational programs to allow participants to prepare for a successful return to their communities.

Van Jones, CNN Commentator and social justice activist, wrote:

> Those of us who are working to heal broken communities
> in California need him [Mr. Harris] to come home now.
> As the death and despair continue to climb in too many
> urban communities, we are doing the best we can without
> him."  (See Exhibit B.)

Gayle McLaughlin wrote:

> As Mayor of Richmond, I am only too aware that our city
> -- as well as other urban communities -- has been plagued
> by deadly violence, too often driven by confrontations
> between our youth.  Reducing the violence is a top priority
> of my administration, and the now-rehabilitated Mr. Harris
> maintains a unique standing among urban youth and with
> urban youth culture, given his history of having founded
> Death Row Records -- the music label that launched
> rappers Snoop Dogg and Tupac Shakur.  (See Exhibit B.)

2)   <u>"San Quentin News" Newspaper</u>.  Mr. Harris was integral in helping to resurrect the "San Quentin News," which is a newspaper which had been in hiatus for 17 years prior to Mr. Harris' efforts.  After being personally selected by Warden

72

Aries and successfully interviewing with the principal of the San Quentin Education Department, Ted Roberts, Mr. Harris served as managing editor of the newspaper and later became its editor-in-chief.  The "San Quentin News" still is in operation and is circulated to all 35 California State prisons.  It is available on-line at sanquentinnewspaper.com or CDCR's website.

Steve McNamera, CEO of Prison Media Project wrote:

> Mr. Harris is among the more impressive people I have ever met, inside or outside of prison.  I met him while serving as an advisor to the "San Quentin News," the prison newspaper for which he served as Editor-in-Chief. Also, I interviewed him and a dozen other prisoners for a book I was writing about what in their life experiences nudged some people to act in generous or altruistic ways and what caused other people to act anti-socially...  I wound up taking a lead role in the revival in 2008 of the "San Quentin News," the only inmate-produced newspaper in California and one of the few in all the world.  From its beginnings with Mr. Harris as Editor, it now circulates 30,000 copies to all 35 California prisons and to other prisons as well.  I created the Prison Media Project to raise funds for the paper's printing and distribution expenses. (See Exhibit B.)

Aly Tamboura wrote:

> I met Michael while working at the inmate published "San Quentin News."  In fact, Michael was instrumental in growing the newspaper.  What began as an 8-page tabloid handed to inmates at San Quentin transformed into an award-winning publication distributed to all 35 prisons in

California...  I was instantly impressed by Michael's business acumen and his compassion for mentoring fellow inmates.  He is a gifted leader who changed the trajectory of many of the lives at San Quentin, including my own.  In a culture where it is easy to negatively influence others, he used his influence to positively change inmates' outlook on life.  He showed us that we were capable of learning and practicing skills while incarcerated that would provide us the opportunity to build better lives for ourselves once released.  (See Exhibit B.)

Lt. S. Robinson, Administrative Sponsor, "San Quentin News," at San Quentin State Prison, wrote:

In my professional position as Public Information Officer, I interact with inmate Harris on a weekly basis.  We talk about topics and incidents that have occurred in the institution.  During these discussions, I present inmate Harris, who is the editor-in-Chief of the San Quentin newspaper, with the official version(s) of institutional events.  When time permits, I also attend the monthly advisory meetings for the San Quentin newspaper.  While at those meetings, I am able to witness inmate Harris' professional attitude and reliable work ethic.  As an editor and an organizer, Harris' skills have become highly proficient and, as a professional, I consider his progress as a positive attribute to rehabilitation.  From my opportunity to observe inmate Harris' rehabilitational development, I can attest that his change is genuine and that he is sincere in his efforts to improve the community."  (See Exhibit B.)

Even though Mr. Harris was editor-in-chief of "San Quentin News," sometimes he enjoyed taking on writing assignments as well, as when U.S. District Court Judge Thelton Henderson of Northern California visited San Quentin. Mr. Harris took the responsibility for covering the Judge's visit. The result was the lead story on the front page, "Judge Henderson: Catalyst of Change." During his interview of Judge Henderson of Los Angeles, Mr. Harris was surprised to learn he had been raised in the same South Park neighborhood as the Judge. Using the skills he in San Quentin as a newspaperman, Mr. Harris wrote a fascinating and insightful in-depth feature article, "One Neighborhood...Two Paths, Two Lives...Why the Difference." (See S.Q. Articles, Exhibit J.)

3)    <u>San Quentin Journalism Guild</u>. Mr. Harris co-founded the San Quentin Journalism Guild, an organization that trains men in the art of professional journalistic writing. The Guild has created an advising committee consisting of the editor of the Associated Press, the former owner of the "Bay Area Weekly" and "Pacific Sun," and seasoned journalists, all whom assist in the mentorship program.

K. J. Williams, Associate Warden, General Population, San Quentin State Prison, wrote:

> ...Mr. Harris started the San Quentin Journalism Guild, an organization that trains men in professional journalistic writing. The Guild recruited a team of retired journalists to assist with the accomplishment of this task. (See Exhibit B.)

4)    <u>Keeping It Real</u>. Mr. Harris was the creator and co-facilitator for this program, which was sponsored by the San Quentin Stand Up Program. The program acts as a therapeutic outlet for participants by with personal issues. The overall goal of Keeping It Real is to reduce recidivism by preparing prisoners with the necessary insight into their past criminal offenses and the non-violent communication skills required to succeed in the community.

The Keeping It Real course is a peer-led education program for those most at risk of incarceration as well as those experiencing chaos and confusion in their daily lives.  The curriculum helps bring participants into a state of readiness and willingness to dig deeply into underlying issues that keep them imprisoned, both inside and outside.  Keeping It Real facilitators introduce many of the topics for group reflection using "skits" or role-plays drawn from real life experiences.  A few of the topics offered include:

    a.    Identifying and Removing The Masks

    b.    Peeling Away The False Layers and Rediscovering Our True Selves

    c.    Finding Self-Validation

    d.    Learning To Become Less Dependent on Others For Our Self-Esteem

    e.    Healing the Wounded Father/Son Relationship

    f.    Uncovering The Intentionally Suppressed Wounds and Learning To Forgive

Keeping It Real is able to provide the understanding, sensitivity, and hope participants need for building their new foundations.  By connecting more deeply with their peers, themselves, and a higher power, participants can begin to act on the vision of a larger purpose for their lives.  Many prisoners who have been through the program and now are on parole or probation report major life changes as a result of their participation.

        5)    The Green Life.  The Green Life is a peer education course with an intensive curriculum of topics that integrate spiritual and practical pathways toward obtaining the necessary skills and temperament to successfully perform in the new environmentally conscious America.  It is a directive program, which includes identification and assessment of life skills, emotional readiness and needs of inmates in order to address and focus on the issues and areas required for re-entry into the new Green Economy.  The course inspires accountability and emotional honesty on all levels, rebuilding integrity and self-esteem, and enabling participants to move

76

toward a life of positive contribution and service to society.  This course provides a safe, facilitated atmosphere that promotes inner self-evaluation and life-affirming motivations.  The Green Life is proposed to be a pre-requisite for Green Jobs training, and will make recommendations from its evaluated course participants to next steps in a pathway toward successful living.

Mr. Harris created and co-founded this program after being inspired by CNN commentator, social activist, and green economy expert, Van Jones.  The goal of The Green Life is to identify and explore the choices of prisoners in an environment that promotes green economy and eco-literacy.  Through his program, Mr. Harris helped coordinate a live presentation by Mr. Jones to the San Quentin mainline population of the green economy, in addition to a presentation on green job opportunities by Solar Richmond, a green training organization.

Van Jones, CNN commentator and Criminal and Social Justice Activist, wrote:

> We often muse about great geniuses whom we assume must be wasting away in America's prisons -- unable to make their great gifts available to a country that desperately needs them.
>
> After I met Michael, this idea was no longer an abstraction. Michael Ray Harris is as close as one could ever come in real life to a textbook case.  He is someone with an off-the-charts IQ who unfortunately outsmarted himself during his younger days...who then made awful mistakes...who then had a true, demonstrable, undeniable transformation behind bars...and who has been an exemplary leader and role model for innumerable other men behind bars...

His program, 'Keeping It Real," was created to increase Self-Awareness and provide practical life-skills tools for the men most at risk of recidivism.

I felt the need to get more involved, and I became a staunch supporter of the group initiative.  Michael arranged for me to visit San Quentin and speak to the entire prison population.  The visit was encouraged and attended by the warden himself.

Your Honor, in San Quentin I discovered in Michael, the "perfect storm."  He was an inmate entrepreneur, successfully applying business skills to create Innovative courses and programs -- all within an institution normally unreceptive to methods of change.

As a result of my involvement, Michael revamped the "Keeping It Real" program.  He re-launched the course as "Green Life."  Its mission is to provide education in environmental choices and to promote the green economy and eco-literacy.  This provides a pathway to self-sufficiency and furnishes skills needed both in and out of prison.  We have stayed in touch ever since.  He has become an invaluable mentor and guide for me, as he is for so many people on the inside.  I love and respect this man beyond words.

In providing passage for Mr. Harris to rejoin society, I can personally assure you that I will be working closely with him on all of his forthcoming endeavors."  (See Exhibit B.)

6)      <u>Members of Modern American Society (MOMAS)</u>.  This is a program Mr. Harris co-founded whose goal is to fully prepare prisoners for release into

modern society by teaching crucial skills needed to integrate.  The course consists of three stages: (1) steps necessary to find/maintain employment; (2) personal financing, and (3) advance finance, including investments, stocks, bonds, business and retirement planning of the executive committees.

Two very important initiatives came out of MOMAS, as described in the following excerpts from testimonial letters in support of Mr. Harris.

Rebecca Carter, Ph.D., Founding Director, Bonafide, wrote:

> Michael and I first worked closely together in about 2008 while developing a financial literacy class for the men at San Quentin State Prison.  I was a graduate student at U.C. Berkeley with experience managing a mid-sized non-profit board and endowment.  Michael gathered a team of volunteers and prisoners with various professional and educational backgrounds, and together we created and taught a curriculum that covered everything from bank accounts and budgeting to entrepreneurship and the stock market.  (See Exhibit B.)

Dr. Sang E. Lee wrote:

> I had a chance to work closely with Mr. Harris back in 2009-10 while volunteering at San Quentin Prison.  I was a Ph.D. student at the time and Mr. Harris approached me about starting a class called Members of Modern American Society (MOMAS) that focused on reintegration for inmates who were soon scheduled to be released.  At that time, he already had a sketch of the curricula, recruited the initial group of students, worked with the prison administration to launch the class.  He is a forward thinking individual who thinks about the struggle of others.

79

The MOMAS six week course was a success evidenced by
the long wait-list and the dramatic improvement of
students' skills in resume and cover letter writing and
interviewing skills.  The course continued until he was
transferred out of San Quentin in 2012.  (See Exhibit B.)

7) <u>The Last Mile Project</u>.  In 2010, Chris Redlitz and his wife and business partner, Beverly Parenti, entered San Quentin State Prison after running across an article in a Bay Area newspaper highlighting an educator named Kathleen Jackson, who was a long-time volunteer at San Quentin.  Mr. Redlitz and Ms. Parenti were intrigued by her story and reached out to Ms. Jackson and subsequently were invited by her to San Quentin State Prison to visit.  Because of their background in the world of venture capital, they were invited by MOMAS (Members of Modern American Society) to speak to a group of men about business and entrepreneurship.  They were so impressed by the men's level of business knowledge and desire to learn, they began to nurture the idea of creating a Technology Accelerator inside the prison.

Out of the efforts of Mr. Redlitz and Beverly Parenti, The Last Mile (TLM) was created.  Since its inception, The Last Mile has generated a groundswell of support as a leading model for criminal justice reform across America.

Chris Redlitz, the co-founder of The Last Mile, wrote:

The mission of The Last Mile program is to bridge the gap
between the penal system and the technology business
sector.  The goal of the program is to provide practical
training so that participants have marketable business skills
upon release.  The program trains selected inmates for
employment within the technology sector, and also helps
them develop business ideas that they can pursue in the
future.  Training includes verbal and written

80

communication and presentation skills, business formation
and operational education, and advanced computer skills.
Graduates of the program are eligible for paid internship
positions that may transition into full time employment.
Participating companies are selected by The Last Mile
program and each applicant is placed in a position based
on their skill and domain interest.

We had the honor of hosting Senior Adviser [to President
Obama] Valerie Jarrett at San Quentin State Prison last
month, to observe the program and speak with the inmates.
She commented that the penal system should "try to
replicate this program across the country" because it will
directly impact the huge problems related to recidivism.

The Last Mile would not be in existence today without the
help of Michael Harris.

Michael was one of the first people I met at San Quentin
and he immediately understood my vision and
commitment to establish a sustainable program that could
have a long-term impact.  I was new to the prison system,
prison policies, and the nuances of how to connect with a
population that lacks hope and employable training.
Michael spent many hours with me, teaching me how to
effectively communicate inside prison, and he helped me
build the trust of our initial class participants in 2010.
After Michael was released from San Quentin, and was
transferred to a Federal facility, I had many email
exchanges and conversations with him.  He talked about
how he intended to go back to his community to create

81

opportunities for "at risk" youth and become a positive role model.  He has aspirations to start a business and leverage his entrepreneurial talents to set an example for others to follow.

Michael is a large man, but the depth of his commitment to his community dwarfs his stature.  I respect Michael Harris.  I believe that he will be a huge asset to his community.  I am honored to call Michael Harris my friend."  (See Exhibit B.)

8)  <u>Richmond Project</u>.  Richmond, California resident Tanya Mitchell's life was hard.  A thirty-year-old single mother of two children, Tanya worked three jobs just to keep a roof over their heads, food on their table, and clothes on their back.  But nothing in Tanya's life was harder than when she had to attend the funeral of her 14-year old son, Devon.  Devon, an honor student and star athlete at school, was caught in the cross-fire of two rival Richmond gangs and killed by a stray bullet.  Tanya and Devon were not the only Richmond residents who were negatively impacted by the violence that plagued their city.  In 2007, Richmond had the ninth-worst murder rate in the United States.  When the leaders of Richmond put out a call for help, Mr. Harris was one of the people who answered their call.

Because San Quentin and Richmond are so close, it made sense to connect inmates with the community.  Mr. Harris, along with others like fellow prisoner James Houston, founded the Richmond Project at San Quentin State Prison.  The Richmond Project was a violence-prevention program connecting incarcerated men from Richmond to elected officials, community groups and residents in the city.  From inside San Quentin's walls, Mr. Harris worked to bring together incarcerated residents from rival Richmond neighborhoods in a think tank that met with City officials to find solutions to the increasing street violence.  To Mr. Harris, it made

1  sense for men in prison, who had created or furthered the problems, to give solutions

2  to the youth on the streets and let them know the consequences of their actions.

3  When Mr. Harris was preparing his parole release plans, he decided to parole

4  to Richmond in order to continue his efforts to help reduce the crime and violence in

5  that city.  The numerous people who supported his decision represented the entire

6  spectrum of the Richmond community, as evidenced by the many letters of support.

7  For instance, Gayle McLaughlin, the Mayor of the city of Richmond, wrote:

8  ...I have visited San Quentin State Prison and watched Mr.

9  Harris work with a group of Richmond prisoners who have

10  formed a support group at the prison called "The

11  Richmond Project"...as well as observed him helping

12  young adults who have already made mistakes and, thus,

13  are in prison, but who are trying to rehabilitate themselves,

14  with Mr. Harris' assistance.

15  Mr. Harris' involvement with our city's youth violence

16  prevention programs will provide a critically needed

17  opportunity for him to influence Richmond's youth to end

18  the shooting, the killing, the damage to the well-being of

19  the Richmond community...  (See Exhibit B.)

20  Those "on the ground" in the communities which would be affected by Mr.

21  Harris's release also strongly support his release, as can be seen in the next three

22  support letters.  The first is from James Houston of the Office of Neighborhood

23  Safety, City of Richmond, California, who concludes his letter as follows:

24  This community desperately needs Mr. Harris to show

25  young men other options, and an alternative life.  Who

26  better to do that than a man who has experienced it first

27  hand and been able to change the narrative of his life and

28  become an asset instead of a liability?  If you have any

questions regarding this letter of support, please do not
hesitate to call me.

The Police Chief of Richmond, Chris Manus, wrote:

> I am currently the Police Chief for the City of Richmond,
> California, a position I have held since 2006. I have held
> various public safety positions over the past 32 years,
> including police officer, paramedic, narcotics investigator,
> precinct commander, captain, and police chief. I am an
> active member of the Police Executive Research Forum
> (PERF), the International Association of Chiefs of Police
> (IACP), the California Association of Chiefs of Police, and
> the Contra Costa County Police Chiefs Association. I have
> also taught college level criminal justice classes and been
> significantly engaged in developing community policing
> models within several crime-challenged communities
> around the country.
>
> I have never written a letter for a prisoner or parolee
> before, but I am doing so now because I believe the
> individual I am writing on behalf of, San Quentin prisoner
> Michael Harris (D97093), has demonstrated he can have a
> powerful positive impact on at-risk young adults -- and is
> someone whose help we need in Richmond to assist us
> with our violence-reduction efforts...
>
> I did my "due diligence" first in researching Mr. Harris'
> background and character before expressing my support
> for his request to be released immediately following his
> Progress Report Hearing. I believe Mr. Harris has a rare

and valuable influence that can benefit our city.  We need

his services in Richmond now.  (See Exhibit B.)

John Gioia, Supervisor, District One, Contra Costa County, California, wrote:

I am writing to respectfully ask that you grant an

immediate release of Michael Harris...  Mr. Harris wishes

to be paroled to Richmond, a city in my Supervisorial

District.  As county Supervisor for the area, I would

welcome the opportunity to work with Mr. Harris on

several of our efforts to prevent violence in our

community...

I believe Mr. Harris' efforts in our community could deter

many additional young adults from engaging in violent

behavior...  (See Exhibit B.)

Jeff Ritterman stated:

As a member of the Richmond city council, I am writing to

ask that you grant Mr. Harris's request...to be immediately

released...  We need him now to assist us with reducing the

violence among our community's youth and young adults.

Our experience has been that the very best mentors are

those like Michael Harris who deeply understand the

challenges our youth face and at the same time have the

respect of our at-risk youth.  Mr. Harris, with this

background of having started hip-hop's first significant

record label, Death Row Records, has the ability to capture

the attention of our youth population to steer them away

from guns and drugs.  Mr. Harris's experience of having

spent 22 years in prison provides him the authority to de-

romanticize prison life, to talk directly to our youth to

1   convince them to turn away from criminal behavior that

2   would send them to San Quentin or any other prison...

3   (See Exhibit B.)

4   Leonard McNeil wrote:

5   I am a member of the City Council for the City of San

6   Pablo, which is adjacent to the City of Richmond.  Both

7   cities are part of West Contra Costa County. Our proximity

8   contributes to the fact that both of our municipalities suffer

9   some of the same challenges regarding crime and youth

10   violence.

11   Michael R. Harris has already demonstrated his

12   commitment to West County and his exceptional behavior

13   by working while incarcerated with organizations and local

14   government in my community -- i.e., Neighborhood House

15   of North Richmond and the City of Richmond's Office of

16   Neighborhood Safety -- to stem the tide of youth and

17   young adult violence here by providing mentoring and

18   curriculum development services.  (See Exhibit B.)

19   Elected State Legislators also have supported Mr. Harris' release.  Loni

20   Hancock, California State Senator, Ninth District, wrote:

21   While incarcerated, Mr. Harris began work with a group of

22   prisoners in San Quentin in an effort known as "The

23   Richmond Project."  The project assists incarcerated

24   residents from Richmond by preparing them for release

25   back into the community.  Recently he undertook work

26   with the group by organizing and preparing them to make a

27   presentation to a venture capital firm executive.  As a

28   result of the excellent presentation, the executive has now

86

1   committed to assisting "The Richmond Project"

2   participants develop a social entrepreneurial business,

3   under Mr. Harris' guidance.  In addition, this executive has

4   agreed to work closely with Mr. Harris upon his release to

5   bring the entrepreneurial project to fruition so that others

6   released from prison will have the opportunity to earn a

7   legitimate living...  (See Exhibit B.)

8   The Honorable Dezie Woods-Jones, President, Black Women Organized For

9   Political Action, wrote:

10   Some of our member have visited Mr. Harris in prison and

11   have regularly communicated with him, so we are very

12   aware of his good work inside of san Quentin State Prison

13   helping other prisoners rehabilitate themselves.  We know

14   of his deep desire to continue that work in Richmond,

15   California -- one of the most troubled communities in not

16   only the Bay Area, but in the entire state...

17   BWOPA strongly supports Mr. Harris' application for the

18   commutation of his sentence...so that he is free to travel to

19   Senegal and Ghana to launch an exciting new program that

20   could dramatically change the life experience of so many

21   youth from Richmond who are on the precipice of ruining

22   their lives and further damaging their community.  This is

23   work that needs to be implemented right now.  (See

24   Exhibit B.)

25   9)   Individual Mentoring of Other Prisoners

26   The ripple effect is a spreading effect or series of consequences caused by an

27   action or event, such as when one drops a stone into a pond.  Another example would

28   be the positive effect Mr. Harris' mentorship has had on the lives of numerous other

inmates.  Mr. Harris has used his decades of incarceration to not only transform his own life, but to mentor and challenge other inmates to change their lives for the better as well.

Rebecca Carter, Ph.D. who is founding director of the prisoner reentry program Bonafide, worked closely with Mr. Harris at San Quentin Prison and recognized his "special ability to connect with the young and turn them on a better path."  She wrote:

> One moment I remember, in particular, captures the way Michael could reframe a person's ambitions to be positive, realistic and still inspiring for them.  When talking about career goals, many people in the financial literacy class wanted to talk to Michael about getting into the music business.  Instead of telling them directly that this is not a stable career option and directing them toward something less inspiring for them, he posed a question: 'Let's say you know about this great club and you want to get in.  You see there's a line from the door going around the block and barely moving.  Then you look around the side and you see another door, and only one or two people are standing in that line.  Both doors lead inside the club, so why would you go stand in the long line?  The long line is the line of people who want to be performers, and all they know how to do is perform; the short line is the sound engineers and technicians who took the time to learn extra professional skills and get credentials they could bring to the table.  If you want to work in entertainment, or any industry really, take the time to get educated and gain skills that are valuable in that industry so you can go to the short line.

88

One of the men he gave that advice to is currently in school learning to be a sound engineer, while he pursues his passion for hip-hop.  It was through conversations like this that he guided many young men to pursue their education with the Prison University Project while serving their time, pushed others to think more critically about what skills they have and what they can gain to make themselves more independent, and convinced others that they could achieve success and happiness through legal positive means and not the destructive life they had been living.  (See Exhibit B.)

After being released, inmates whom Mr. Harris has mentored have gone on to live successful lives.  One such success story is that of Aly Tamboura.  In 2004, Aly was charged with felony assault and sentenced to serve twelve years.  He met Mr. Harris while both worked on the "San Quentin News."

Mr. Harris encouraged Aly to apply for the Last Mile Program.  Aly was accepted into the program where he learned how to write computer code and industry standard software development.  During his time in the computer coding program, he met Facebook CEO Mark Zuckerberg.  After being released, Zuckerberg hired Aly who now works as the Manager of Technology and Program Delivery for the Chan Zuckerberg Initiative.  He writes:

My name is Aly Tamboura.  I am a 46-year-old divorced father of 3 adult children and a proud grandfather.  I currently work as a software engineer in San Francisco, California.  I learned to write computer code while I was incarcerated at San Quentin...where I served over 12 years.  Though I owe much of my success to my ambition to

1       thrive post-incarceration, I owe a great deal of it to my

2       friend Michael Harris...

3       I was instantly impressed by Michael's business acumen

4       and his compassion for mentoring fellow inmates.  He is a

5       gifted leader who changed the trajectory of many of the

6       lives at San Quentin, including my own.  In a culture

7       where it is easy to negatively influence others, he used his

8       influence to positively change inmates' outlook on life.  He

9       showed us that we were capable of learning and practicing

10      skills while incarcerated that would provide the

11      opportunity to build live for ourselves once released...

12      I cannot attest to the man that Michael was when he was

13      sentenced to prison because I never met that man.

14      However, I can tell you that he is one of the humblest men

15      I have had the privilege of meeting.  He knew the

16      destructive realities of prison life, and while many of the

17      men I met in prison were raging against the administration,

18      Michael was diligently working to make it a better place

19      for inmates and staff alike.  (See Exhibit B.)

20      In 1994, 22-year old Chrisfino Kenyatta Leal's drug dealing activity and

21 robbery with firearms led to his being sentenced to a life sentence under California's

22 3-strikes law.  Like Aly, Chrisfino had a desire to succeed, and, like Aly, Chrisfino

23 had Mr. Harris as a mentor.  Mr. Harris provided Chrisfino with one-on-one support

24 as he worked to transform his life.

25      In 2012, California's 3-strikes law was changed and Chrisfino was eligible for

26 resentencing and release, if the judge who originally sentenced him in 1994 could be

27 convinced that he no longer posed a danger.  In his consideration, the judge reviewed

28 Chrisfino's participation in some of the programs Mr. Harris helped create, including

The Last Mile.  The judge mentioned in his ruling that those programs helped pursuant him that Chrisfino had transformed his life and merited a second chance. Today, Chrisfino is the manager of Campus Services at RocketSpace, a technology campus in San Francisco.  In some ways, his journey from a young kid living the street life to a tax-paying citizen invested in his community is a miraculous one.  In other ways, it is a path taken by countless people before Chrisfino, like Mr. Harris, whose footsteps Chrisfino followed to find freedom.  About Mr. Harris, Chrisfino wrote:

> I have known Mr. Harris since 2008 as he was a member of both the San Quentin T.R.U.S.T. (Teaching Responsibility Utilizing Sociological Training) and The Last Mile.  The T.R.U.S.T. is a peer-led rehabilitative program aimed at providing life, parenting and job skills to other men at San Quentin.  The Last Mile is an entrepreneurship program which prepares incarcerated individuals for successful reentry through business and technology training....
>
> In this capacity, Mr. Harris demonstrated exemplary leadership, integrity, commitment and professionalism toward staff and others.  In his role as a TRUSTFELLOW and Last Mile graduate, Mr. Harris has been able to utilize his own transformation into an accountable individual to help guide other men, including myself, on our own paths of transformation.  Mr. Harris always approached his work from a place of humility -- wherein he has as much to learn from those with whom he interacts as they do from him. This attribute is a special gift."  (See Exhibit B.)

David Cowen is another person whose life was positively affected by Mr. Harris.  In 1991, David was sentenced to life in prison for committing second degree murder.   Now, having been granted parole, Mr. Cowan is Operations Manager of the Prison University Project and co-founder of Bonafide, a re-entry program to help parolees re-integrate into society.  In his support letter Mr. Cowen wrote:

> Very quickly [upon meeting Mr. Harris] I began to see Michael as a trusted advisor, mentor, confidant, and friend, not just for myself, but for many men who were serious about making better decisions and making themselves into better family and community members...there are many of us now who have paroled and are contributing to our communities...  I am always thinking about...how good it would be to have his help and presence in the communities that we are serving...  I have earned a great deal of respect from formerly incarcerated people, law enforcement, politicians...  I still find myself longing for his voice. There are so many...who will benefit from meeting and working with him.  (See Exhibit B.)

Another prisoner Mr. Harris assisted is James Houston.  Now employed with The Office of Neighborhood Safety in Richmond, California, Mr. Houston, at age 21 was convicted in 1996 of second degree murder and sentenced to 15 years to life, plus a three year gun enhancement.  When James entered prison, he was isolated, angry, disconnected, and searching for a purpose.  Mr. Harris reached out to James and helped him commit to a non-violent life.  While James did the work, Mr. Harris was there to help James map out a plan and then Mr. Harris held James accountable for achieving the plan's goals.  Together, they worked to form The Richmond Project, an offshoot of the T.R.U.S.T. Fellowship.

Fortunately for James, a shift in state policy gave him a better chance at parole.  In 2013, after demonstrating the progress he'd made while incarcerated, James was released from prison.  The passion for helping others which James learned from Mr. Harris, has led James to dedicate his life to rehabilitation and to helping other prisoners learn how to help themselves.  As a neighborhood change agent for Advance Peace in Richmond, California, James's life has come full circle. Like the other men affected by the ripples of Mr. Harris's actions, James pays his debt to Mr. Harris forward.  He writes:

> ...I have known Mr. Harris for approximately 9 years, and he was always a man of humility and stability.  I met him while I was in San Quentin serving a life sentence.  He was one of a few men that truly helped me understand that we can achieve greatness even though we have had a tremendously difficult time to get there.
>
> Because of those men I have been able to accomplish amazing things since my reentry back into the community. I am currently the Program Coordinator with the City of Richmond's Office of Neighborhood Safety.  I have been able to achieve so many of my goals due to the mentoring that I received by Mr. Harris, one of which is being involved in helping the City of Richmond reach its lowest rate of homicides in over 30 years.  I know that if I am able to accomplish so much in the few short years I have been home the sky is the limit for the man who through his tutelage helped me find my true purpose in life.  He helped me realize that I have a responsibility to my community. He was selfless with his giving because he supported me through my Board hearing while working to gain his own

1  freedom.  This is a man whom I had no prior relationship
2  with before meeting him."  (See Exhibit B.)

3      10)   Prelude to Peace.   In addition to his domestic efforts, Mr. Harris also is
4  involved in international campaigns.  Two examples are Prelude to Peace and
5  Senegal Project Team.

6      Prelude to Peace was a series of charitable sporting and music events held in
7  Barcelona, Spain and broadcast internationally.  The events promoted peaceful co-
8  existence between Israelis and Palestinians and promoted education about peaceful
9  coexistence around the globe.  Paul Marshall, a renowned entertainment attorney
10  who selected Mr. Harris for this opportunity, previously wrote support letters for Mr.
11  Harris's state parole and gave Mr. Harris an open invitation to be part of his
12  organization upon release.  Mr. Harris' role was to select American recording artists
13  to appear at the events.

14      The events of Prelude to Peace were made possible by the kind invitation of
15  His Majesty King Juan Carlos of Spain.  Prelude to Peace's Board of advisors also
16  include John Hume of Northern Ireland, Nobel Peace Prize Laureate; Timothy
17  Shriver, Ph.D., Chairman, Special Olympics; President Jimmy Carter, Nobel Peace
18  Prize Laureate; Shimon Peres, Israeli Nobel Peace Prize Laureate; and Desmond
19  Tutu, South African Nobel Peace Prize Laureate.

20      11)   Senegal Project Team.  Mr. Harris helped develop the Senegal Project
21  Team, whose focus is on training at-risk youth in manufacturing, business and
22  finance.  Through this work, he also created a "Sister City" program that pairs
23  economically struggling cities in Senegal with their urban counterparts in the United
24  States.  This "Sister City" program will send at-risk youth from the United States to
25  Senegal to experience another culture, to learn of their own African history and to
26  heal from the stresses placed on urban American youth living in communities
27  devastated by guns, gangs, drugs and unemployment.  The youth of both countries
28  will be trained in Senegal in Green construction and other viable vocations.

The Senegal Project team is developing two museums in Senegal: (1) The Leopold Sedar Senghor Museum, which will spotlight the life of Senegal's first President after gaining its independence from France in 1960; and (2) The Museum of the Lost Tribes, which tracks the history of the descendants of those who crossed the plank at Goree Island, Senegal, onto ships and into slavery throughout the world. Mr. Harris will work closely with leading historians to develop these two projects.

Mr. Harris also has led the planning work of the International Advisory Committee for the Senegal Project team's International Institute for Social Justice. This Advisory Committee designed the curriculum and mission statement for the International Institute.  In addition to Mr. Harris, this committee consisted of Dr. Maki Mandela, the eldest daughter of Nelson Mandela; Taghreed Jaber Alqadi, Middle East and Africa regional Director of Penal Reform International; Bill Babbitt, Board of Directors of Murder Victims' Families for Human Rights; Amina Bouayach, President of the Moroccan Organization for Human Rights; Juan F. Matos De Juan, Puerto Rican Bar Association; Hans Strub, Director of Training for Protestant Church of Switzerland; Elizabeth A. Zitrin, J.D., Coordinator of International Outreach and Communications for Death Penalty Focus, and Robert R. Bryan, Attorney at Law.

D.      *Peace, Reconciliation, Transformation, and Redemption*

For most people, incarcerated or not, involvement with so many projects would be difficult.  Mr. Harris' lengthy proven track record and ability to connect with people at all levels of society demonstrate his unfailing commitment to using his personal experience and hard-earned insights as tools for helping others and finding a better way forward.

Mr. Harris always has been a dreamer who aimed to do big things in his life. Even behind prison walls in the tense environment of being locked up, he built relationships with legislators, local police chiefs, activists, entrepreneurs, non-profit leaders, and, most importantly, his fellow prisoners.

95

Altering the trajectory of someone's life is tough work, but for the last three decades Mr. Harris has worked tirelessly to transform lives, starting with his own. Over thirty years ago, Mr. Harris was part of the problem.  During the last three decades, however, he transitioned to become part of the solution.  He has worked in the name of reconciliation and redemption to make each day better for as many people as possible.

Mr. Harris still has the ability and the connections to make a difference in America's communities by reaching out to impressionable youth.  He understands what they are going through and where they are headed.  It will be his lifelong mission to bring all the stakeholders together in order to achieve lasting and sustainable solutions to change the trajectory of our youth away from criminal lifestyles.  By using his life experience, he will continue to work tirelessly to help build bridges out of poverty, prison, and despair.  The knowledge and insights he has learned over the last 32 years would be best shared today with the youths outside the prison walls who need it most to avoid landing inside those walls.

As evidenced by the letters from Aly Tamboura, Chrisfino Leal, David Cohen, James Houston and others, Mr. Harris has an ability to inspire people to turn themselves around.  This is part of the ripple effect of Mr. Harris' actions:  when men he has mentored go back into the community they have been effective role models themselves, thus generating more positive ripples in their own communities.

Mr. Harris mentored well over 1,000 men, one-on-one and in group sessions. If a stone thrown into a pond produces multiple ripples, how many ripples are produced when 1,000 stones are thrown in the pond?

Mr. Harris respectfully submits that his efforts to help transform lives, combined with the other factors detailed herein, demonstrates "extraordinary and compelling reasons" supportive of a sentence reduction.

*E.*      *Prison Officials' Assessment of Mr. Harris' Extraordinary Rehabilitation*

In addition to letters from prison volunteers, community leaders, family members, and fellow inmates, numerous prison officials have described Mr. Harris as a model inmate. These authorities have not only written letters documenting Mr. Harris's exceptional post-conviction rehabilitation, they also provided favorable input to the Parole Board which was fundamental to Mr. Harris' release from the life sentence he was then serving.

One such official is Scott Kernan, who has over three decades of service with the California Department of Correction and Rehabilitation (CDCR). He began his career in 1984 as a correctional officer at San Quentin Prison and was promoted to Correctional Sergeant in 1985, Associate Budget Analyst in 1986, Correctional Lieutenant in 1987, and Correctional Captain in 1991. He served as a Correctional Administrator from 2000 to 2001 and Chief Deputy Warden from 2001 to 2003. He became Warden at Mule Creek State Prison in 2003 and Warden of California State Prison-Sacramento in 2004. Mr. Kernan became Deputy Director of Adult Institutions in 2006, Chief Deputy Secretary of Adult Operations in 2007, and Undersecretary of Operations in 2008. In 2015, Mr. Kernan was promoted to serve as the Secretary of the California Department of Corrections and Rehabilitation. As Secretary, he was entrusted with the responsibility to lead a department of 69,000 employees with a $12 billion annual budget, overseeing more than 200,000 inmates and 45,000 parolees.

Scott Kernan is a dedicated professional who has had a highly successful career. Previous Governor Edmond G. Brown, Jr. publically stated, "Under Scott's leadership, our correctional institutions made real and lasting improvements for the staff, for the inmates and for the people of California." There can be little doubt that any recommendations made by Mr. Kernan would be well-reasoned and supported by the facts, especially when this recommendation is to the parole board weighing a

parole date for an inmate serving a life sentence.  In this context, Mr. Kernan, then Undersecretary of Operations, wrote the following:

> Mr. Harris has demonstrated the ability to positively program while incarcerated with the California Department of Corrections and Rehabilitation and the willingness to participate in pro-social rehabilitative programs.  Mr. Harris has the confidence of local law enforcement and community leaders who indicate that Mr. Harris will be a positive influence in the community modeling the behaviors and attitudes that promote alternatives to crime and incarceration.  Mr. Harris will be provided with an employment opportunity, an apartment, and professional and personal coaching by the Neighborhood House of Richmond.
>
> Based on Mr. Harris' abilities and willingness to serve the community, the attached recommendations of law enforcement and community leaders, and the Board of Parole Hearing's decision, it is my recommendation that Mr. Harris' request for an advance parole date be granted.
>
> (See Exhibit B.)

Keith J. Williams, Associate Warden of San Quentin State Prison, also wrote a letter to the Parole Board on Mr. Harris' behalf.  Like Undersecretary Kernan, Associate Warden Williams had worked for over 29 years for the Department of Corrections and Rehabilitation, and in that time had developed a "special ability to discern motivations and interpret behavior" of the inmates he oversaw.  After personally observing Mr. Harris on a daily basis for a six year period as the Correctional Captain of the General Population Housing Unit to which Mr. Harris was assigned, Associate Warden Williams stated:

98

I have learned that his great sense of civic responsibility is
driven by an authentic and heart-felt remorse.  His remorse
and desire to honor his victim and anyone else who has
suffered harm is manifested both in his stabilizing role in
the San Quentin general population and also his dedication
to outside community efforts and needs...

Based on my close interaction with Mr. Harris, not to
mention the Board of Parole Hearing's decision, it is my
personal and professional opinion that Mr. Harris is not a
threat to public safety and to the contrary, his release will
benefit the community, especially those whom he will
serve as a role model and assistant.  I earnestly and without
reservation recommend that Board of Parole Hearing's
grant Mr. Harris an advanced parole date."  (See Exhibit
B.)

Another prison official who wrote a letter of recommendation for Mr. Harris
was Lt. Sam Robinson, nicknamed "The Mayor of San Quentin."  Lt. Robinson is a
22 year employee of the CDCR, eleven of those years serving as the Public
Information Officer at San Quentin State Prison.  Lt. Robinson is responsible to
provide access and information to the numerous events and rehabilitative programs,
coordinate with headquarters communications staff, and ensure that all questions
about San Quentin are answered.  In his professional position as Public Information
Officer, Lt. Robinson interacted with Mr. Harris on a weekly basis.  In his letter to
the Parole Board, Lt. Robinson wrote:

I am able to witness inmate Harris' professional attitude
and reliable work ethic.  As an editor and an organizer,
Harris' professional attitude and reliable work ethic.  As an
editor and an organizer, Harris' skills have become highly

99

proficient and, as a professional, I consider his progress as a positive attribute to rehabilitation.  From my opportunity to observe inmate Harris' rehabilitation development, I can attest that his change is genuine and that he is sincere in his efforts to improve the community.

As the Public Information Officer, one of my duties is to conduct tours of San Quentin for the community.  During those tours, there's an opportunity for inmates to speak to the various groups.  Inmate Harris has become one of the inmates I rely on to convey to the visitors how participation in pro-social rehabilitation programs prepare inmates for re-entry into the community.

I believe that the Board should grant inmate Harris' request for an advanced parole date based on the fact that his conduct exemplifies the criteria necessary for such consideration.  (See Exhibit B.)

J. Evans has worked as a correctional officer at San Quentin Prison for 29 years.  Mr. Evans was assigned as the Education CDCR Officer, where he got to know Mr. Harris over a period of four years.  Like the other prison officials who wrote letters supporting Mr. Harris' release, Mr. Evans recognized Mr. Harris as a positive force was willing to place his processional reputation on the line and recommend that Mr. Harris, who was then serving a life sentence, be released early from prison due to his exceptional rehabilitation and extraordinary post-conviction efforts.  Mr. Evans wrote:

I have observed him on a number of different occasions, in the housing unit, interacting with other inmates on the yard, and at his work assignments...

I have personally witnessed Harris perform his duties in a professional manner on several interviews surrounding a number of events such as graduations, symposiums, and appreciation ceremonies.  My job position location provides me with the opportunity to view inmates from a distance as well as close up.  It is my opinion and experience that Harris has always conducted himself in a respectful and professional manner not just when people and officers are watching but more importantly when people are not.  During a number of conversations with inmate Harris I can attest to his inner growth and insight.  His time here at San Quentin has been nothing less than a constant flow of [positiveness] among staff, inmates, volunteers and prominent government officials.  His actions have demonstrated to me a willingness to be a productive person upon his release with a true mission for public safety.  In my professional opinion and code of ethics, Harris will be an asset to the world community, not a liability or a danger, because he has already shown a willingness to help society.  In your decision process regarding safety and security of the community concerning the release of inmate Harris, I pray that you sincerely consider my many years of observation of inmates and my professional experience within CDCR on this specific issue.  (See Exhibit B.)

The above prison officials who wrote letters supporting Mr. Harris' parole from a life sentence had over 100 years combined professional experience in corrections and rehabilitation.  Each of them is a correctional expert  They came to

1   their respective decisions to support Mr. Harris through years of personal interaction
2   and observation of Mr. Harris in a diverse range of situations and environments.
3   Each made perfectly clear that Mr. Harris at this point is an asset, not a threat, to the
4   public and, if released, would benefit society immensely.

5   Since Mr. Harris has been in the custody of the BOP, he has maintained his
6   exceptional prison conduct and rehabilitation efforts.  However, as related to him by
7   Unit Manager Webster, BOP policy no longer allows for staff to generate personal
8   letters of recommendation for individual inmates.  However, Mr. Harris has been
9   provided with a copy of his most recent BOP Program Review Summary Report.
10  (Exhibit K.)  This document contains a summary of all the information regarding Mr.
11  Harris' prison conduct, used by his Unit Team (Unit Manager, Case Manager, and
12  Correctional Counselor) in determining Mr. Harris' program needs.  A review of this
13  document will show the Court that Mr. Harris continues to maintain clear conduct
14  and meet all of his various programming goals.  Mr. Harris respectfully submits that
15  this information, combined with the other factors detailed herein, evidences
16  "extraordinary and compelling reasons" supportive of a sentence reduction to time
17  served.

18  F.    *California State Board Granted Mr. Harris Parole in 2011 after Finding Him*
19        *Suitable for Early Release.  Mr. Harris was Discharged from Parole in 2012*

20  When determining whether to release a defendant from a term of
21  imprisonment early, one of the most important questions this Court must thoroughly
22  consider is whether, if released, that defendant would pose a threat to society.

23  In the case of Mr. Harris, this question already has been answered in 2010 by
24  the California State Parole Board ("Parole Board") when the Parole Board
25  determined Mr. Harris was suitable to be paroled early from prison.  The Parole
26  Board is tasked with the specific duty of determining parole suitability.  It consists of
27  professionals qualified to make sound, informed judgments about the suitability of
28  restoring civil rights and returning a prisoner to free society.

The Parole Board's workforce includes seventeen Commissioners, appointed by the governor and subject to State Senate confirmation, as well as Deputy Commissioners, forensic clinical psychologists, investigators, and administrative and legal staff.  The mission of the Parole Board is to protect and preserve public safety and to maintain a high performing and professional parole hearing and review system that protects California's communities.

While California state law mandates that every inmate sentenced to a term with the possibility of parole be provided a parole hearing date, there is nothing which guarantees an inmate ever will be granted parole.  As one former commissioner stated: The purpose of the Parole Board is not necessarily to set the right inmate free, but to ensure the wrong inmate stays locked-up.  In support of this statement, CDCR data has shown that, on average, less than 13% of all inmates serving life sentences, who came in front of the Parole Board actually are granted parole.

There are many considerations the Parole Board weighs when determining whether an inmate is deemed suitable for parole.  These considerations are provided in the California Code of Regulations, Title 15.  They include: nature and gravity of the commitment offense, past criminal record, social history, psychological evaluation, institutional behavior, post-conviction rehabilitation, parole plans, stable relationships, and age, among other factors.

The Parole Board took the above-mentioned factors into consideration when making the rare decision to grant Mr. Harris a parole date after his hearing in 2009. His dedication to self-help and education, lack of disciplinary action for over ten years, strong support system and realistic future plans, sense of remorse and accountability for his past actions, and rehabilitative mental state led the Parole Board to deem Mr. Harris suitable for parole, the Parole Board specifically commenting on his "genuine and sincere remorse."  As summed up by Presiding Commissioner Shelia Petrakis:

Not only was it your words, it was your conviction, your

tone of voice, that the panel did recognize.  It was with that

and other statements of remorse that showed the panel that

you did have insight into the causative factors and you

truly understood the nature and magnitude of the offense.

The prisoner's positive and rehabilitative mental state and

the prisoner's sincere signs of remorse and his attitude

toward the crime show he is suitable for parole because he

has, as we previously explained, the prisoner has insight

into what led to his criminality, to include not only

creating an environment of criminal activity, but to also

include one in which violence was brought forth upon Mr.

Lester.  And, again, your signs of genuine and sincere

signs of remorse.  (See BPH 2009 Transcript, Exhibit L.)

The Parole Board's decision validates Mr. Harris' remarkable post-conviction record and personal transformation, and indicates that he would not be a danger if granted a reduced sentence and release from custody.  Therefore, Mr. Harris submits to the Court that his state parole from a life sentence -- an extraordinary and compelling circumstance -- combined with the other factors detailed herein, supports reduction of Mr. Harris' current federal sentence to time served.

G.      *Mr. Harris Continued His Engagement with Programming after He was Transferred to Federal Custody*

 San Quentin State Prison offered over 100 programs and utilized over 3,000 outside volunteers, from students to heads of large corporations, to implement those programs.  This provided Mr. Harris the fertile ground in which to conceptualize and grow successful rehabilitation programs.  While the Federal Correctional Institution at Lompoc ("FCI-Lompoc") is more limited in the number of programs available, since Mr. Harris was transferred he has continued to further his rehabilitation by

1  taking advantage of all programming available at FCI-Lompoc.  In addition to

2  continuing his formal education through both Coastline and Allan Hancock Colleges,

3  he is an active participant in the Adult Continuing Education Program, the Post-

4  Release Employment Readiness Program, the Health and Nutrition Programs, and

5  numerous other rehabilitative activities summarized in his attached BOP

6  "Individualized Reentry Plan -- Program Review."  (Exhibit M.)  Mr. Harris also

7  dedicates time and energy to mentoring other inmates as they prepare for their

8  release.

9       The United States Probation Officer is tasked with the duty of conducting in-

10 depth research into a defendant's history and characteristics.  The Court relies on

11 their accurate, complete, and factual report in order to craft a just sentence.  In Mr.

12 Harris' case, the United States Probation Office recently assessed Mr. Harris' post-

13 sentencing conduct and submitted a report to this Court which reads in part:

14             [Mr.] Harris has distinguished himself by his exceptional

15             pro-social, post-sentencing conduct while in state prison.

16             He worked to make society safer by mentoring fellow

17             inmates to lead a crime-free life, and by promoting

18             educational and vocational initiatives within the prison

19             system.  It speaks volumes that so many distinguished

20             public servants in the Bay Area, occupying high-profile

21             positions, would endorse so strongly someone like Harris,

22             who was then a San Quentin inmate serving a 25-year

23             prison sentence for attempted murder.  A common theme

24             runs through the many letters submitted by both the mayor

25             and chief of police for the City of Richmond, California, as

26             well as those submitted by the state senator, assembly

27             member, county supervisor and others serving that area

28             (PACER Doc. No. 1373-1).  All believed the city of

105

1   Richmond would have benefitted immediately if Harris

2   was paroled, so that he might deploy his unique skill set to

3   improve neighborhood safety.

4   Since entering the Bureau of Prisons, Harris has continued

5   his exceptional pos-sentencing rehabilitation.  He has

6   completed numerous educational programs, including

7   college-level courses.  As was the case in the California

8   Department of Corrections, Harris has maintained an

9   exemplary disciplinary record.  (See Exhibit M.)

10   Even the United States Attorney's Office recognized Mr. Harris' "significant

11   post-conviction rehabilitation efforts" (see the government's Answer Brief to the

12   Ninth Circuit, Case 18-50114, 01/04/2019, ID: 11142664, DktEntry: 18, Page 36 of

13   38).

14   Mr. Harris respectfully submits that this information, combined with the other

15   factors detailed herein, provides further evidence of "extraordinary and compelling

16   reasons" supporting a sentence reduction.

17   *H.   Facts Discovered Post-Sentencing Provide Credible Evidence Mr. Harris was*

18   *Actually Innocent in His Now Discharged California State Case No. A954503*

19   One of the "extraordinary and compelling reasons" why this Court should

20   consider reducing Mr. Harris' 235-months federal sentence is the credible evidence,

21   discovered post-sentencing, showing that Mr. Harris actually is innocent of the state

22   crime for which he served 23 years.

23   On June 11, 1987, James Curtis Lester ("J.C. Lester") was kidnapped from the

24   home of his girlfriend in Los Angeles by four individuals.  J.C. Lester claims they

25   took him to an abandoned house and tied him up, then drove him to Canyon Country,

26   California, where he was shot and abandoned.  He managed to walk to a nearby

27   house where he called for help.

28

106

1   Prior to being taken to the hospital, J.C. Lester told Deputy Sheriff Garns,
2   California Highway Patrol Officer Reed, and later, after arriving at the hospital,
3   Detective Segars, that he did not know who his assailants were.

4   However, J.C. Lester later changed his story and stated Mr. Harris and one
5   other person kidnapped and shot him.

6   Mr. Harris was subsequently arrested.  He retained attorney Clay Jacke, Sr.
7   ("Mr. Jacke") to represent him as counsel.  Mr. Harris informed Mr. Jacke that he
8   was in Houston, Texas during the week of the shooting and had multiple alibi
9   witnesses who would testify to that fact.  Mr. Harris also made clear that he had no
10  knowledge of the abandoned house (which J.C. Lester testified was located at 1305
11  W. 80th St., Los Angeles) where J.C. Lester had claimed he was tied up.  In fact,
12  after the trial, the owner of the house, Derrick Pruett, signed a sworn affidavit which
13  stated he was home having his birthday party celebration on the night of the
14  shooting.  (See Exhibit N.)  However, due to Mr. Jacke's [unfounded] belief that Mr.
15  Harris lacked funds, he made no effort to investigate any of Mr. Harris' claims.

16  J. C. Lester's testimony was the only evidence presented at trial identifying
17  Mr. Harris as the perpetrator of the crime.  No physical evidence or other direct
18  evidence ever was introduced to corroborate J.C. Lester's trial testimony.  All other
19  circumstantial evidence introduced was hearsay originating from J.C. Lester,
20  including testimony from his brother, L.C. Lester.

21  Mr. Harris was convicted on Conspiracy to Commit Murder, and sentenced to
22  serve a 25-years-to-life indeterminate sentence, and for Great Bodily Injury, he was
23  sentenced to serve a consecutive 3-year determinate sentence.

24  After trial, Mr. Jacke realized that it was the direct result of his failure to
25  properly investigate Mr. Harris' alibi, the home J.C. Lester testified he was tied up at,
26  and other witnesses, that led to Mr. Harris' conviction.  Mr. Jacke provided a sworn
27  affidavit acknowledging his ineffective assistance of counsel.  (Exhibit O.)

28

107

In November 26, 1990, while Mr. Harris still was serving his 3-year determinate state sentence, he was sentenced in his federal case, by Judge William J. Rea, who ordered his 235-month federal sentence to run "consecutive to the state sentence defendant was presently serving." (Exhibit D.) By operation of law, that sentence was the 3-year determinate state sentence for Great Bodily Injury which Mr. Harris was then serving.

Two years after Mr. Harris' federal sentence was imposed, a sworn affidavit by the sole victim, James Lester, was provided showing that Mr. Harris actually was, and is, innocent of the state crimes for which he served a total of twenty-three years. Those state convictions were the basis for Mr. Harris' nineteen-year federal sentence being imposed consecutively. The affidavit of victim Lester was followed over a period of 20 years by four additional voluntary sworn affidavits/declarations, as well as sworn testimony at two parole hearings -- all of which were consistent in their exoneration of Mr. Harris.

In 1987, Mr. Harris was convicted of the robbery, kidnapping, and conspiracy to commit murder of James Lester. He was sentenced to serve 25 years to life plus a three-year determinate term in state prison. Mr. Harris' lifestyle and reputation as a major drug dealer directly contributed to the life sentence he received, as his activities had landed him on the radar of law enforcement officials in the Los Angeles area. However, the victim, James Lester, admitted as early as 1992 that, in order to convict Mr. Harris, he had lied, due to the urging and threats of law enforcement agents against him and his family if he did not cooperate. Beginning that year, Mr. Lester voluntarily signed a series of sworn declarations admitting that he lied to help law enforcement convict Mr. Harris. (See Declarations from James Lester attached hereto as Exhibit P.) Mr. Lester explained that he originally told law enforcement officers that he suspected Mr. Harris might be involved because Mr. Harris thought Mr. Lester may have stolen money from him. However, he knew that Mr. Harris was not one of his three assailants.

1   James Lester's brother, L.C. Lester, also signed declarations admitting that his

2   only knowledge of the offense came from information his brother had provided.

3   (Exhibit P.)  He admitted that his brother initially told him that he did not know who

4   his assailants were, but that his brother changed his story and named Mr. Harris

5   because law enforcement officers pressured him to do so.  Like his brother, L.C.

6   Lester also succumbed to pressure from law enforcement officers to falsely testify

7   against Mr. Harris.

8   The Lester brothers learned that the man behind the attack was Buford Bates, a

9   well-known gang leader from whom they feared retaliation if they were to implicate

10   him.  (Id.)  Although they both admitted falsely implicating Mr. Harris in this offense

11   in 1992, they did not specifically name Mr. Bates until after they had learned of his

12   death in or around 2002.

13   Mr. Harris has consistently maintained his innocence throughout the course of

14   his trial, appeal, and his subsequent incarceration and parole hearings.  However, as a

15   review of his September 2008 parole hearing transcript shows, the Board of Parole

16   Hearings inexplicably rejected James Lester's admission in the parole hearing that he

17   had lied and that Mr. Harris did not commit the crime against him.  (Defer to

18   September 25, 2008, Parole Hearing Transcript, at Pages 136-141.)

19   The September 2008 hearing was actually a continuation -- albeit with a new

20   commissioner -- of a hearing that began in March of that year but was suspended for

21   the Board to determine whether Mr. Lester had been threatened or coerced in any

22   way to exonerate Mr. Harris.  (Defer to March 20, 2008 Parole Hearing Transcript.)

23   Before suspending the March 2008 proceedings, Presiding Commissioner Linda

24   Shelton said she wanted to get Mr. Lester's statement on the record.  However,

25   before Commissioner Shelton allowed Mr. Lester to enter his statement into the

26   record, she made the following series of statements:

27   I'm stuck here...  What I'm stuck here is, is that I'm looking

28   at a man across the table who says he's innocent and I'm

109

looking at a victim who says you're innocent too.  And I, in good conscience, cannot move this hearing forward without a thorough investigation...  This hearing and this Board in this room cannot retry your case...  But we can at least do what I think we should do with regards to investigation.

The problem is, is that I am going to postpone this hearing today.  And I am going to request an investigation based on what I just told you...  I want everything thoroughly investigated because if, in fact, you are innocent, you shouldn't be sitting here...  And I don't know that much about the law and state and federal charges, but it would seem to me that you might potentially, if you are innocent...somebody might take a look at your federal sentence...  And I asked Ms. Hoffman if one could get credit for your time served already...  I am struggling with -- I've talked with Ms. [D.A.] Naftel.  I've talked with Ms. [Attorney for Mr. Harris, Johanna] Hoffman.  I've talked with Mr. Lester.  I've talked with my partner [Deputy Commissioner Philip J. Bruccoleri] and I've talked with me.  I don't know how long this kind of information goes on and people ignore it or do not ignore it, but it seems to me, to quote my partner, there should be a remedy...  And there should be resolution for once and for all.  And either that resolution is you're stuck here for life until you earn parole or the resolution is that you're innocent.

We all know that there are innocent people in prison.  We also know that there's a lot of people who say they're

1  innocent who aren't.  But I've been doing these hearings for

2  two years and I have not had a victim come in and say, he

3  didn't do it.  It seems to me we should do something with

4  that...  We cannot ignore Mr. Lester's testimony, which

5  we're going to get to in a moment because I would like him

6  to put his statement on record since it's never, ever been on

7  record in a hearing room...  I just have to go with my

8  conscience...

9  The victim, James Lester, stated the following:

10  Okay.  To members of the State of California Parole Board

11  and Mr. D.A.  I, James Lester, declare and signed two or

12  three statements -- declarations under the United States

13  Courts of Law testifying that Michael Harris and Richard

14  Dawson was not my assailant and kidnapper and robber

15  and shooter, did not do it.  When, in fact, a guy by the

16  name of Buford (sp) Bates, better known as B.J. was the

17  shooter.  I, James Lester, was the victim of a horrendous

18  crime and I just want to make peace within myself because

19  I couldn't sleep and just didn't feel right with myself

20  knowing that Mr. Harris was not the shooter and had

21  anything to do with it.  So I'm here on my own free will,

22  was not threatened by Mr. Harris nor his family.  So I can

23  go on with my life and also so he can go on with his.

24  Thank you."  (Exhibit P.)

25  Mr. Lester even apologized to Mr. Harris for "taking him through this."  (Id. at

26  15.)  Still, the Board proceeded to deny Mr. Harris parole in the September 2008

27  hearing.

28

111

Upon closer review, the Board's handling of this case reveals a major flaw in the criminal justice system: the rules governing the parole consideration process do not provide a pathway home through the parole board for someone who has a legitimate claim of innocence.  Specifically, §2281 of Title 15 of the California Code of Regulations enumerates 15 different factors that could constitute the kind of "relevant, reliable information" that should guide the Board's determination of whether someone currently represents such an unreasonable risk to public safety that they should be denied parole.  (See Cal. Code of Regs., tit. 15. Sec. 2281, subds. (b), (c) and (d).)  Actual innocence is nowhere among those 15 factors.  As a result, the Board was unable or unwilling to grant parole on the basis of Mr. Harris' innocence.  Even so, Mr. Harris has always acknowledged the destructiveness and danger of the drug-dealing lifestyle that he was involved in, and he fully accepts that violence is often an inevitable and foreseeable consequence of that life.  In short, he owns responsibility for his part in the devastation of his community, and on numerous occasions, such as in interviews, Mr. Harris has apologized for the role he played.

Mr. Harris was later found suitable for parole at another hearing (his fourth) on September 16, 2009.  While once again considering the sworn admissions by James and L.C. Lester, the Board rested its decision to grant parole on the many ways in which Mr. Harris has worked to transform himself and his community despite the fact of his innocence in this crime.  Lastly, the Board considered the overwhelming weight of the evidence showing that Mr. Harris would present a very low risk -- and would actually make a huge contribution -- to the public if released.

Mr. Harris still is being impacted by the improper execution of the state and federal sentences and the federal court's reliance on the factors entailed in the state case.  Mr. Harris does not contest the legality of his federal conviction, just the manner of his federal sentence's execution by the U.S. Marshal Service, and the aggregation of his federal sentence with his undischarged state sentence.  Judge Rea, when he imposed Mr. Harris' federal sentence on November 26, 1990, did not, of

1  course, have the benefit of the post-sentencing facts.  This Court does have the

2  benefit of those facts.

3       Furthermore, this Court now has the authority to take a "second look" at the

4  aggregation of Mr. Harris' convictions as well as the U.S. Marshals Service's

5  execution of his federal sentence (as discussed in the next section) as factors in

6  determining an appropriate compassionate release ruling.  The California Parole

7  Board, being an Executive agency, lacked the authority to declare or even take into

8  account what properly is a Judicial determination of Mr. Harris' actual innocence.

9  As quoted earlier, Parole Board Presiding Commissioner Shelton said, in part, at Mr.

10  Harris' March 20, 2008 Parole Hearing, "...somebody might take a look at your

11  federal sentence..."  In reference to the multiple sworn affidavits/declarations and

12  sworn testimony by the victim Lester, recanting his false trial testimony which had

13  led to Mr. Harris' state convictions, Presiding Commissioner Shelton said:

14          I don't know how long this kind of information goes on

15          and people ignore it or do not ignore it, but it seems to me,

16          to quote my partner, there should be a remedy...and there

17          should be resolution once and for all...  We cannot ignore

18          Mr. Lester's testimony...I just have to go with my

19          conscience.

20       The First Step Act now allows this Court to look at the post-conviction facts

21  and to "go with" its conscience under its §3553(a) review.  The beauty of the First

22  Step Act is that it builds into the law the ability of a federal judge to pay attention to

23  the better angels of his or her nature and to consider unique "extraordinary and

24  compelling" factors such as those involved with Mr. Harris's sentences.

25       Among the various compelling reasons why this Court should grant

26  compassionate release to Mr. Harris, it is the persistent efforts of the victim, Mr.

27  Lester, over the last 28 years to recant his trial testimony so he can, according to him,

28  sleep at night, clear his conscience and go on with his life, is particularly

"extraordinary and compelling."  He has sworn no less than five affidavits/declarations and testified under oath on the record twice in parole hearings that Michael Harris was *not* his assailant and was innocent of the crimes for which Mr. Harris served the first 23 of his 32 years incarceration.  Yet, the state conviction of Mr. Harris in 1988 for being Mr. Lester's assailant was the basis for Judge Rea's decision that Mr. Harris' nineteen-year sentence should run consecutive to his 3-year state sentence, which was improperly executed by the U.S. Marshals Service who instead inadvertently made it run consecutive to his indeterminate 25-years-to-life sentence.

Without the state convictions, there would have been no need to run Mr. Harris's 19-years sentence consecutively, and Mr. Harris would have been released from federal custody no later than 2009.  With good time credit, his release would have taken place on or about 2005, when some of his co-defendants with similar sentences were released.  Now that the First Step Act allows consideration of what previously was not allowed to be considered by this Court, it is time for Mr. Harris to be considered for release.

I.   *Concurrent vs. Consecutive*

1.   If the Sentencing Judge Had Known of Mr. Lester's Perjured Testimony that was Used to Convict Mr. Harris in His State Cases, It is Reasonable to Conclude He Would Have Imposed a Concurrent Sentence Instead of a Consecutive Sentence

Mr. Harris was a first-time federal offender who was convicted for violating non-violent federal drug offenses.  Evidence presented at trial and recorded in the PSR showed that while Mr. Harris was a buyer of cocaine from the Villabona Organization, and was "separate" and "apart" from that Organization (PSR, ¶109).

Based upon the various sentencing factors, Mr. Harris was sentenced to a federal term of 235 months.  Had Mr. Harris only had to serve the federal sentence,

1    he would have been released in 2008, twelve years ago, and with good time he would

2    have been released in 2005 as some of his co-defendants were.

3        Unfortunately, in 1988, Mr. Harris had been convicted in State Court to serve

4    a 25-years-to-life indeterminate sentence for conspiracy to commit murder, to run

5    consecutive to a three-year determinate sentence for Great Bodily Injury.  Much of

6    the federal sentencing proceeding was taken up by the discussion of whether Mr.

7    Harris' federal sentence should be ordered to run concurrent or consecutive to his

8    state sentences.  A review of the sentencing transcript will show that over half of the

9    entire hearing was consumed with discussion of the state convictions.

10       Though Mr. Harris had always maintained his innocence, the only information

11   he had to rely upon at sentencing was the evidence of Mr. Harris' state convictions.

12   And it is perfectly clear from U.S. District Judge William Rea's own statements that

13   it was the violent nature of Mr. Harris' conviction that made him decide to impose a

14   consecutive sentence.  In fact, Judge Rea commented:

15              What you are saying is that being convicted of conspiracy

16              to commit murder gives you a free bite of the apple so to

17              speak so that if you are convicted of some later crime you

18              get credit for that crime for the sentence that's being

19              imposed on you for conspiracy to commit murder.  (Id.)

20       The prosecutor also focused on the violent nature of the state offense, when he

21   stated:

22              If the Court does sentence Mr. Harris concurrently he is

23              going to get a freebie for taking somebody out, binding

24              them up with a telephone wire, leading them out to the

25              desert and shooting them twice.  (Id.)

26       Mr. Harris fully recognizes that, absent any evidence to the contrary, the

27   consecutive sentence the Court chose to impose was a punishment reasonably based

28   on the violent nature of the state crime, if Mr. Harris was guilty.  However, as noted

115

previously, after Mr. Harris had been federally sentenced, credible evidence, including the recantation in a sworn affidavit of perjured trial testimony by the sole victim, James Lester, came to light which supported Mr. Harris' claim of actual innocence which he had maintained from the beginning.

Had all the post-conviction evidence of actual innocence been available for the sentencing judge to review, prior to imposing its federal sentence, the Court may have determined there was enough doubt as to whether Mr. Harris committed the state offense, to have imposed the federal sentence to run concurrent to the state sentences.

It is Mr. Harris' hope that this Court will review all of the Exhibits provided supporting Mr. Harris' claim of actual innocence of committing the state crime, and impose his federal sentence to run concurrent to his now discharged state sentences, or order an evidentiary hearing to review the evidence, question any witnesses and then make a determination of whether this Court finds enough support for Mr. Harris' claim of actual innocence.

2.   The Sentencing Court's Intent in Running Mr. Harris' Federal Sentence Consecutive to the Determinate Three-Year State Term Rather Than the 25-To-Life Indeterminate Term

It is clear from the Sentencing Transcript that Judge Rea made the best decision he could with the information he had in 1990 when he imposed Mr. Harris' federal sentence.  The judge did not have the benefit of knowing that the state case against Mr. Harris was based solely on the victim's perjured testimony, as the victim admitted after the trial in no less than five sworn affidavits/declarations and sworn testimony in two parole hearings.

But in 1990, Judge Rea, focusing on what at the time he believed to be the serious nature of the crimes Mr. Harris had committed, made clear he wanted Mr. Harris to serve the maximum amount of time on each of his multiple sentences.  By running the 235-month determinate sentence immediately after Mr. Harris' three-year

1  determinate state sentence (the state sentence he is "presently serving"), the judge

2  was guaranteeing at least 22 years would be served before the 25-years-to-life

3  sentence began.  In other words, he wanted the two determinate sentences served

4  before the 25-years-to-life indeterminate sentence started.

5      The judge stated:

6          So, if I sentenced [Mr. Harris] to twenty years to run

7          concurrent, that means he will do three years on this.  And

8          in fact, with good behavior he'd do less than that... He's

9          committed serious crimes."  (Sentencing Transcript, Page

10          16, lines 10-12; 23, Exhibit H.)

11      Judge Rea was worried that if he ruled Mr. Harris' federal sentence should run

12  concurrent with his 25-years-to-life sentence, that the only determinate time Mr.

13  Harris would serve would be the three year state determinate sentence that Mr.

14  Harris was then finishing up.  Clearly, the judge wanted to make sure that Mr. Harris

15  served both of his determinate terms -- the 235-month federal sentence immediately

16  following his three-year state determinate sentence -- before his state 25-years-to-life

17  indeterminate sentence commenced.

18      Judge Rea's intent in that regard was consistent with California law, P.C.

19  §669(a), which states a determinate term must be served before an indeterminate

20  term. The judge was concerned that Mr. Harris might be paroled in a relatively short

21  period of time.  Judge Rea said, "...I have no way of knowing at this time whether the

22  Parole Board will let him go at five years, ten years, fifteen...  They work in a strange

23  way over there as far as I can see."  (Sentencing Transcript, Page 7, lines 20-23.)

24      The judge had reviewed the PSR from the U.S. Probation Office and he knew

25  Mr. Harris had two undischarged state sentences and was serving his determinate

26  three-year term at the time the federal sentence was imposed (PSR, ¶125).  There is

27  no doubt that Judge Rea's intent, motivated by his concern over the serious and

28  heinous nature of the state crime, was to assure that Mr. Harris would serve as much

1  time as possible.  The judge purposely "front loaded" the determinate sentences

2  before the indeterminate state sentence, thus "stacking" the terms of the three

3  convictions in such a way as to insure the maximum amount of time Mr. Harris

4  would have to serve.  The judge expressed his concern with a concurrent sentence:

5          I think that's the thrust of this particular case, because what

6          you are saying is that being convicted of conspiracy to

7          commit murder gives you a free bite out of the apple so to

8          speak so that if you are convicted of some later crime you

9          get credit for that crime for the sentence that's being

10         imposed on you for conspiracy to commit murder.

11         (Sentencing Transcript, Page 10, lines 2-8.)

12      But what if in 1990 the sentencing court had the benefit of Mr. Lester's sworn

13  affidavits/declarations and testimony stating he had lied in Mr. Harris' state trial

14  testimony and that Mr. Harris was not involved in the conspiracy to murder him?

15  Nobody is able to answer that question, but it is reasonable to conclude Mr. Harris'

16  19-year sentence would not have been made consecutive to his state term, and Mr.

17  Harris would be a free man today.

18      Thanks to the First Step Act of 2018, this Court has the opportunity to take

19  into account what Mr. Harris' sentencing court couldn't.  This court has the

20  opportunity not only to take Mr. Harris' remarkable accomplishments from his

21  incarceration these past thirty years into account, but also and especially to examine

22  and take into account the post-conviction history of his state case.  It is

23  understandable how Mr. Harris' state cases would have appeared to the sentencing

24  judge in 1990 and why it was Judge Rea's intent to give Mr. Harris as much time as

25  possible.  His intent was to make sure his federal sentence was served immediately

26  after his three year determinate sentence.  This court now should seize the

27  opportunity to recognize that, in retrospect, Mr. Harris' federal sentence should not

28  have been consecutive and on that basis, as well as for other reasons contained in this

motion, this Court should use its discretion under the First Step Act to reduce Mr. Harris's sentence to time served.

3.   The Federal Judge's Sentencing Order was Improperly Executed to Run Consecutive to the Wrong State Sentence

STATEMENT OF FACTS

1)   In 1987, Mr. Harris was charged by the State of California with conspiracy to commit murder, with an enhancement for inflicting great Bodily Injury (Case No. A954503).  After posting bond, Mr. Harris remained free through the date of his conviction in April, 1988.

2)   While on bond, a DEA task force investigating the Villabona/Bennett drug organization intercepted a phone conversation between Mr. Harris and Mario Villabona, discussing an 11.5 kilogram cocaine transaction.

3)   Around March, 1988, Mr. Harris proceeded to trial in his state case and was convicted on April 16, 1988.

4)   On September 16, 1988, Mr. Harris was sentenced to serve a three-year (36-month) determinate sentence for the Great Bodily Injury conviction, to be served consecutive to a twenty-five (25)-years-to-life sentence for the attempted murder. Under California law, 25-years-to-life is an "indeterminate" term.  (Exhibit Q.)

5)   Per California law Penal Code §669(a), all determinate sentences, regardless of the jurisdiction or order imposed, shall always be served first, when ordered to run consecutive to an indeterminate term.  (Exhibit R.)

6)   On September 27, 1988, Mr. Harris was transferred to the custody of the California Department of Corrections and Rehabilitation ("CDCR") to serve his terms of imprisonment.

7) On December 2, 1988, a federal grand jury returned a four-count indictment charging Mr. Harris with various drug offences (Case No. 88-CR-972-WJR).

119

8)      On December 29, 1988, Mr. Harris was removed from state custody by the United States Marshals Service ("the Marshals") on a Writ of Habeas Corpus Ad Prosequendum to answer the federal charges.

9)      On November 26, 1990, the District court ordered Mr. Harris to serve a federal sentence of 235 months, to run consecutive to the state sentence Mr. Harris was "presently serving."  (Exhibit D.)

10)     When District Court Judge William J. Rea imposed the federal sentence, he was fully aware that Mr. Harris had two undischarged state sentences, a determinate state sentence that had been ordered to run consecutive to an indeterminate state sentence.  [At the time the federal sentence was imposed, Mr. Harris still was serving the determinate state sentence.]

11)     Per the Sentencing Reform Act of 1984, which Mr. Harris was sentenced under, all federal sentences were considered to be determinate.

12)     [At the time the federal sentence was imposed by the District Court, Mr. Harris was still serving his 36-month determinate state sentence.]

13)     When the District Court ordered Mr. Harris' federal determinate sentence, to be served consecutive to Mr. Harris' state determinate sentence, the District court judicially aggregated the two consecutive determinate sentences into one continuous determinate sentence.

14)     Upon completion of the federal sentencing proceeding, Mr. Harris was remanded back into the custody of the Marshals, whose primary role and mission is the non-discretionary duty to "obey, execute and enforce all orders of the District court."

15)     In order for the Marshals to properly obey, execute, and enforce the District court's sentencing order, it would require the Marshals first to determine which sentence Mr. Harris was "presently serving" when his federal sentence was imposed.

16)     On November 26, 1990, the Marshals failed to enter the District court's sentencing order into the Marshals' Prisoner Tracking System, but instead only entered: "235 MONTH CAG CONSECUTIVE TO STATE."  (Exhibit S.)

17)     On December 4, 1990, the District court filed its Judgment and Sentencing Minutes, which ordered Mr. Harris to be "committed to the custody of the Bureau of Prisons for an imprisonment term of 235 months...shall run consecutive to the state prison sentence the defendant is presently serving."  (Exhibit D.)

18)     On December 5, 1990, the Marshals lodged a detainer against Mr. Harris with the CDCR.  (Exhibit E.)

19)     On January 15, 1991, the Marshals returned Mr. Harris back into state custody, to close the Writ of Habeas Corpus Ad Prosequendum, but the Marshals failed to determine which state sentence Mr. Harris was "presently serving" when he was returned.

20)     On January 18, 1991, the Marshals lodged another detainer against Mr. Harris with the CDCR.

21)     On January 27, 1991, the 36-month determinate sentence Mr. Harris was "presently serving" when his federal sentence was imposed, expired.  By operation of California State Law, Cal. PC §669(a), the state automatically relinquished primary jurisdiction of Mr. Harris to the custody of the Attorney General [CAG], in order for Mr. Harris to commence serving the federal portion of his 271-month aggregated determinate sentence, prior to the service of his 25-years-to-life indeterminate state sentence.

22)     On January 28, 1991, the Marshals continued to fail in its legal duty to obey, execute, and enforce the District Court's sentencing order, by not delivering Mr. Harris into the custody of the federal Bureau of Prisons to serve his federal sentence, nor did it make the necessary arrangements to allow Mr. Harris to serve his federal sentence while housed in the custody of the CDCR.

23)     On April 2, 1991, over 60 days after the expiration of the determinate state sentence Mr. Harris was "presently serving" when his federal sentence was imposed, the Marshals finally sent the CDCR a Sentence Status Request.  The state provided information regarding Mr. Harris' indeterminate life sentence, which was not the sentence the District Court ordered Mr. Harris' federal sentence to run consecutive to.  (Exhibit F.)

24)     Between 1991-2004, Mr. Harris was taken back into the custody of the Marshals, for a combined total of four years and seven months, on the following occasions:

A.     October 11, 1991 - February 25, 1992 (137 days)

B.     June 12, 1993 - December 15, 1993 (186 days)

C.     July 27, 1995 - September 16, 1995 (61 days)

D.     October 11, 1995 - December 1, 1995 (51 days)

E.     June 13, 1997 - October 17, 1997 (126 days)

F.     October 17, 1997 - October 22, 1997 (5 days)

G.     July 16, 2003 - August 31, 2004 (412 days)

H.     August 31, 2004 - September 2, 2004 (2 days)

I.      September 2, 2004 - September 3, 2004 (1 day)

Each time the state transferred Mr. Harris into the custody of the Marshals, the state automatically relinquished primary jurisdiction, physical, and legal custody of Mr. Harris to the federal government.  The Marshals repeatedly failed to obey, execute, and enforce the District Court's sentencing order when they continued to send Mr. Harris back into the custody of the State, instead of delivering him into the custody of the Bureau of Prisons.

25)     In 2008, Mr. Harris' 235-month federal sentence expired.

26)     In 2011, Mr. Harris was granted parole on his indeterminate life sentence.  Prior to his release, the CDCR notified the Marshals per the detainer they had lodged against Mr. Harris.  (Exhibit E.)

27)     On October 11, 2011, three years after his federal sentence had expired, the Marshals finally executed the District court's 1990 sentencing order and delivered Mr. Harris into the custody of the Bureau of Prisons.  (Exhibit D.)

28)     In February of 2019, Mr. Harris came across new evidence which led him to believe that the United States Marshals Service had improperly executed the District Court's 1990 sentencing order.

29)     Between March, 2019 and August, 2019, Mr. Harris wrote the State Court, the U.S. District Court, the California Department of Corrections and Rehabilitation, and the U.S. Marshals Service seeking documentation relating to both his state and federal sentences.

30)     On August 27, 2019, Mr. Harris filed an Administrative Remedy Request (No. 98055-F1) with the Bureau of Prisons to have the time he spent in State custody, from January 27, 1991 until 2008, credited to his current federal sentence, which was denied.  (Exhibit C.)

The United States Marshals Service ("the USMS") is the agency tasked with executing a judge's sentencing order.  When Judge Rea imposed Mr. Harris' 235-month federal sentence to be served consecutive to the state sentence, that "defendant was presently serving" (Exhibit D), it was the duty of the USMS to determine which state sentence Mr. Harris was "presently serving" at the time the 235-month federal sentence was imposed.  Instead, the USMS entered the following erroneous information into their tracking system: "235 MONTH CAG CONSECUTIVE TO STATE."  (Exhibit S.)  Further, the USMS made no effort to determine which state sentence Mr. Harris was "presently serving" until April 2, 1991, over 60 days after the three year determinate state sentence Mr. Harris was "presently serving" had ended.

Because of the error committed by the USMS in executing Judge Rea's sentencing order, Mr. Harris' judgment and commitment papers lay unexecuted for over twenty years!  The USMS are ministerial officers who do not have the

123

discretionary power to determine when the time is appropriate for service of a

prisoner's sentence (see Green v. Christiansen, 732 F.2d 1397, 1399-1400 (9th Cir.

1978), but do have a specific duty to properly execute a Court's sentencing order.

The failure to properly execute Mr. Harris' federal judgment and commitment order

for more than twenty years constituted gross negligence on the part of federal

authorities.  See Shelton v. Ciccone, 578 F.2d 1241 (8th Cir., 1978)  Had it not been

for the errors committed by the USMS in executing Mr. Harris' federal sentence, Mr.

Harris would have completed serving his 235-month federal sentence in 2008.

The concept of primary jurisdiction was established by the Supreme Court

nearly a century ago, when it acknowledged the need for comity between state and

federal authorities with respect to managing defendants who are subject to both state

and federal criminal prosecution and sentences.  See Ponzi v. Fessenden, 258 U.S.

254, 259, 42 S.Ct. 309, 66 L. Ed. 607 (1922).  In Ponzi, the Supreme Court stated the

general rule that the first sovereign to arrest a defendant obtains primary jurisdiction

over him against other sovereigns.  Id at 260 ("The chief rule which preserves our

two systems of courts from active conflict of jurisdiction is that the court which first

takes the subject matter of the litigation into its control, whether a person or

property, must be permitted to exhaust its remedy, to attain which it assumed into its

control, before the other court shall attempt to take it for its purpose.")  Nevertheless,

the sovereign with primary jurisdiction could consent to the defendant's transfer to

another sovereign for trial or other proceedings.  Id at 261.  Such a decision is vested

"solely to the discretion of the sovereignty making it, "acting through its

representatives with power to grant it."  Id. 260.

A federal court of habeas corpus ad prosequendum serves the presence for trial

of a criminal defendant who is held in a state's custody.  United States v. Mauro, 426

U.S. 340, 357-58, 98 S.Ct. 1834, 56 L. Ed. 2d 329 (1978); see also 28 U.S.C.

§2241(c)(5) ("The writ of habeas corpus shall not extend to a prisoner unless...[i]t is

necessary to bring him into court to testify or for trial.")  Primary jurisdiction by a

sovereign is not relinquished if it transfers a prisoner in custody to another sovereign pursuant to a writ of habeas corpus ad prosequendum to answer charges in the jurisdiction. Id. at 44.  Under such circumstances, the prisoner is deemed to be "on loan."  United States v. Evans, 159 F.3d 908, 912 (4th Cir. 1998); Thomas v. Brewer, 923 F.2d 1361, 1367 (9th Cir. 1991); Crawford v. Jackson, 589 F.2d 693, 695, 191 U.S. App. D.C. 170 (D.C. Cir. 1978).  "[T]he term 'primary jurisdiction' in this context refers to the determination of priority of custody and service of sentence between state and federal sovereigns."  "A lack of 'primary jurisdiction' does not mean that sovereign does not have a jurisdiction over a defendant.  It simply means that the sovereign lacks priority of jurisdiction for purposes of trial, sentencing, and incarceration." Id.

Thus, a prisoner is not entitled to have his federal sentence commence immediately upon sentencing in federal court if he has been held pursuant to a writ prior to sentencing, until the federal government has legal custody of a defendant, meaning the primary jurisdiction necessary to enforce the federal sentence.  See, e.g. Elwell v. Fisher, 716 F.3d 477, 481 (8th Cir. 2013) (Pursuant to the doctrine of primary jurisdiction, service of a federal sentence generally commences when the United States takes primary jurisdiction and a prisoner is presented to serve his federal sentence, not when the United States merely takes physical custody of a prisoner who is subject to another sovereign's primary jurisdiction.")  United States v. Evans, 159 F.3d 908, 911-12 (4th Cir. 1998) (same).

Although "custody" can mean mere physical possession or control of a person, it may also refer to lawful authority over a person.  See Black's Law Dictionary, pg. 441 (9th ed. 2009) (defining "constructive custody" as "[c]ustody of a person [such as a parolee or probationer] whose freedom is controlled by legal authority but who is not under direct physical control.")  Webster's Third New International Dictionary, pg. 559 (2002) ("[C]ontrol of a thing or person with such actual or construction possession as fulfills the purpose of law or duty requiring it.")  Courts long have

interpreted "custody" in the context of section 3585 and its predecessors as referring to the federal government's control over a prisoner when it has both physical custody and primary jurisdiction necessary to enforce the federal sentence.

Having determined that a federal sentence commences only when the federal government has physical possession and primary jurisdiction over the defendant, one must next determine when the federal government obtains such primary jurisdiction. It is well established that if a sovereign takes a defendant into its custody before another sovereign has done so, then the arresting sovereign established its primary jurisdiction and may give effect to its sentence before other sovereigns may do so. Thomas v. Brewer, 923 F.2d 1361, 1365 (9th Cir. 1991).  A sovereign's priority terminates when the sentence expires, charges are dismissed, or the prisoner is allowed to go free.  See Elwell, 716 F.3d at 481; Taylor, 164 F.3d at 445; cf. Strand v. Schmittroth, 251 F.2d 590, 599 (9th Cir. 1957) (en banc) ("When a defendant or a parolee or a probationer is released from actual physical custody, even for temporary purposes, he may be arrested, tried and convicted by any other such sovereign in the territory in which he may be without the consent of the first sovereign, which may have a judgment against him as yet unsatisfied or which may be seeking to try him."); see United States v. Warren, 610 F.2d 680, 684-94 (9th Cir. 1980) ("[t]he sovereign with priority of jurisdiction, here [the State of California], may elect under the doctrine of comity to relinquish it to another sovereign."  Id. at 685; see also United States v. Cole, 416 F.3d 894 (8th Cir. 2005) ("Primary jurisdiction continues until the first sovereign relinquishes its priority in some way."); In Re Liberatore, 574 F.2d 78 (2nd Cir. 1978) (Once "jurisdiction has attached to a person or thing, it is -- *unless there is some provision to the contrary* -- exclusive in effect until it has wrought its function." (emphasis added); Albori v. United States, 67 F.2d 4, 7 (9th cir. 1933) ("[A] mere telephone call from the Marshal change[d] the custody of the prisoner").  And while in many cases the election to relinquish jurisdiction is a "discretionary function," ibid., in the case of Mr. Harris it was mandatory under

operation of law.  Specifically, California Penal Code §669(a) requires that "whenever a person is committed to prison on a life sentence (indeterminate term) that is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment *shall be served first...*" Id. (emphasis added).

In 1987, Mr. Harris was first arrested by the State of California and in 1988 found guilty of violating state laws.  As the first sovereign, with priority of jurisdiction, the State of California fixed the punishment for his offenses at a 3-year (36-month) term, to be served consecutively to a twenty-five-to-life sentence.  Under California law, the 36-month sentence is a "determinate" term, and the 25-year-to-life sentence is an indeterminate term.  See People v. Felix, 22 Cal 4th 657 [94 Cal. Rptr. 2d 54, 995 F.2d 186] (2000).  California Penal Code §669(a) required that a determinate sentence shall be served before an indeterminate life sentence.  See People v. Sewell, 20 Cal. 3d 639, 642 (1978) (quoting Cal. Penal Code 669; and analyzing its application); People v. Rodriguez, 207 Cal. App. 4th 204, 217, 143, Cal. Rptr. 3d 178 (2012) ("When the defendant is sentenced to determinate and indeterminate terms, the determinate term is served first.")

In 1988, after being convicted and sentenced by the State of California, Mr. Harris was loaned to the federal government [the second sovereign], via a writ of habeas corpus ad prosequendum, to face federal drug charges.  After being found guilty of violating federal law, Mr. Harris was sentenced by the District Court on November 26, 1990 to a term of imprisonment of 235 months, to be served consecutive to the determinate state sentence Mr. Harris was "presently serving." Under federal law, the 235-month sentence was another "determinate term," thus triggering California Penal Code §669(a).

Under California law, a sentence of life (indeterminate), even if imposed first, is interrupted by the need to serve a subsequently imposed determinate sentence. See California Penal Code section 669(a) ("...the determinate term of imprisonment shall be served first.")  See also People v. Grimble, 116 Cal. App. 3d 678, 684-85,

[172 Cal. Rptr. 362] (1981) ("Whenever a person is sentenced to prison on a life sentence and any other term of imprisonment for a felony conviction, and the sentences are to run consecutively, the sentence must provide that the determinate term of imprisonment shall be served first and that the life sentence shall be consecutive to that determinate term, and not vice versa.")

The Effect of California Penal Code §669(a).

In determining the meaning of a statute, [the Court looks] first to its text."  In Re Kelly, 841 F.2d 908, 912 (9th Cir. 1986).  The central task is to ascertain and give effect to the intent of the General Assembly.  The language at issue must be read in the context of the statute as a whole and the context of the entire statutory scheme.  Id.  California Penal Code §669(a) provides as follows:

"When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which the sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively...  Whenever a person is committed to prison on a life term sentence (indeterminate sentence) which is ordered to run consecutively to any determinate term of imprisonment, shall be served first and no part thereof shall be credited toward the person's eligibility for parole."

The plural use of the words "different proceedings or courts" indicates an intent to include any different proceedings or court, state or federal. cf. Collector v. Hubbard, 79 U.S. 1, 10, 20 L. Ed.2d 272 (1870) ("any Court" means state or federal court.)  The use of the term "any determinate sentence" indicates an intention to include state as well as federal sentences.  See United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L. Ed.2d 132 (1997) ("any other term of imprisonment" means state or federal.).  The use of the word "shall," indicates an intent to impose a discretionless obligation that "the determinate term of imprisonment [] be served

128

first."  Id.  §669(a); please also cf. <u>Federal Express Corp. v. Holowecki</u>, 552, U.S. 389, 400, 128 S.Ct. 1147, 170 L. Ed.2d 10 (2008) ("Congress' use of the term 'shall' indicates an intent to impose discretionless obligations.")  The grammatical structure of this statute makes clear that California [as First Sovereign] automatically (under comity and operation of law) relinquished primary jurisdiction and legal custody of Mr. Harris to federal authorities [the Second Sovereign] upon the expiration of his determinate state sentence, to allow Mr. Harris to *first serve uninterrupted* his determinate federal sentence, prior to serving his indeterminate life sentence.  Thus, when Mr. Harris' 36-month determinate state sentence expired on January 27, 1991, his 235-month federal determinate sentence officially commenced.  And the Marshals, whose duty is to obey, enforce, and execute the District court's order, were required by law to deliver Mr. Harris into the custody of the Attorney General of the United States (CAG) to allow Mr. Harris to serve his federal sentence uninterrupted, and then upon completion, return him to the State of California to serve the remaining term of his life sentence.

Under the "dual sovereignty" doctrine, a criminal defendant owes a debt to two (or more) separate sovereigns, each of which may expect payment independently of the other.  See, e.g., <u>Heath v. Alabama</u>, 474 U.S. 82, 88-93, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); <u>Jackson v. Brennan</u>, 924 F.2d 725, 729 (7th Cir. 1991).  This doctrine has been invoked as authority to allow the state and federal governments to separately prosecute and punish an individual.  The dual sovereignty doctrine often has been cited as justification for the BOP's refusal to give inmates credit against their federal sentences for time served in a state prison.  In some situations, that analysis is correct.  See <u>United States v. Labeill-Soto</u>, 163 F.3d 93, 99 (2nd Cir. 1998) ([A] defendant has no right to credit on his federal sentence for time that has been credited against his prior state sentence.")  However, in a rare and unique situation, such as Mr. Harris', the dual sovereignty doctrine leads to opposite results. See <u>Kiendra</u>, 763 F.2d at 72-72 (Sentence began to run from date federal authorities

1  wrongly refused to accept inmate into federal custody despite tender by state

2  officials.)  "The dual sovereign doctrine is not a one-sided rule that only operates

3  adversely to a criminal defendant, but is neutral.  Just as the dual sovereignty

4  doctrine acknowledges and protects the rights of each sovereign to exact as much

5  punishment for a crime as that sovereign desires, the doctrine also acknowledges and

6  protects the rights of each sovereign."  See Cozine, 15 F.Supp.2d at 1010.

7       The concepts of federalism and comity "represent...a system in which there is

8  sensitivity to the legitimate interests of both State and National Governments, and in

9  which the National Government, anxious though it may be to vindicate and protect

10  federal rights and federal interests, always endeavors to do so in ways that will not

11  unduly interfere with the legitimate activities of the states."  Comity signifies "a

12  proper respect for state functions."  Younger v. Harris, 401 U.S. 37, 44, 27 L.Ed.2d

13  669, 91 S.Ct. 746 (1971).

14       Under the dual sovereignty doctrine, the District court was legally entitled to

15  order a federal determinate sentence to be served consecutive to the state determinate

16  sentence Mr. Harris was "presently serving."  The Marshals, however, as mere

17  ministerial agents, had no legal right to force Mr. Harris, in violation of the District

18  Court's order and California law, to first serve his indeterminate state sentence, prior

19  to his service of the federal sentence.  "Comity demands that federal officials

20  acknowledge, and give effect to," California Penal Code §669(a).  See Cozine, 15

21  F.Supp.2d at 1011.  Once Mr. Harris' determinate state sentence expired on January

22  27, 1991, California, by operation of its own law, automatically relinquished primary

23  jurisdiction of Mr. Harris to the United States to commence service of his

24  consecutive federal sentence, to be served first, prior to commencing the service of

25  his consecutive indeterminate state sentence.

26       Federal authorities were lawfully obliged to either transfer Mr. Harris to a

27  federal facility to commence service of his federal sentence, or designate the state

28  prison as the place of service for his federal sentence.  Id. 1011-12.  Because they

130

failed to do either, and lacked a lawful basis for their failure, the effect of the Marshals' improper execution of the District Court's order violated the doctrines of comity, denying respect to the laws of a "dual sovereign" [California], and illegally interrupted the lawful service of Mr. Harris' federal sentence by twenty years.

While it is true that "one sovereign [California] cannot order how another sovereign [the United States] is to compute its sentence or order it served," there is a flip-side to this coin. Federal authorities cannot ignore, set aside, or fail to give effect to how the State of California relinquishes primary jurisdiction of one of its prisoners committed to its custody on a life sentence, nor are they at liberty to demand that California execute the life sentence, before commencement of the federal sentence, if that result violates California's statutory "indeterminate" sentencing scheme and Mr. Harris' state-created rights. See 28 U.S.C. §1738 (discussing "full faith and credit" doctrine). "The forbearance which courts of coordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between state courts and those of the United States, it is something more it is a principle of right and of law, and therefore, of necessity. It leaves nothing to discretion or mere convenience." Ponzi v. Fessender, 258 U.S. 254-260-61, 42 S.Ct. 309, 55 L. Ed.2d 607 (1922). This position is further bolstered by the District Court's order that Mr. Harris' determinate federal sentence be served consecutive to the determinate state sentence defendant was "presently serving." Thus, the District Court's intent that Mr. Harris was to serve consecutive state and federal sentences was in complete concordance with the legislative policy for the State of California. See California Penal Code §669(a) ("...the determinate terms shall be served first and no part thereof shall be credited toward the person's eligibility for parole").

1    Since primary jurisdiction was automatically relinquished to the federal

2    government upon the expiration of Mr. Harris' determinate state sentence on January

3    27, 1991, that date is when Mr. Harris' federal sentence officially commenced.  See

4    Schleining v. Thomas, 642 F.3d 1242, 1243 (9th Cir. 2011).  Between January 1991

5    and 2011, Mr. Harris was transferred out of the custody of the state and taken into

6    the physical and legal custody of the Marshals, serving an approximate total of two

7    years and eight months of unaccredited time in federal custody.  Each transfer

8    provided the Marshals another opportunity to obey, enforce, and execute the District

9    Court's order, but every time the Marshals instead chose to improperly transfer Mr.

10   Harris back into state custody and lodge another detainer with the state.  The

11   Marshals clearly erred, on multiple occasions, by failing to transfer Mr. Harris into

12   the custody of the Attorney General of the United States (CAG), to commence

13   service of his federal sentence, until after Mr. Harris paroled from his life sentence in

14   2011.  The Marshals, either due to extreme neglect or deliberate indifference, failed

15   for more than twenty years to execute the District Court's 1990 Judgment And

16   Commitment Order.  The Marshals are mere ministerial officers who do not have the

17   discretionary power to determine when time is appropriate for service of a prisoner's

18   service.  Green v. Christiansen, 732 F.2d 1397, 1399-1400 (9th Cir. 1978)  The

19   repeated failure to properly execute Mr. Harris' federal sentence for over twenty

20   years constituted gross negligence on the part of the federal authorities.  See Shelton

21   v. Ciccone, 578 F.2d 1241 8th Cir. 1978).  It was never the duty, nor responsibility,

22   of Mr. Harris to execute his federal sentence; that duty and responsibility lay with the

23   United States Marshals Service, who by law, are tasked with the non-discretionary

24   duty to obey, enforce, and execute a District Court's order.  Accordingly, the blame

25   for this error rests squarely at the door of the federal officials and cannot be charged

26   up against Mr. Harris.

27   A prisoner has some rights.  A sentence of 235 months means a continuous

28   sentence, unless interrupted by escape, violation of parole, or some fault of the

132

1 prisoner, and he cannot be required to serve it in installments.  In cases involving

2 interruption due to no fault of the prisoner, most courts have held that the sentence is

3 deemed to have continued to run because the prisoner has a right to serve a

4 continuous, uninterrupted sentence.  See White v. Pearlman, 42 F.2d 788, 789 (10th

5 Cir. 1930); accord Green v. Christiansen, 732 F.2d 1317, 1400 (9th Cir. 1984);

6 United States v. Mazzoni, 677 F.Supp. 339, 341-42 (E.D. Pa. 1987).  In fact in White

7 it was ruled:

8      "It is settled that a person, duly convicted of a criminal offense and upon

9 whom a sentence of imprisonment is imposed, has a right to serve that sentence

10 promptly and continuously, and he cannot be required to serve his sentence in

11 installments...  It is our conclusion that where a prisoner is discharged from a penal

12 institution, without any contributing fault on his part, and without violations of

13 conditions of parole, that his sentence continues to run while he is at liberty.  Lanier

14 v. Williams, 361 F.Supp. 944, 947-48 (E.D.N.C. 1973) (Butler, Ch. J.).  But see

15 Dunne v. Keohane, 14 F.3d 335, 336-37 (7th Cir.) (recognizing the continued vitality

16 of the common law rule favoring continuous sentences, but distinguishing Mr.

17 Dunne's situation because a lack of relief there would not postpone "the date at

18 which the prisoner's last sentence would expire (cert. denied, 511 U.S. 1149, 128 L.

19 Ed.2d 900,114 S.Ct. 2182 (1994).

20      The failure to transfer Mr. Harris to the Bureau of Prisons, by the Marshals,

21 does not involve the prisoner's fault and an interruption of Mr. Harris' federal

22 sentence is not mandated by statute.  The failure by the Marshals to transfer Mr.

23 Harris is analogous to the inadvertent prisoner release cases:

24      "Under the doctrine of credit for time at liberty, a convicted person is entitled

25 to credit against his sentence for the time he was erroneously at liberty provided

26 there is a showing of simple or mere negligence on behalf of the government and

27 provided the delay in execution of sentence was through no fault of his own."

28 United States v. Martinez, 837 F.2d 861, 865 (9th Cir. 1988)."

The rule against piecemeal incarceration precludes the government from artificially extending the expiration date of a prison sentence.  Surely if a prisoner can be credited with time spent at liberty due to custodial mistakes, a prisoner can be credited for time spent in custody due to custodial mistake.

There is a strong similarity between the problems in Mr. Harris' situation and the problems discussed by the Circuit Court of Appeals for the Ninth Circuit in the case of Albori v. United States, 67 F.2d 4 and Smith v. Swope, 91 F.2d 260.  The same problem was discussed by the Georgia District Court in McPike v. Zerbst, 21 F.Supp 961.  In those cases, the Marshal failed to execute the judgment of the sentences until such times as the defendants had completed service of sentences imposed by the state courts.  In condemning the practice, Judge Denman, in Smith v. Swope, supra [91 F.2d 262], used this language:

> The least to which a prisoner is entitled is the execution of the sentence of the court to whose judgment he is duly subject.  If a ministerial officer, such as a Marshal, charged with the duty to execute the court's orders, fails to carry out such orders, that failure cannot be charged up against the prisoner.  The prisoner is entitled to serve his time promptly if such is the judgment imposed, and he must be deemed to be serving it from the date he is ordered to serve it and is in the custody of the Marshal under the commitment, if, without his fault, the Marshal neglects to place him in the proper custody.  Any other holding would give the Marshal, a ministerial officer, power more arbitrary and capricious than any known to law.  A prisoner sentenced for one year might thus be required to wait forty under the shadow of his unserved sentence before it pleases the Marshal to incarcerate him.  Such

134

1   authority is not even granted to courts of justice, let alone

2   their ministerial officers.  Id. F.2d at 262.

3   Accord In Re Jennings, 118 F. 479, 482 (C.C.E.D. Mo. 1902) ("No ministerial

4   officer, by disobeying the mandate of the court, and unlawfully surrendering [the

5   defendant] into another custody than that where he rightfully belonged, could

6   suspend the running of [a] sentence...")

7   The Smith court credited the defendant's federal sentence with the entire time

8   served in state prison because the U.S. Marshal did not execute the federal

9   commitment order.  In Mr. Harris' case, the District Court sentencing order stated

10  that:

11  IT IS HEREBY ADJUDGED: The defendant is committed

12  to the custody of the Bureau of Prisons for an

13  imprisonment terms of 235 months...  This term shall run

14  consecutively to the state prison sentence the defendant is

15  presently serving.

16  The District Court's order explicitly sets forth the time at which the Marshals

17  shall commit Mr. Harris into the Custody of the Attorney General of the United

18  States (CAG), thus the court's intent is clear beyond dispute.  The delivery of Mr.

19  Harris into the custody of his federal sentence was to be made at the expiration of the

20  36-month determinate state sentence Mr. Harris was "presently serving" when his

21  federal sentence was imposed.  The federal court was fully aware Mr. Harris had two

22  separate undischarged state sentences to serve and the court contemplated that its

23  sentence would commence immediately upon the expiration of the first state

24  sentence.  In effect, the Marshals' failure to take Mr. Harris into custody not only

25  violated state law, but also failed to obey, enforce, and execute the order of the

26  federal District Court.  A federal Marshal lacks such power.

27  The question is whether Mr. Harris should receive the credit in question even

28  though he was not placed in federal prison.  As was stated by the court in McIntosh

135

1  v. Looney, 249 F.2d 62, 64 (10th Cir. 1957), cert. denied, 355 U.S. 935, 2 L. Ed.2d

2  417, 78 S.Ct. 418 (1958):

3           We are in accord with appellants' academic premise that a

4           prisoner cannot be charged with a detriment attributable to

5           the misfeasance or nonfeasance of the United States

6           Marshal in executing or failing to execute an order of the

7           federal court" [citation omitted].

8        There, the court found no failure to execute the court's order.  Here, there is no

9  question that the federal District Court ordered the sentence to begin at the expiration

10  of Mr. Harris' 36-month determinate state sentence on January 27, 1991, and the

11  Marshals failed to obey, enforce, and execute that order.

12        The Court should not allow the Marshals Service and the Bureau of Prisons to

13  simply say "Oops, our bad," and wipe clean a slate on which more than 29 years

14  have been written.  This conclusion is supported by other circuits who have held that

15  the errors of ministerial officers were not allowed to be charged against the prisoner.

16  See Kiendra v. Hadden, 763 F.2d 69, 73 (2nd Cir. 1985); United States v. Croft, 450

17  F.2d 1094, 1098 (6th Cir. 1971); Smith v. Swope, 91 F.2d 260, 262 (9th Cir. 1937)

18  ("The prisoner is entitled to serve his time promptly if...the Marshal neglects to place

19  him in the proper custody.")

20        In conclusion, by the U.S. Marshals not taking Mr. Harris into federal custody,

21  they thereby extended the duration of his incarceration by twenty years.  Mr. Harris

22  was entitled to credit against his federal sentence for that period of time during

23  which he had been in federal custody, but for the Bureau of Prisons wrongfully

24  refusing to accept California's automatic tender of Mr. Harris, per California Penal

25  Code §669(a).  California cannot directly compel another jurisdiction which is not

26  bound by California law to accept the transfer of a prisoner.

27

28

*J.      The Drug Quantity Determination that Drove Mr. Harris' Lengthy Federal*
*Sentence is Subject to Re-Assessment Due to Appeals Court Determinations*
*Subsequent to the Original PSR and Other Factors*

Mr. Harris' lengthy sentence is a direct result of drug quantities attributed to him.  Not through actual evidence being presented, but rather through attribution to him of the full 2,776 kilograms, as a result of his being characterized initially as a "supervisee" of the Villabona-Bennett organization.  However, in 1995, the Ninth Circuit vacated Villabona's and Bennett's 21 U.S.C. §848 Continuing Criminal Enterprise ("CCE") convictions.  It did so on grounds that there was insufficient evidence to support §848's requirements that Villabona and Bennett each supervised five criminally culpable individuals.  Notably, the government conceded in their appeal brief that Mr. Harris, as a matter of law, was not a supervisee.[8]

According to both the government and the Ninth Circuit, Mr. Harris' relationship with the Villabona-Bennett group was properly characterized as a buyer-seller relationship:

"This Court recently held that a seller of cocaine, who does not exercise any control over a customer, does not organize, supervise, or manage that customer. United States v. Delgado, 4 F.3d 780, 785086 (9th cir. 1993) (two-member majority opinion) (Hall, J. concurring.)  The government acknowledges that the Delgado opinion indicates Harris was not a "supervisee" for CCE purposes.  (See Appellee's Brief, Page 48, Footnote 36.)

This issue turned out to be pivotal, and was the reason that the §848 convictions of Villabona and Bennett were overturned, their life sentences vacated, and both men are now out of prison.

It was a *per se* rule of federal law at the time of defendant Harris's trial "that a mere buyer-seller relationship, without more, would be insufficient to establish that

---

[8] See Nos. 90-50686 and 90-50692, Appellee's Brief in U.S. v. Brian Bennett and Michael Harris, Page 48, Footnote 36.

[Villabona or Bennett] held some managerial role with respect to [Harris]."  United
States v. Apocada, 843 F.2d 421, 426 (10th Cir. 1988).  The inclusion of Mr. Harris'
name among each list of supervisees for the purpose of Count 27 and Count 28 was
not lawful, Apocada, 843 F.2d at 426; Barona, 56 F.3d at 1098, and the presentation
of such a misleading argument to the jury was extremely harmful.  The jury was not
instructed that defendant, "as a matter of law, [was] incapable of being counted as a
supervisee," but "the jury needed to be instructed of this."  Barona, 56 F.3d at 1097.
A trier of fact could have relied on the same facts and principles to find "the buyer-
seller rule" applicable with respect to Count One (the conspiracy charge).

Absent a finding of guilt with respect to Count One, the sentencing proceeding
would have been substantially different.  The government relied exclusively on the
amount charged in the conspiracy to determine Mr. Harris' base offense level.
Without a finding of guilt as to Count One, the government would have been
required to prove the amount of drugs attributable to Mr. Harris based on actual,
reliable proof.  Absent the conspiracy, the only evidence presented in the PSR as to
the actual amount attributable to Mr. Harris is 11.5 kilograms of cocaine.  (See 1990
PSR ¶70.)  Under these facts, there are compelling reasons to recalibrate the offense
level to the amount actually proven against this defendant (i.e. the 11.5 kilograms
discussed by telephone on December 10, 1987).

In Mr. Harris' case, the PSR called for a base "offense level of 36."  The
justification for level 36 was that "Count 1 [of the indictment] alleges some 2,776
kilograms of cocaine." Id.  The government neither proved any evidence nor set forth
any "sufficient indicia of reliability to support [the PSR's] probable accuracy."
United States v. Garcia-Sanchez, 187 F.2d 1143, 1149 (9th Cir. 1999).  In fact, the
record sheds no light on how or to whom Mr. Harris distributed the drugs he
presumably purchased, or intended to purchase, from Villabona and/or Bennett.
There was no indication as to the frequency of the sales, the quantity of drugs
involved (outside of "the 11.5 kilogram deal" mentioned at Page 12, ¶70 of the 1990

PSR), the level of trust between lead defendant Villabona and Mr. Harris, including the length of time during which sales were ongoing, whether the transactions were standardized, whether the parties advised each other on the conduct of the other's business, whether Mr. Harris assisted Villabona by looking for other customers, whether Mr. Harris had a "stake" in the drugs sold by Villabona to other distributors, whether Mr. Harris had any knowledge of the extent or inner details of the Villabona-Bennett enterprise, or whether the parties agreed to warn each other of potential threats from competitors or law enforcement.  See United States v. Moe, 781 F.3d 1120, 1125-96 (9th Cir. 2015).  In sum, there was only one concrete fact the record resolutely reflected: that Mr. Harris "discussed" purchasing a large quantity of cocaine from Villabona ("11.5 kilograms") on one occasion.  Even though a large quantity of narcotics "permits an inference of conspiracy," it does not "by itself" provide sufficient indicia of reliability to attribute to Mr. Harris the entire amount of cocaine that the supply organization, for whom he was one among many customers, was found to have distributed.  United States v. Howard, 996 F.2d 1362, 1354 (10th Cir. 1992).[9]

**K.**     *The Government's Improper Plea Bargain Negotiations Tactics Violated DOJ Policy and Precipitated Mr. Harris Going to Trial for which He is Serving a 235-Month Sentence*

Beginning in 1983 and continuing until 1988, Mario Villabona and Brian Bennett were the leaders of a global conspiracy that imported thousands of pounds of cocaine into the United States.  Beginning in 1987, a DEA drug and money laundering task force began an investigation into the Villabona-Bennett organization.

---

[9] See also United States v. Ameline, 376 F.3d 967 (9th Cir. 2004).  Unless a defendant admits facts as part of his guilty plea or at sentencing, or waives his right to a jury, juries, not judges, will make the material factual finding for sentencing purposes, and they will do so by employing a higher standard of proof.  Also, Alleyne v. United States, 570 U.S. 99, 108 (2013): "Any fact, by law, that increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt.  It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."

139

During the course of this investigation, the DEA identified several active members of the Villabona-Bennett drug conspiracy who were involved in day-to-day operations.

Mr. Harris' direct involvement in the Villabona-Bennett drug activity is summarized in the 1990 PSR, which indicates that Mr. Harris participated in a December 1987 phone call to set up a transaction involving 11.5 kilograms of cocaine.  (PSR ¶70.)

When Mr. Harris was indicted with his thirteen other co-defendants, he instructed his attorney to immediately enter into plea negotiations with the government as Mr. Harris was ready to accept responsibility for his participation in the drug conspiracy.

The government, however, used a prohibited and unjust plea negotiation tactic with Mr. Harris' attorney.  Doing so forced Mr. Harris into a trial which precipitated the 235-month consecutive sentence he is serving today.  Use of that tactic, though, would never be condoned or permitted today.

In particular, the government refused to allow Mr. Harris an opportunity to accept responsibility and plead guilty, unless Mr. Harris agreed to cooperate with the government, provide testimony against his co-defendants, and agree to the indictment as it was written.  Most of Mr. Harris' co-defendants were allowed to plead guilty without being required to cooperate with the government.  Co-defendants Jimmy Washington, David Paz, Jairo Sanchez, Miguel Rodriguez, Joseph Gough, and Michael Robinson were allowed to plead guilty prior to trial and were given sentences ranging from 108 to 120 months.

Every single person involved in the conspiracy has been released from prison for nearly a decade, including the two leaders of the organization, Bennett and Villabona.  If Mr. Harris would have been allowed to plead guilty prior to trial, as he attempted to do, he may also have been sentenced to between 108 and 120 months and he could have received a concurrent sentence to his undischarged state commitment as opposed to it being run consecutive, and he would be a free man

140

1  today.  This is another "extraordinary and compelling reason," which, in combination

2  with the other factors detailed herein, warrants this Court reducing Mr. Harris' 235-

3  month consecutive sentence to time served.

4  L.      *Mr. Harris' Jury was Provided with Improper Jury Instructions*

5          From 1983 until 1988, the Villabona-Bennett criminal organization was

6  responsible for the importation of thousands of kilograms of cocaine into the United

7  States and the money laundering of millions of dollars.  In 1987, a single phone

8  conversation between Villabona and Mr. Harris, regarding the purchase of 11.5

9  kilograms of cocaine, was recorded by DEA agents via a wiretap.  Though there

10  were discussions of cocaine deliveries to a persons named Mike, there were three

11  active members or associates of the organization with the name of Mike.

12          Mr. Harris has always maintained that he never was a member of the

13  Villabona-Bennett conspiracy, but merely was a customer who bought drugs from

14  Villabona to supply his own distribution network.  The factual information provided

15  by the Probation Office in the original PSR clearly states Mr. Harris was "separate"

16  and "apart" from the Villabona-Bennett Enterprise (PSR ¶109), further supporting

17  that his role in relation to the conspiracy was that of "buyer" from members of the

18  conspiracy, who collectively were "sellers."

19          But when Mr. Harris was indicted and forced to go to trial, because he refused

20  to provide substantial cooperation to the government, the jury was provided with an

21  improper jury instruction insinuating that Mr. Harris, as a "supervisee" of Villabona

22  and Bennett, was part of the larger conspiracy involving his co-defendants.  This

23  allowed the jury to convict Mr. Harris under the Pinkerton Theory of Liability for the

24  substantive crimes committed by his co-defendants.

25          All of the defendants were found guilty in 1990.  Villabona and Bennett were

26  each sentenced to life without parole, based on their convictions for being the

27  principal organizer/administrators of the Continuing Criminal Enterprise ("CCE")

28

141

1 (Counts 27-28) in charge of five or more participants.  Mr. Harris was improperly

2 listed as one of those participants, within the definitions of 21 U.S.C. §848(b).

3    In 1994, Villabona and Bennett appealed their CCE convictions. (See United

4 States v. Barona, 56 F.3d 1087, 1096-98 (9th Cir., 1995))  One of their contentions

5 was that Mr. Harris was not a "supervisee" for the purposes of a CCE conviction.  In

6 fact, in the Appellant's Brief, filed on June 16, 1994, the government conceded that

7 Mr. Harris was not a "supervisee," but rather that his relationship was that of a buyer.

8 (See Appellant's Brief, Page 48, Footnote 36.)

9    This issue turned out to be pivotal, and was the reason the §848 convictions of

10 Villabona and Bennett were overturned, their life sentences vacated, and both men

11 now are out of prison.  The Ninth Circuit held in Barona:

12    Among the list of supervisees, which the government

13    conceded, was at least one person who could not legally

14    qualify as a supervisee under United States v. Delgado, 4

15    F.3d 780, 785 (9th Cir., 1993) (Delgado).  Delgado

16    establishes that "selling [drugs] to people does not make

17    one an organizer of customers, even wholesale customers,

18    any more than buying from them makes one an organizer

19    of suppliers.  Id. at 786.

20    It was a *per se* rule of federal law at the time of Mr. Harris' trial "that a mere

21 buyer-seller relationship, without more, would be insufficient to establish that

22 [Villabona or Bennett] held some managerial role with respect to [Harris]," United

23 States v. Apocada, 843 F.2d 421, 426 (10th Cir. 1988).  The inclusion of Mr. Harris'

24 name among a list of supervisees was not lawful (Apocada, 843 F.2d at 426; Barona,

25 56 F.3d at 1098), and the presentation of such a misleading argument to the jury was

26 extremely prejudicial.  The jury was not instructed that Mr. Harris, "as a matter of

27 law [was] incapable of counting as [a] supervisee," but "the jury needed to be

28 instructed of this." Barona, 56 F.3d at 1097.

142

1   There can be no doubt that absent a proper jury instruction, Mr. Harris' trial

2   was compromised, as a trier of fact reasonably could have relied on those same facts

3   and principles to find "the buyer-seller role" applicable with respect to Count One

4   (the conspiracy charge).  Absent a finding of guilt to Count One, the sentencing

5   proceeding would have been substantially different.  This is another "extraordinary

6   and compelling reason" for this Court to reduce Mr. Harris' sentence today.

7   *M.*   *The Sentencing Court Erred by Not Addressing Mr. Harris' Objection to the*

8   *Factual Inaccuracies Concerning the Offense Level Role Adjustment at*

9   *Sentencing*

10  Mr. Harris always has maintained that he was an arms-length customer of the

11  Villabona-Bennett enterprise and not a part of their larger distribution conspiracy.

12  According to the information provided by the U.S. Attorney's Office and DEA

13  agents, the following information was introduced into the PSR as facts:

14  1)   The five defendants arrested in Detroit did not qualify as minor or

15  minimal participants.  (PSR ¶108.)

16  2)   The most culpable were its leaders Villabona and Bennett, followed by

17  Barona and Martinez.  (PSR ¶109.)

18  3)  Mr. Harris operated his own distribution ring, which was "separate" and

19  "apart" from the Villabona-Bennett enterprise.  (PSR ¶109.)

20  Based upon the factual information that Mr. Harris either was a customer of

21  the conspiracy or a minor participant in a larger conspiracy, there should have been a

22  2-level role adjustment as described in U.S.S.G. §3B1.2, dropping his offense level

23  from 36 to 34.  The Probation Office, however, concluded Mr. Harris did not have a

24  minor role as described in §3B1.2, thus no adjustment was applicable.  (PSR ¶116.)

25  In both Mr. Harris' sentencing memorandum (GER 56-59) and at his sentencing

26  hearing (GER 128-131), Mr. Harris made his objections known to the Government,

27  to the Probation Office, and to the Court.

28

The burden of making objections to the PSR is on the defendant. But once a defendant challenges the accuracy of any matter contained in the PSR, the District Court must, at the time of sentencing, make findings or determinations required by Fed. R. Crim. Rule 32(c)(3)(D), including allowing the government a chance to respond, and explain why the court is accepting or rejecting those arguments, or that the disputed matter will not affect the sentence. Rule 32(c)(3)(D) states:

> If a criminal defendant alleges a factual inaccuracy in the presentence report, the sentencing court is required either to make a finding as to the accuracy of the challenged factual proposition or to indicate that the court is not taking it into consideration." Fed. R. Crim. P. 32(c)(3)(D); United States v. Edwards, 800 F.2d 878, 808-81 (9th Cir. 1986). [There must be strict compliance with the rule, otherwise a remand is necessary and required].

A review of the sentencing transcript makes plain the sentencing court never addressed Mr. Harris' objections, even to dismiss them in shorthand. The sentencing judge's total omission goes plainly against the "strict compliance" of Rule 32. This is another "extraordinary and compelling reason" for this Court to consider reducing Mr. Harris' sentence.

N.    *Continuation of Mr. Harris' Sentence Would Precipitate a Circumstance of Unwarranted Sentencing Disparity*

This court may also consider as "extraordinary and compelling" the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). In 1988, thirteen defendants were indicted in a drug conspiracy. Of those thirteen defendants, seven were allowed to plead guilty and have been out of prison for over two decades. In 1990, the six other defendants proceeded to trial and all were found guilty. Mario Villabona and Brian Bennett, who each received a 4-level upward adjustment for

being the ringleaders of the conspiracy, were originally sentenced to life without parole on counts 27-28 (being the principal organizer/administrators of an §848(b) CCE involving five or more participants), to be followed by 365 months on counts 1-5, 7-8, 12-16, 17, 19-26.  In 1995, their §848 CCE convictions were overturned by the Ninth Circuit and they were subsequently resentenced to a term of 290 months. Both were released from prison nearly a decade ago.

Three of the remaining defendants who were found guilty at trial (Maria Barona, Luz Janeth Martinez, and Michael McCarver) were all released from prison nearly a decade and a half ago.  Thirty-two years after thirteen co-defendants were sentenced to prison, twelve are now free and only Mr. Harris remains behind bars.  It is grossly disproportionate that Mr. Harris, who was sentenced to a nineteen year term in 1990, and who was the only defendant the Probation Office found "separate" and "apart" from the criminal organization, thirty-two years later is the only defendant who still remains in prison.

This is yet another "extraordinary and compelling reason" for the court to consider, which, combined with the other factors detailed herein, justifies a reduction of Mr. Harris' sentence.

O.    *The COVID-19 Coronavirus Could Prove Deadly for Mr. Harris Duet to His Guillain-Barré Syndrome*

1.    Why Mr. Harris' Documented Health Condition of Guillain-Barré Syndrome Magnifies His Risk of Contracting and Dying From the COVID-19 Coronavirus

A final but urgent "extraordinary and compelling reason" for this Court to consider is the current COVID-19 coronavirus pandemic which has affected the entire world and has prompted the President to declare a National State of Emergency and poses a grave risk in Mr. Harris' housing unit at Lompoc FCI Prison due to its crowded environment and impossibility to do social distancing.

It has been well-documented that the COVID-19 coronavirus is fatal in extraordinarily high numbers for vulnerable, health-compromised older persons who contract the disease.  On March 29, 2020, an inmate at FCI Oakdale became the first BOP-reported COVID-19 death.  As of April 24, 2020, the BOP announced that 76 inmates and 23 correctional officer had contracted the disease at the Lompoc federal prison complex where Mr. Harris is housed.  For at least a month, the BOP has been operating under emergency conditions and has ordered a complete nationwide lockdown of all federal prisons.

A review of Mr. Harris' medical records shows he was diagnosed with Guillain-Barré Syndrome ("GBS") in February, 1996 while serving time at Lancaster State Prison.  He was diagnosed after falling down a flight of stairs.  After his fall, Mr. Harris was immediately rushed to Medical where he was first diagnosed with GBS.  With the onset of Guillain-Barré, he was taken to San Joaquin Hospital in Bakersfield, California, where he was hospitalized, suffering an extreme bout of paralysis which engulfed his entire body.  He was kept in intensive care for six weeks.  The paralysis, which began at his feet and progressively moved up his body, stopped just short of his lungs.  His doctor told him that had it continued into his lungs, he could have very well died.  (See Medical Records, Exhibit U.)

Guillain-Barré Syndrome is an auto-immune disorder wherein the body's immune system attacks itself.  There is no known cure for Mr. Harris's condition.  The syndrome damages parts of nerves.  The nerve damage causes tingling, muscle weakness, and paralysis.  Most often it affects the nerve's covering (myelin sheath).  Such damage is called demyelination and causes nerve signals to move more slowly.  Damage to other parts of the nerve can cause the nerve to stop working altogether.

When the condition is triggered in any way, the patient will need to go to the hospital for treatment, which may include artificial breathing support.  Clearly, Mr. Harris, under CDC guidelines, fits the criteria for prisoners who are most vulnerable to COVID-19 coronavirus.  If he were to contract COVID-19 while in prison, he

1  would be at grave risk.  While much about this disease remains unknown, it is well-

2  established that older persons with auto immune illnesses are among those at greatest

3  risk.

4      Mr. Harris' Bureau of Prisons Health Services "Health Problems" records

5  reflect that he has been diagnosed with GBS, and its effects have shown up in

6  various ways over the years.  For instance, his record indicates that in the past while

7  in BOP custody, he has been diagnosed with peripheral neuropathy, unspecified;

8  Glaucoma, unspecified; hypertension; joint pain -- all of which are consistent with

9  the effects of GBS.  (See BOP Health Services Records, Exhibit V.)  In addition, Mr.

10 Harris has had to be very careful with his balance since falling down the stairs, to

11 guard against falling, which occurred in his housing unit recently.

12     With a damaged immune system, Mr. Harris is highly susceptible both to

13 contracting and to succumbing to the COVID-19 coronavirus if it is introduced into

14 his dorm.  The Centers for Disease Control ("CDC") consider the most vulnerable to

15 include people with a condition that affects their lungs, heart, kidneys, immune

16 system or who have another serious chronic medical condition.  The immune system

17 vulnerability describes Mr. Harris' situation.  When Mr. Harris first contracted

18 Guillain-Barré Syndrome 24 years ago, he was a 34 year old strong and robust man

19 and he was able to fight off death.  In the intervening years, GBS has chipped away

20 at his health.  Simply put, if he is infected with COVID-19 coronavirus, he probably

21 will not survive.

22     This COVID-19 pandemic is so serious, and the concern for the safety of

23 vulnerable federal inmates and prison staff (and through them, the community-at-

24 large) so great, that when Congress passed the CARES Act on March 27, 2020, they

25 specifically included a provision (Section 12003(b)(2)) to address the need to reduce

26 the elderly and medically vulnerable inmate population, by releasing those inmates

27 to home confinement.  On April 3, 2020, Attorney General Barr ordered the

28

147

immediate release to home confinement of such vulnerable inmates.  To date, Mr. Harris has not been considered for release.

2.   Mr. Harris' Ability to Avoid Contracting and Dying From the COVID-19 Coronavirus is Made Impossible By the Overcrowding in His Housing Unit at Lompoc FCI Prison, His Inability to Maintain Social Distancing in That Prison Setting, and the Continual Coming And Going of 15 to 30 Prison Staff In and Out of His Housing Unit Each Day Without Masks or Any Other Protective Gear, Place Mr. Harris Squarely in the Path of the Contagion

The Lompoc Prison Complex consists of four separate institutions totaling approximately 2761 inmates, as of DOJ statistics from late March, 2020.  Lompoc U.S. Penitentiary, a medium-security prison, confines approximately 974 prisoners. Lompoc Federal Correctional Institution ("FCI"), confines approximately 1,278 inmates.  Two of the lowest-security "camps" confine the remaining approximately 519 prisoners in the Lompoc complex.

Correctional Officers ("c.o.'s"), nurses, and all other Bureau of Prison ("BOP") staff travel repeatedly back and forth between the outside world and into the confines of the Lompoc Prison Complex, into various FCI housing units, including Mr. Harris's housing unit.  In his housing unit, which is an unheated warehouse-style building holding approximately 235 other prisoners, there are six large fans which blow the interior air in every direction.

Staff has told inmates, including Mr. Harris, that upon entering the prison compound, they are screened for COVID-19.  Staff say the screening process consists of having their temperature checked for fever and being asked if they feel ill. No blood, nasal or throat swabs are taken for testing.  Once they pass the cursory screening, they then are issued a flexible plastic bracelet that identifies clearance, and they enter the complex to work.

148

The screening process that the BOP implemented is inadequate because, as the CDC has reported, studies have shown that up to 25% of persons infected with COVID-19 virus do not exhibit fever or any other symptoms.  Even those with the virus can be both asymptomatic and contagious for the first few days before symptoms appear.  Without the ability to consistently test rather than merely verbally screen incoming prison staff for COVID-19, the BOP is ill-equipped and unable to provide and maintain proper safety measures either for its staff and especially for inmates, including Mr. Harris.

Visitors to see inmates at the prison last were permitted inside the prison on March 8, 2020.  Yet, on March 30, 2020, reporters confirmed the Lompoc prison complex was struck with multiple confirmed cases of the virus.  The prison cluster of cases represented over ten percent of the cases in the county in which the prison is located, Santa Barbara County.  With prison employees not wearing protective gear, such employees represent a danger to local outside communities in which they live, such as Santa Maria, Pismo Beach, Morro Bay, Lompoc, Solvang, Santa Ynez, and other surrounding communities.

Given the living conditions, the skimpy testing procedures, the lack of social distancing, the asymptomatic character of the virus in some infected persons, and the lack of protection between staff and inmates, there are probably many more infected inmates in the Lompoc prison complex than current statistics indicate.  With a two to three week gap from the last day the prison hosted visitors for inmates and the first reported case of infection at Lompoc prison, it is logical to conclude the BOP staff, despite the cursory screening, has introduced the COVID-19 virus into the prison, imperiling inmates, other staff members and, through the other staff, jeopardizing the community-at-large.

As this is being written, the Lompoc prison complex is the second most infected prison in the federal prison system, as measured by the number of cases of inmates and staff who have tested positive for COVID-19, as reported on the BOP

web site.  The flawed process the BOP is following at the Lompoc prison complex unfairly imposes the deadly COVID-19 coronavirus on Mr. Harris and other inmates, especially those older and health-compromised inmates, such as Mr. Harris.  The high risk of death for Mr. Harris if he catches the virus is a Fifth Amendment due process constitutional violation.

3. <u>Specific Conditions in Mr. Harris' Dormitory are Exactly What the COVID-19 Coronavirus Needs to Spread Rapidly and Infect All Inmates in the Dormitory</u>

Lompoc FCI is the low-security institution within the Lompoc prison complex.  It is comprised of four main housing units.  Mr. Harris is housed in "J" unit.  The building housing J-Unit is literally a warehouse, with a high ceiling and concrete floor.  The interior air is unheated, even in winter when the outside temperature is below freezing.  There are six extra-large fans which blow the unheated interior air in all directions.  Mr. Harris' bunk is located approximately twenty feet from one of the fans.  The doors to the unit are locked at night.  The few narrow windows do not open to let in fresh air.

The unit houses approximately 235 inmates in uncomfortably tight quarters, similar to housing on a Naval vessel.  The prisoners sleep on bunk beds which are only three to four feet apart.  There are eight rows of such bunk beds, each row having 15 or 16 bunks.  The telephones for prisoner use are on a wall, about three feet from each other.  Similarly, six computers also are located approximately three feet apart.

It simply is not possible to achieve the social distancing recommended by the CDC, from the Emergency Declaration of the President, and other federal guidelines for avoiding COVID-19 infection.

Prisoners in federal low security prisons, such as Lompoc FCI, are split, some housed in dorm-style facilities and some in cells.  J-Unit is one such dorm style unit.  This dorm environment creates a much greater risk for inmates of contracting and

1   spreading viruses.   In the past, the flu and variants of the common cold, which often

2   are other versions of coronavirus have spread rapidly once introduced to J-dorm.

3          Prisoners in J-dorm sleep in bunk beds.  There are two inmates approximately

4   three to four feet from Mr. Harris on one side of his bunk, and two other inmates on

5   the other side.  There are two sets of bathrooms, one at either end of J-dorm, with

6   sinks approximately two feet apart and urinals three feet apart.  Telephones and

7   computers also are three feet apart.  The idea of social distancing in such a setting is

8   not realistic or feasible.

9          COVID-19 is spread through people being too close to other people.  They do

10  not need to touch.  The virus, like the corona viruses which cause the common cold,

11  can be spread simply by the infected person breathing and a person in the vicinity

12  breathing in a virus particle from the breath of the infected person.  Coughing and

13  sneezing is not necessary for spread of the virus.  With the large fans in J-dorm, an

14  infected prisoner theoretically can infect dozens of other prisoners.  Also, an infected

15  person in the bathroom can leave behind contaminated water residue on a sink from

16  which infection can spread to anyone who touches that water and then touches his

17  face, clothing, toothbrush, etc.

18          4.    The Response of the Bureau of Prisons

19          The prison dormitory environment is unsafe.  Attorney General Barr, in his

20  March 26, 2020 memorandum described dormitories such as Mr. Harris's dormitory

21  as a "Petri Dish."  At Lompoc FCI, inmates who are ill and displaying symptoms are

22  being sent to the medium security institution within the complex for quarantine

23  rather than being transferred to a hospital.  They are being kept there indefinitely

24  rather than being returned back to the FCI from which they were sent.  It is common

25  belief within the FCI that they are being kept in the Segregated Housing Unit (SHU),

26  which normally is used as a form of punishment for infractions of prison rules.

27          Several inmates have sent requests to the acting warden to be evaluated to see

28  if they can be selected to be released for home confinement.  Inmates who inquire

151

1  have been told it is unlikely the acting warden will respond any time soon due to the

2  emergency lockdown the prison is under.  They have been told that at the moment

3  the prison does not have an actual warden, but rather an "acting warden" and that

4  normally the warden would not respond to those types of requests, but rather have

5  subordinates respond.  With those people possibly sick or reassigned to correctional

6  officer status during this emergency, prisoners who ask should not expect a response

7  anytime soon.

8       All upper branches of the prison administration have been crippled due to the

9  lockdown circumstances.  Although officially the lockdown is for fourteen days,

10  several officers have suggested it will be a 21-day or 30-day lockdown.  Both

11  inmates and staff are unclear about what is really going on.  During the week ending

12  April 4, 2020, those staff willing to come to work were on mandatory double shifts.

13  The Attorney General has urged the BOP to release eligible non-violent qualified

14  inmates who file a request for release.  Therefore, there is no staff for inmates to

15  submit to or receive a response from.  Even if administrative offices were fully

16  staffed at Lompoc, under normal conditions administrative remedies can take several

17  weeks or even months.  With the COVID-19 already inside the prison, those

18  remedies are impossible to obtain in a timely manner.

19       One reasonably can assume that the situation in federal prisons is one reason

20  why Attorney General Barr in his April 3, 2020 memo to the BOP wrote: "...now that

21  I have exercised my authority under the CARES act, your review should include all

22  at-risk inmates -- not only those who are previously eligible for transfer...  Given the

23  speed with which this disease has spread through the general public, it is clear that

24  *time is of the essence*.  Please implement this memorandum as quickly as possible..."

25  (Emphasis provided.)  The problem is, as mentioned above, there is no staff

26  available.

27

28

5.      Conditions at the Lompoc Prison Complex Create a "Perfect Circle of Contamination and Infection" Between the Prison and the Outside Community, Exacerbating the Infection Rate for Both

On April 6, 2020, the Surgeon General of the United States said that 25% to 50% of COVID-19 coronavirus cases are asymptomatic but also contagious before the infected person begins to show symptoms.  He recommended that all persons wear masks.  Yet, in spite of the Surgeon General's recommendation, in Mr. Harris' dormitory, as of April 6, 2020, the wearing of masks by the C.O.'s has been optional, and only approximately 10% have worn them.  This creates an extremely dangerous environment for Mr. Harris and others who meet the CDC definition of vulnerability.

As mentioned earlier, the COVID-19 coronavirus undoubtedly was introduced to Lompoc prison inmates by way of one or more staff members coming to work from the outside community.  Once the virus was inside the prison, inmates undoubtedly have passed the virus both to other inmates and to staff.  Those staff members, once infected, not only place other inmates and staff at risk, but also their loved ones, friends and the outside community.  Thus, the Lompoc prison complex, including the FCI where Mr. Harris is located, is a key link in the "perfect circle" of contamination and infection by the COVID-19 virus. In a very real sense, the outside community is as much at risk as the inmates and staff.

6.      Attorney General Barr has Recognized the Need for the BOP to Release Vulnerable Prisoners Immediately

Realizing how impossible it is for the BOP to effectively fight the COVID-19 coronavirus, Attorney General Barr on April 3, 2020, ordered the BOP "to move with dispatch and using home confinement...to move vulnerable inmates out of...institutions [at risk]."  He said, "The CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons.  I hereby make that finding and direct that...you give priority in

153

1  implementing these new standards to the most vulnerable inmates at the most
2  affected facilities..."

3       Attorney General Barr's memo continued, "While BOP has taken extensive
4  precautions to prevent COVID-19 from entering its facilities and affecting our
5  inmates, these precautions...have not been perfectly successful at all institutions."
6  With that said, the Lompoc prison complex is one of the most affected facilities in
7  the entire federal prison system.

8       7.   Eighth Amendment Protects Inmates Against Future Harm to Health
9       Risks

10       In this court's recent ruling on March 27, 2020, your honor stated and quoted
11  the following: "That the Eighth Amendment protects against future harm to inmates
12  is not a novel proposition." Helling, 509 U.S. at 33.  The Supreme Court clearly
13  states that "...the Eighth Amendment protects [prisoners] against significantly
14  imminent dangers as well as current, unnecessary infliction of pain and suffering..."
15  Helling, 509 U.S. at 33.  Indeed, the Court concluded that where prisoners in
16  punitive isolation were crowded into cells and some of them had infectious maladies,
17  "...the Eighth Amendment required a remedy, even though it was not alleged that the
18  likely harm would occur immediately and even though the possible infection might
19  not affect all of those exposed." Helling, 509 U.S. at 33.

20       "The Eighth Amendment is violated when a condition of a criminal detainee's
21  confinement puts him at substantial risk of suffering serious harm and that the
22  condition causes suffering inconsistent with contemporary standards of human
23  decency.  See Smith v. Wash., 781 F. Appx. 595, 597-598 (9th Cir. 2019)."

24       "The Supreme Court has acknowledged that it has '...great difficulty agreeing
25  that prison authorities may not be deliberately indifferent to an inmate's current
26  health problems but may ignore a condition of confinement that is sure or very likely
27  to cause serious illness and needless suffering the next week or month or year.'
28  Helling, 509 U.S. at 33."

In conclusion, based on Mr. Harris' condition and the BOP's inability to follow the CDC's recommendation for keeping vulnerable prisoners safe from the COVID-19 virus via social distancing and other life-saving procedures, Mr. Harris' condition constitutes an overwhelmingly extraordinary and compelling reason for sentence reduction to time served/immediate release.

VIII.

EMERGENCY COMPASSIONATE RELEASE: INCREASINGLY DISTRICT COURT JUDGES ARE EXERCISING THEIR ENHANCED DISCRETIONARY AUTHORITY THROUGH "COMPASSIONATE RELEASE" (AS AMENDED BY THE FIRST STEP ACT OF 2018) AND §3582(c)(1)(A) TO PROVIDE RELIEF FOR FEDERAL DEFENDANTS BY REDUCING THEIR SENTENCES FOR EXTRAORDINARY AND COMPELLING REASONS

More and more judges across our nation are utilizing their discretionary power to provide relief to defendants with meritorious extraordinary and compelling claims.

One of the most important reforms of the First Step Act gave people the right to go to federal court and ask a judge to grant compassionate release if the Bureau of Prisons either denies a request or does not answer a request within 30 days.

Just to highlight a few of the District Court Judges who have answered the call in extraordinary and remarkable ways:

District Court Judge Marina Garcia Marmolejo resentenced Conrado Cantu to time served.  See United States v. Cantu, No. 1:05-CR-458-1, 2019 WL 2498923 (S.D.Tex. June 17, 2019).  Judge Marmolejo did so after finding that Cantu presented "extraordinary and compelling reasons" for a sentence reduction under the compassionate release statute contained in 18 U.S.C. §3582 (c)(1)(A).

Importantly, Judge Marmolejo held that criteria contained in the sentencing guidelines for compassionate release was inconsistent with the changes that Congress made to the compassionate release statue in The First Step Act.  Because of that conflict, she concluded:

Thus, the correct interpretation of 3582(c)(1)(A) -- based on the text, statutory history and structure, and consideration of Congress's ability to override any of the commission's policy statements 'at any time', <u>Mistretta v. United States</u>, 488 U.S. 361, 394 (1989) -- is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. §1B1.13 cmt.n.1(A)-(c) warrant granting relief.

Nothing in the statutory text of §3582(c), nor the Sentencing Guidelines, precludes a District Court from making its own determination of what are "extraordinary and compelling" circumstances warranting a reduction of sentence. Congress intended for compassionate release to act as a second look provision in 1984, when it enacted the compassionate release provision while at the same time abolishing parole. The problem was that Congress handed over the triggering mechanism to the Director of the Bureau of Prisons, which gave the Director the power to set the criteria no matter what the U.S. Sentencing Commission said. Congress fixed that problem in The First Step Act, by allowing federal judges to have the authority to reduce sentences even if the BOP director finds that extraordinary and compelling reasons aren't present. And the criteria in U.S.S.G. §1B1.13 cmt.n.1(D) is inconsistent with these Congressional changes and thus is no longer binding on federal judges.

Another judge also recently found that the criteria for compassionate release contained in the U.S. Sentencing Guidelines is inconsistent with the statutory changes made by The First Step Act. Recently, District Court Judge Sim Lake reduced Arturo Cantu-Rivera's prior sentence of two concurrent life sentences to time served.

Judge Lake based the sentence reduction on two grounds.  The judge first found that Cantu-Rivera met the age-related criteria under the guidelines. But more importantly, Judge Lake found U.S.S.G. §1B1.13 cmt.n.(1)(D) was inconsistent with the statutory changes made by Congress through the First Step Act.  See Page 3, n.1 ("Because the current version of the guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect.").

Another opinion finds Statutory Reform among "Extraordinary and Compelling Reasons" for reducing sentences under 3582(c)(1)(a).  In United States v. Maumau, (No.208-cr-00758-TC-11) (D. Utah, Feb 18 2020), U.S. District Judge Tena Campbell provided an extended, thoughtful review of recent compassionate release jurisprudence and the changes to §3582(c)(1)(A) brought by the First Step Act.

As background, Defendant Maumau was sentenced to 57 years in prison for Racketeering Conspiracy, Hobbs Act Robbery, and Assault with a Dangerous Weapon. The sentence was later reduced to 55 years following an appeal.  Now, after having served approximately ten years in prison, Maumau filed a motion to reduce his sentence under 18 U.S.C. §3582(c)(1)(A).

Here are some excerpts from the opinion that helps highlight its importance:

> This Court joins the majority of other district courts that have addressed this issue in concluding that it has the discretion to provide Mr. Maumau with relief, even if his situation does not directly fall within the Sentencing Commission's current policy statement.  Under the First Step Act, Congress eliminated the consecutive stacking previously required for violations of 924(c) [which had led to a 55-year sentence for the defendant for crimes committed at age 20]...  When considered together, the court is inclined to find that Mr. Maumau's age, length of

sentence imposed, and the fact that he would not receive the same sentence if the crime occurred today, all represent extraordinary and compelling grounds to reduce his sentence.

The United States points out in its opposition that Mr. Maumau's request is unlike the vast majority of compassionate release requests because he is not suffering from any medical- or age-related physical limitations. But the fact that such cases are uncommon does not mean that Mr. Maumau's request must be denied. First, the lack of such cases is, at least arguably, part of what spurred Congress to pass the First Step Act...  Finally, and perhaps most importantly here, at least one district court has modified a sentence based solely on the First Step Act's changes to 924(c) sentencing...  Like the Urkevich court, this court concludes that the changes in how 924(c) sentences are calculated is a compelling and extraordinary reason to provide relief on the facts present here.

The United States objects to this conclusion because, it notes, Congress could have made its changes to 924(c) retroactive but it chose not to do so.  See Brown, 2019 WL 4942051 at *5.  While this is a relevant consideration, it ultimately has little bearing on the court's conclusion.  It is not unreasonable for Congress to conclude that not all defendants convicted of 924(c) should receive new sentences, even while expanding the power of the courts to relieve some defendants of those sentences on a case-by-

1   case basis.  As just noted, that is precisely the approach

2   taken by the Urkevich court.

3   Based on the above, the court concludes that a combination

4   of factors, Mr. Maumau's young age at the time of the

5   sentence, the incredible length of mandatory sentence

6   imposed, and the fact that, if sentenced today, he would

7   not be subject to such a long term of imprisonment,

8   establish an extraordinary and compelling reason to reduce

9   Mr. Maumau's sentence...

10   Regarding what type of sentence to impose, Mr. Maumau

11   "urge[s] the court to...hav[e] him brought to the district,

12   where he can be interviewed by probation and perhaps

13   have an opportunity to address the Court."  (Def's Reply at

14   1 (ECF No.1744).)  The Court agrees that this is the best

15   way for the Court to determine an appropriate sentence

16   modification.

17   Accordingly, the Court sets this matter for hearing at 2:00

18   p.m. on April 7th. At that time, Mr. Maumau and the

19   United States will be permitted to present their arguments

20   regarding what would be an appropriate sentence for Mr.

21   Maumau in light of the above factors.  The Court further

22   orders Mr. Maumau, in advance of the resentencing

23   hearing, to meet with the Probation Office, and for the

24   Probation Office to prepare a new Presentence Report that

25   addresses Mr. Maumau's character, his danger to the

26   public, his likelihood of rehabilitation or recidivism, the

27   type of sentence he likely would have received had he been

28

159

1   charged and convicted after the First Step Act had been

2   passed, and any other relevant considerations."

3       In <u>United States v. Tran</u>, 8:08-cr-197-DOC, Dkt. No. 405 (C.D. Cal. Apr. 10,

4   2020), U.S. District Court Judge David O. Carter in the Central District of California

5   granted immediate release on April 10, 2020 to Defendant Vo Duong Tran.  The

6   parallels between Tran and Michael Harris are notable.  Like Mr. Harris, Mr. Tran

7   had been convicted of a serious offense (in Tran's case, conspiracy to commit a

8   robbery affecting interstate commerce, in violation of 18 U.S.C. §1951(a) ("the

9   Hobbs Act"); interstate travel and acquisition of a firearm with intent to commit a

10  robbery, in violation of 18 U.S.C. §924(g); possession of firearms in furtherance of a

11  "crime of violence," namely, the Hobbs Act robbery conspiracy charged in Count

12  One and the §924(g) offense charged in Count Two; and possession of a machine

13  gun, in violation of 18 U.S.C. §922(o)(1).

14      Defendant Tran is currently age 52, six years younger than Mr. Harris.  Like

15  Mr. Harris, Defendant Tran has suffered from a respiratory condition for many years

16  (asthma in Tran's case, Guillain-Barré Syndrome in Mr. Harris') which leaves him

17  particularly susceptible to harm from COVID-19.  And like Mr. Harris, who is at FCI

18  Lompoc, Tran was at FCI Oakdale, both among the hardest-hit BOP facilities where

19  the virus is raging out of control and inmate deaths at both places have occurred.  In

20  his written decision explaining why he was granting the order, Judge Carter stated:

21      The Court is persuaded that Defendant presents an

22      extraordinary and compelling reason for compassionate

23      release and that such release is consistent with applicable

24      policy considerations.  The Court is aware of the current

25      global health crisis caused by COVID-19.  The President

26      has declared a National Emergency, and states and

27      localities across the nation have implemented measures to

28      stymie the spread of the novel coronavirus. And while the

160

Court is aware of the measures taken by the BOP, news reports of the virus's spread in detention centers within the United States and beyond our borders demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection. See, e.g., Danielle Ivory, "We Are Not a Hospital: A Prison Braces for the Coronavirus," N.Y. Times (March 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (citing densely populated living conditions, dearth of soap, hand sanitizer, and protective gear, and impossibility of maintaining safe distance between inmates and guards as reasons prisoners are at particular risk of infection).

Indeed, at the prison Defendant is housed, six individuals have died after testing positive for the virus and at least 56 other inmates and staff have tested positive.  See COVID-19, Fed. Bureau of Prisons (April 10, 2020), https://www.bop.gov/coronavirus/.  In this case, Defendant has been diagnosed with a serious medical condition that, according to reports from the Center for Disease Control, make him particularly vulnerable to severe illness from COVID-19.  See People Who Are at Higher Risk for Severe Illness, CDC (April 10, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.  Thus, the Court finds that Defendant has demonstrated an extraordinary and compelling reason for compassionate release.

Moreover, the Court is persuaded that the applicable §3553(a) factors support Defendant's request for compassionate release and that Defendant will not pose a threat to the community. While the Court acknowledges the seriousness of Defendant's offense, Defendant has already served the vast majority of his sentence and has a criminal history category of I. The length of Defendant's incarceration adequately expresses the seriousness of the offense, deters criminal conduct, and protects the public under §3553(a). Because of Defendant's serious medical condition and the length of time already served, the Court is persuaded that Defendant will not pose a threat to the community.

Pursuant to 18 U.S.C. §3582(c)(1)(A), the Court finds that extraordinary and compelling reasons warrant a reduction of Defendant's sentence, that Defendant does not pose a danger to any other person or the community, that the §3553(a) factors support a reduction, and that the reduction is consistent with currently applicable Sentencing Commission policy statements.

In another case decided four days later in the Western District of Washington, United States v. McPherson, Case No. 3:94-cr-5708, Dkt. No. 209 (W.D. Wash. Apr. 14, 2020), Hon. Robert J. Bryan granted the request for compassionate release of Defendant Eric Detrick McPherson. The defendant, age 57 (one year younger than Mr. Harris), had been sentenced in October of 1995 to 392 months (32.6 years in prison) for conspiracy to commit armed bank robbery; and two counts of using a firearm in connection with a crime of violence. The judge found that McPherson was not a danger to the safety of any other person or to the community as provided in

1  18 U.S.C. §3142(g); that he suffered from serious medical and physical conditions
2  which substantially diminished his ability to provide self-care within the
3  environment of a correctional facility and that he was at risk for COVID-19; and that
4  he had been rehabilitated during his incarceration.  Judge Bryan's written order states
5  in part:

6         While his physical condition and his rehabilitation are not
7         stand-alone justifications for a sentence reduction, those
8         reasons, in combination with the reasons set forth below,
9         militate toward a time served sentence reduction….
10        So we have here Mr. McPherson, sentenced to over 32
11        years in prison for what is now probably a 17-year crime.
12        His sentence was 15 years beyond what is now deemed a
13        fair penalty by our law, and he has already served 26 years
14        of that now clearly unfair sentence.  It is extraordinary that
15        a civilized society can allow this to happen to someone
16        who, by all accounts, has long since learned his lesson.
17        In spite of all indications being that Defendant is safe to be
18        at large, some may wonder if he is truly rehabilitated. The
19        Defendant is facing five years of supervised release –
20        limitations on his freedoms – during which he can be
21        quickly returned to custody if he shows signs of likely
22        recidivism.
23        Mr. McPherson presents an extraordinary and compelling
24        story that provides reasons for a sentence reduction, and
25        that compels this judge to grant him the relief he seeks.
26        Therefore, the Court finds that there are extraordinary and
27        compelling reasons warranting a reduction of Defendant's
28

163

custodial sentence to time served.  All other conditions in
his original sentence will remain as ordered.

IX.

CONCLUSION:  A REVIEW OF THE UNIQUE, EXTRAORDINARY AND
COMPELLING FACTUAL AND LEGAL GROUNDS MILITATES FOR
A REDUCTION OF MR. HARRIS' SENTENCE AND RELEASE FROM
CUSTODY UNDER THE AUTHORITY OF 18 U.S.C. §3582(c)(1)(A)

Mr. Harris was born into turbulent times.  He was raised by his mother, a
single parent, who instilled in him values that emphasized responsibility and hard
work.  By the age of thirteen, Mr. Harris already was contributing to his family's
finances.  As a youth, Mr. Harris had a passion for life and a connection to his
community.  In high school, Mr. Harris exhibited a talent for photography, music,
and film.  After graduating high school he entered community college to earn a
business degree.  Though Mr. Harris never completed college, he started several
legitimate businesses and had plans for creating his own entertainment company.
For twenty-three years Mr. Harris did the right thing; he never planned on selling
drugs, nor did he dream of coming to prison.  Unfortunately, Mr. Harris started to
"hustle on the streets" and one thing led to another.  What started out small earlier in
the 1980's had become large by 1988.

At a young age and lacking the proper guidance, Mr. Harris made the terrible
decision in those years to engage in criminal activity.  Every single day since then,
for the past thirty-two years, he has continued to pay the price for his youthful
mistakes.  Yet by every account, he is no longer the same person, with his attitude,
values and approach to life having undergone a complete metamorphosis.  An
assessment of the 18 U.S.C. §3553(a) factors, as they apply to Mr. Harris, yields a
strong and inescapable conclusion:  There is no longer any legitimate penological or
societal interest to be served by his continued incarceration.  Retribution has been
achieved, justice has been served, a stronger deterrent message has been imparted,

1  rehabilitation has succeeded, and all of the other objectives of incarceration have
2  most certainly been met.

3      Mr. Harris was remanded into custody on April 16, 1988 on state charges.  In
4  1990, Mr. Harris was sentenced by the U.S. District Court to serve a determinate
5  term of nineteen years, to run consecutive to an undischarged three-year determinate
6  state term he was "presently serving."  And yet, in 2020, three decades later, Mr.
7  Harris remains still imprisoned, with nearly a decade still to serve on his original
8  1990 federal sentence.  The 32 years of continuous incarceration that Mr. Harris
9  already has served have consumed over 85% of his adult life, and by any measure
10 represents a very substantial punishment that reflects the seriousness of his offenses
11 and the need for adequate deterrence.  Also, it is a period of time that amply
12 promotes respect for the law and provides just punishment for his crimes.

13     With respect to the need to avoid sentencing disparities, Mr. Harris' sentence
14 was disparate relative to his more culpable co-defendants, who have all years ago
15 been released from prison.  At age 58, Mr. Harris not only is statistically unlikely to
16 recidivate -- his 32 years in prison without a major disciplinary infraction, his
17 substantial and documented post-conviction rehabilitation, and the fact that he was
18 deemed suitable for release from a life sentence by the California State Parole Board
19 all provide this Court with clear and refutable evidence that he does not any longer
20 pose a danger to the safety of others or to the community.

21     Equally important to why Mr. Harris has served 32 years in prison is how Mr.
22 Harris chose to serve those years.  Mr. Harris has demonstrably grown, matured,
23 atoned, given back, and has a proven post-conviction record that simply is amazing.
24 He devoted years to participating in numerous rehabilitative programs to pursue a
25 journey of self-reflection and personal transformation.  He had a central role in
26 conceptualizing, developing and running a host of inmate rehabilitation programs
27 that have assisted thousands of other prisoners in transforming their own lives as
28 they prepare for a successful reentry.

Mr. Harris' exceptional post-conviction efforts are fully documented in numerous attached letters which verify his journey of redemption. Some of these letters come from volunteers, who have dedicated large portions of their lives to assisting inmates in their rehabilitation and reentry process back into their communities. Some are from prison officials, professionals tasked with assessing a prisoner's conduct and rehabilitation, all who strongly support Mr. Harris and recommend he be released. Some are from elected officials, law enforcement, and community leaders, who all believe Mr. Harris can leverage his unique experience to help stop the gang violence plaguing their communities. Some come from former prisoners, who have paroled and have become stable and productive members of their communities, each crediting Mr. Harris as a mentor and influential source of guidance and motivation. And some are from his family members, who desperately want Mr. Harris finally to return home, including from both his daughters, one, now 35, who was three years old when her father began his journey in prison, and another daughter, now in her twenties, who never has known her father as a free man.

Mr. Harris has provided clear and convincing evidence that his post-conviction rehabilitation is substantial and well-documented and he is an inmate whose case deserves a "second look" by this Court. But, when Congress passed the SRA in 1984, which included §3582(c)(1)(A), they stated that "[r]rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" warranting release. In his motion before this Court, Mr. Harris has included several other grounds which this Court should consider "extraordinary and compelling," thus warranting the relief he seeks.

First, when Mr. Harris was indicted by the federal grand jury, he instructed his attorney to inform the government that he was willing to accept responsibility and would plead guilty to his role in the charged criminal offense. The government, however, refused to allow Mr. Harris to plead guilty unless he provided Substantial Assistance against his co-defendants. Had Mr. Harris been allowed to enter into a

166

1   non-cooperation plea agreement, like six of his co-defendants who were actual

2   supervisees in the conspiracy, he would have received a significantly lower sentence

3   and like those co-defendants, would be a free man today.

4           Second, when Mr. Harris was brought to trial, he was charged as a co-

5   conspirator and supervisee of Mario Villabona and Brian Bennett.  Because of this

6   improper jury instruction, Mr. Harris was found guilty for the substantive acts of his

7   co-defendants who were active participants in the conspiracy, and not as a direct

8   result of his involvement as a customer of the conspiracy.  In 1995, Villabona's and

9   Bennet's §848 CCE/Kingpin convictions were overturned when the government

10  conceded that Mr. Harris was not a "supervisee" of the conspiracy, but merely a

11  buyer/seller.  Had the buyer/seller jury instruction been made available to Mr. Harris

12  during the trial, there is a reasonable probability that a different verdict would have

13  been reached for Mr. Harris, and like Mr. Villabona and Mr. Bennett, Mr. Harris

14  would be a free man today.

15          During the course of the investigation into the Villabona/Bennett conspiracy,

16  numerous drug weights were attributed to different individuals on various dates.  But

17  the only specific reference to a drug weight of 2,776 kilograms of cocaine is found in

18  the original Grand Jury transcript and was attributed to an intercepted phone call in

19  December, 1987 between Mario Villabona and Maria Barona discussing the overall

20  amount of cocaine they distributed during the preceding years.  Further, in Mr.

21  Harris' PSR, the Probation Office attributes the entire 2,776 kilograms of cocaine

22  specifically to Mario Villabona (see PSR, ¶70).  The only drug weight directly

23  attributed to Mr. Harris' own actions was an 11.5 kilogram cocaine deal, referenced

24  in an intercepted phone call between Mr. Harris and Mr. Villabona.

25          When the Probation Office determined Mr. Harris' base offense level for

26  sentencing, it incorrectly attributed the entire amount of cocaine (2,776 kilograms)

27  alleged in the whole conspiracy to Mr. Harris.  Since the Probation Office attributed

28  the same 2,776 kilograms of cocaine to Villabona, the leader of the conspiracy, as

167

they did to Mr. Harris, this calculation was not the result of an individualized drug quantity determination based upon Mr. Harris' own offense conduct, as required by the Sentencing Guidelines.  The District Court failed to determine the scope of Mr. Harris' agreement with his co-conspirators before sentencing him on the basis of all the conspiracy's sales during the period of his participation.

Unlike criminal liability for acts of co-conspirators [see U.S.S.G. §1B1.3 comment (n.1)], "the sentencing court may not rely simply upon the total amount involved in drug conspiracy, but must undertake an individualized evaluation of the amount for which [the defendant] is accountable under the Guidelines."  United States v. Newland, 116 F.3d 400, 405 (9th Cir. 1997).  See also United States v. Petty, 992 F .2d  8867, 890 (9th Cir. 1993) ("Under the Guidelines each conspirator...is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators.").

The reason for Mr. Harris' continued insistence to correct the factual record, by attributing only the amount of cocaine Mr. Harris was directly responsible for, is two-fold.  First, the correct amount of cocaine attributable to Mr. Harris would significantly reduce his federal sentence.  And second, it finally would correct the misperception that Mr. Harris was intimately involved in the Villabona conspiracy.

Mr. Harris is not attempting to mislead the Court into believing he was not involved in the drug trade; he was.  Mr. Harris is not denying that for a time he distributed drugs; he did.  Nor is Mr. Harris attempting to minimize the damage the drugs he distributed caused his community, which is undeniable.

What Mr. Harris is trying to convey to the Court is that his involvement, as it relates to the Villabona conspiracy for which he was indicted, was simply as a customer, who was directly identified on a single occasion attempting to purchase drugs from the Villabona organization.  Having the entire 2,776 kilograms of cocaine incorrectly attributed to him was highly prejudicial, and in the sentencing Court's

1  eyes simply reduced Mr. Harris' entire life to being a major drug dealer, completely

2  overlooking all of the positive and legitimate accomplishments Mr. Harris had

3  achieved in the first 23 years of his life.

4    Another factor for this Court to consider is the Rule 32 error committed by the

5  Sentencing Court when it failed to address Mr. Harris' request for a two-level minor

6  role adjustment.  Mr. Harris has consistently provided evidence that he was a

7  customer of the Villabona organization and never a member of the larger conspiracy.

8  The Probation Office, in Mr. Harris' PSR, specifically found Mr. Harris was

9  "separate" and "apart" from the Villabona enterprise (see PSR, ¶109).  In both his

10  sentencing memorandum (see GER at 56-57) and during sentencing (see GER at

11  128-131), Mr. Harris made his objections known to the government and the Court,

12  arguing that based on the facts, his offense level should be reduced from 36 to 34.  A

13  review of the sentencing transcript will show the plain error, when the Sentencing

14  Court never addressed Mr. Harris' objection, even to dismiss them in shorthand,

15  which plainly goes against the "strict compliance" of Rule 32.

16    Additionally, Mr. Harris' case is very unusual and unique which warrants a

17  "second look" because it involves the actual innocence of a man who served 23 years

18  of a life sentence in state prison, prior to the commencement of the 19-year federal

19  sentence he is currently serving.  The victim (and sole witness) in the state case

20  admitted in a series of sworn declarations and affidavits -- and also testified under

21  oath twice before the State Board of Parole Hearings -- that he had provided perjured

22  testimony to convict Mr. Harris.

23    It was based on the state crime, of which Mr. Harris actually is innocent, that

24  the Sentencing Court ordered Mr. Harris' federal sentence to run consecutive to the

25  undischarged determinate state sentence Mr. Harris was "presently serving."  If the

26  district court in 1990 had been aware that the only evidence used to convict Mr.

27  Harris of his state crime was derived from perjured testimony, it is more likely than

28  not that the federal court would have ordered Mr. Harris' federal sentence to run

1  concurrent to his undischarged state sentence and Mr. Harris would be a free man

2  today.

3       Another reason for the court to consider is the fact that due to extreme

4  negligence or deliberate indifference, the Marshals failed to execute the District

5  Court's 1990 sentencing order for over twenty years.  It is clear from the record that

6  the sentencing judge was aware Mr. Harris was serving two undischarged

7  consecutive state sentences.  When the District Court ordered Mr. Harris to serve a

8  235-month federal term of imprisonment, it was ordered to run consecutive to the

9  undischarged state sentence Mr. Harris was "presently serving," which was the first

10  of the two undischarged state sentences.

11       It was the sole responsibility of the Marshals to determine which undischarged

12  state sentence Mr. Harris was "presently serving" when the federal sentence was

13  imposed, and to determine the date that sentence expired.  Had the Marshals done

14  their due diligence when executing the District Court's sentencing order, they would

15  have become aware Mr. Harris was serving a three-year determinate sentence that

16  was set to expire on January 27, 1991.  Instead of delivering Mr. Harris into the

17  Custody of the Attorney General (CAG) in 1991 to commence serving his federal

18  sentence, the Marshals improperly left him in state custody until Mr. Harris paroled

19  from his second undischarged state sentence in 2011.  Due to the failure by the

20  Marshals to properly execute the District Court's order, Mr. Harris has been

21  unlawfully denied credit to his federal sentence, from January 28, 1991 when the 3-

22  year state term expired until the expiration of his federal sentence in 2008.  Had the

23  Marshals properly executed the District Court's order in 1991, Mr. Harris would be a

24  free man today.

25       A final "extraordinary and compelling" factor for this Court to consider is the

26  current COVID-19 pandemic which has affected the globe and has caused the

27  President to declare a National State of emergency.  It has been well documented that

28  the COVID-19 virus can be fatal to vulnerable persons who contract this disease.  On

170

March 29, 2020, an inmate at FCI Oakdale became the first BOP COVID-19 death; as of today's date at least 26 more Federal inmates are dead of this contagion, with scores of others hospitalized.  The BOP is now operating under emergency conditions and has ordered a complete nationwide lockdown of all federal prisons. As of April 26, 2020, over 800 inmates and 350 staff have tested positive.  Of those totals, 89 inmates and 27 staff have tested positive in Lompoc prison complex, which is where Mr. Harris is housed.

A review of Mr. Harris' medical records (see Exhibit U) will confirm that in February, 1996, he contracted and almost died from Guillain-Barré Syndrome (GBS) while in the California state prison system.  GBS is an incurable disease associated with a weakening of the breathing muscles that also severely compromises a person's immune system, thus making Mr. Harris highly susceptible to the COVID-19 virus if it is introduced into the dorm in which he is being housed.  This pandemic is so serious, and the concern for the safety of vulnerable federal inmates and prison staff so great, that when Congress passed the CARES Act on March 28, 2020, they specifically included a provision (§12003(b)(2)) to address the need to reduce the elderly and medically vulnerable inmate population by releasing those inmates to home confinement.

It is Mr. Harris' position, which is backed by a growing number of recent rulings by District Courts across the nation, that this Court has unfettered discretion when assessing a defendant's §3582(c)(1)(A) motion and determining whether "extraordinary and compelling reasons" exist to grant early release.  In Mr. Harris' motion, he has presented multiple reasons that the Court can consider, either individually or collectively as part of a "combination of factors," to reach the required threshold of "extraordinary and compelling reasons" warranting a reduction of sentence.

The overarching upward trajectory of Mr. Harris' exceptional post-conviction behavior, within both the state and federal systems, strongly militates for a

reassessment of Mr. Harris' sentence.  The sentencing considerations set forth in 18 U.S.C. §3553(a), along with the "extraordinary and compelling reasons" that have been provided to be assessed both individually and cumulatively, all warrant this Court to take a "second look" at Mr. Harris' case and provide the right relief for a deserving defendant by granting Mr. Harris a "second chance."

In reviewing the 18 U.S.C. §3553(a) factors, this Court may elect to invoke U.S.S.G. §5G1.3, Amendment 660, which allows the Court to resentence Mr. Harris under the present amended guideline provision which sets forth the following:

Concurrent or consecutive subsection (c) cases.  In circumstances not covered under subsection (a) or (b), subsection (c) applies.  Under this subsection, the court may impose a sentence concurrently, partially concurrently, or consecutively.  To achieve a reasonable punishment and avoid unwarranted disparity, the court should consider the factors set forth in 18 U.S.C. 3584 (referencing 18 U.S.C. 3553) and be cognizant of:

(a)     the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;

(b)      the time served on the undischarged sentence and the time likely to be served before release;

(c)     the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

(d)     any other circumstance relevant to the determination of an appropriate sentence for the instant offense."

The updated version of U.S.S.G. §5G1.3, as modified by Amendment 660, could under this Court's review of §3553(a)(5) remedy the U.S. Marshals' error of improperly executing Mr. Harris' federal sentence.

Providing Mr. Harris a reduction of his sentence today will be a statement of fairness and justice that will reflect this country's evolving criminal justice priorities.

Accordingly, and for all the foregoing reasons, Mr. Harris respectfully submits that this Court enter an order, pursuant to 18 U.S.C. §3582(c)(1)(A), as amended by the First Step Act of 2018, and reduce his 235-month federal sentence to time served.

Date:  April 27, 2020                    Respectfully submitted:


By      */s/Matthew J. Lombard*
         MATTHEW J. LOMBARD
         Law Offices of Matthew J. Lombard


By      */s/Bruce Zucker*
         BRUCE ZUCKER
         Ahrony, Graham & Zucker, LLP

         Attorneys for Defendant
         MICHAEL HARRIS